**David W. Elrod**
Texas State Bar No. 06591900
delrod@elrodtrial.com
**Worthy Walker**
Texas State Bar No. 24033308
wwalker@elrodtrial.com
**Elrod, PLLC**
500 N. Akard Street, Suite 3000
Dallas, Texas 75201
Telephone: (214) 855-5188
Facsimile: (214) 855-5183

and

**Paul B. George,** OSB No. 990090
georgep@lanepowell.com
**LANE POWELL PC**
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204-3158
Telephone:  503.778.2100
Facsimile:  503.778.2200

Attorneys for Defendant Gas Transmission Northwest
Corporation

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| PACIFICORP, an Oregon corporation,<br><br>        Plaintiff,<br><br>  v.<br><br>NORTHWEST PIPELINE GP, a Delaware Partnership, and GAS TRANSMISSION NORTHWEST CORPORATION, a California corporation,<br><br>        Defendants. | Case No. **3:10-CV-99-PK**<br><br><br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT GAS TRANSMISSION NORTHWEST CORPORATION'S MOTION FOR SANCTIONS FOR SPOLIATION** |

## TABLE OF CONTENTS

INTRODUCTION & SUMMARY ................................................................................................. 1

FACTS ............................................................................................................................................. 2

   1.   PacifiCorp destroyed, discarded and/or refurbished nearly all turbine components which form the basis for its claims in this case. ............................................................. 4

   2.   PacifiCorp failed to preserve gas and "oil" samples on which it relies. ............................. 7

   3.   Fuel gas scrubbers were sold for scrap long after litigation was anticipated..................... 8

   4.   PacifiCorp destroyed or discarded other physical evidence. ............................................ 10

ARGUMENT & AUTHORITIES ................................................................................................. 12

   1.   PacifiCorp had a duty to preserve evidence...................................................................... 12

   2.   The Court has inherent authority to issue sanctions for spoliation. .................................. 13

   3.   PacifiCorp's destruction and spoliation of evidence was willful, and dismissal is appropriate. ....................................................................................................................... 13

   4.   GTN is prejudiced by PacifiCorp's spoliation................................................................... 14

   5.   Photographs cannot remedy the prejudice of the destruction of evidence......................... 17

   6.   In the alternative, reference to the spoliated evidence must be excluded......................... 18

   7.   The Court should issue an adverse inference instruction must be issued concerning the discarded scrubbers. ...................................................................................................... 19

CONCLUSION .............................................................................................................................. 21

CERTIFICATE OF SERVICE ...................................................................................................... 22

i

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Akiona v. United States*,
  938 F.2d 158 (9th Cir. 1991) ........................................................................14

*Anheuser-Bush, Inc. v. Natural Beverage Distributors*,
  69 F.3d 337 (9th Cir. 1995) .........................................................................13

*BTO Logging, Inc. v. Deere & Co.*,
  174 F.R.D. 690 (D.Or. 1997) .............................................................17, 18, 19

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991) ......................................................................................13

*Glover v. BIC Corp.*,
  6 F.3d 1318 (9th Cir. 1993) .....................................................................13, 19

*Great N. Insurance Co. v. Power Cooling, Inc.*,
  2007 WL. 2687666 (E.D.N.Y. 2007) .......................................................15, 19

*Kronisch v. United States*,
  150 F.3d 112 (2d Cir. 1998) .........................................................................12

*Leon v. IDX System Corp.*,
  464 F.3d 951 (9th Cir. 2006) ...........................................................12, 13, 15, 18

*In re Napster, Inc. Copyright Litigation*,
  462 F. Supp. 2d 1060 (N.D. Cal. 2006) ...................................................19, 20

*Pirv v. Glock, Inc.*,
  2009 WL 54466 (D.Or. 2009) ......................................................................14

*Silvestri v. General Motors Corp.*,
  271 F.3d 583 (4th Cir. 2001) ..................................................................13, 18

*State Farm Fire and Casualty Co. v. Broan Manufacturing Co., Inc.*,
  523 F. Supp. 2d 992 (D. Ariz. 2007) ..........................................................17

*Uniguard Sec. Inc. Co. v. Lakewood Engineering & Manufacturing Corp.*,
  982 F.2d 363 (9th Cir. 1992) ...........................................................13, 14, 15, 19

*United States v. Kitsap Physicians Serv.*,
  314 F.3d 995 (9th Cir. 2002) .............................................................12, 13, 14

*United States v. Shaffer Equip. Co.*,
    11 F.3d 450 (4th Cir. 1993) ............................................................................................13

Defendant Gas Transmission Northwest Corporation ("GTN") files this Memorandum in Support of its Motion to for Sanctions for Spoliation.

Due to the spoliation issues that permeate this case, and PacifiCorp's gross failure to preserve relevant evidence, GTN respectfully requests that the Court issue sanctions based on its inherent authority to control the judicial process and to address conduct that abuses the judicial process.

## INTRODUCTION & SUMMARY

It has become readily apparent throughout the course of this litigation that PacifiCorp has failed to preserve key evidence relevant to its claims. PacifiCorp admits that it had anticipated litigation in this matter since at least August 2007. Yet, it failed to preserve nearly all of the physical evidence that would support – or could refute – its claims in this case. Indeed, PacifiCorp failed to instruct anyone to preserve evidence relating to damaged turbine components and even actively destroyed other relevant evidence such as fuel gas scrubbers.

The prejudice to GTN is clear: GTN is left defending against claims for which the most critical evidence no longer exists. While PacifiCorp is asking this Court (and ultimately the jury) to speculate about the cause of turbine component failures, the physical evidence of those alleged failures was willfully destroyed by PacifiCorp, and GTN is unable to fully develop alternative theories of cause and damage.

As explained more fully below, sanctions are appropriate to remedy this prejudice to GTN. The Court should dismiss all of PacifiCorp's claims that are premised on equipment damage and outages for which PacifiCorp failed to preserve physical evidence. In the alternative, the Court must issue exclusion sanctions against PacifiCorp and issue adverse inference instructions.

<u>FACTS</u>

As the Court is aware, PacifiCorp claims damages related to a set of alleged "outages" that occurred at the Hermiston Plant in 2007 and 2008.  PacifiCorp alleges that it should recover damages for (1) the capital costs associated with repairing, refurbishing and/or replacing turbine components, and (2) "lost net revenues" associated with those alleged outages.  As detailed more fully below, PacifiCorp failed to maintain or preserve any physical evidence relating to the outages or the alleged component failures associated with the great majority of the outages.

PacifiCorp represented to the Court that it anticipated litigation in the "fall of 2007, when PacifiCorp retained outside counsel…and sent demand letters to defendants." *See* Doc. #186, p. 8. Based on PacifiCorp's representations, this Court determined that PacifiCorp anticipated litigation as of August 2, 2007. Doc. #210, p. 5.  Accordingly, PacifiCorp should have – at a minimum – maintained all of the physical evidence of its alleged turbine failures since August of 2007. Yet, PacifiCorp has failed to maintain or preserve substantially all of the evidence relevant to its claims that existed before and after that date.

In this case, PacifiCorp claims that it suffered 13 "outages" that were caused by gas quality issues on the following dates:

| No. | Date & Unit | Notes |
|-----|-------------|-------|
| 1. | 8/29/07-8/29/07 (Unit 1) | PacifiCorp did not maintain <u>any</u> parts for inspection or analysis. |
| 2. | 9/8/07-9/10/07 (Unit 1) | PacifiCorp did not maintain <u>any</u> parts for inspection or analysis. |
| 3. | 10/05/07 – 10/08/07 (Unit 1) | PacifiCorp did not maintain <u>any</u> parts for inspection or analysis. |
| 4. | 10/16/07 – 10/17/07 (Unit 1) | PacifiCorp did not maintain <u>any</u> parts for inspection or analysis. |
| 5. | 1/25/07 – 1/28/07 (Unit 2) | PacifiCorp did not maintain <u>any</u> parts for inspection or analysis. |
|  |  |  |

| 6. | 7/30/07 – 7/31/07 (Unit 2) | One set of 5 fuel nozzles and end cover (one fuel nozzle assembly) kept by PacifiCorp.  No other components. |
|---|---|---|
| 7. | 7/31/07-8/02/07 (Unit 2) | One set of 5 fuel nozzles and end cover (one fuel nozzle assembly) kept by PacifiCorp. No other components. |
| 8. | 8/29/07-9/10/07 (Unit 2) | PacifiCorp did not maintain any parts for inspection or analysis. |
| 9. | 9/24/07-10/10/07 (Unit 2) | PacifiCorp did not maintain any parts for inspection or analysis. |
| 10. | 10/16/07 – 10/17/07 (Unit 2) | PacifiCorp did not maintain any parts for inspection or analysis. |
| 11. | 11/10/07-11/10/07 (Unit 2) | PacifiCorp did not maintain any parts for inspection or analysis. |
| 12. | 12/23/07 – 12/23/07 (Unit 2) | PacifiCorp did not maintain any parts for inspection or analysis. |
| 13. | 3/08/08-3/08/08 (Unit 2) | PacifiCorp did not maintain any parts for inspection or analysis. |

Doc. #270-2 (Exhibits to Walker MSJ Declaration), Ex. 2, Plaintiff's Amended Response to GTN's Second Interrogatories, pp. 3-4, Interrog. No. 2.[1]  As seen in the chart, PacifiCorp maintained limited physical evidence relating to only two of the claimed outages – nos. 6 and 7.

For each of the remaining outages, PacifiCorp failed to preserve evidence relating to: (a) the turbine components that were allegedly damaged (and which form the basis for PacifiCorp's property damage claim) including damaged fuel nozzles, transition pieces, and combustion liners; (b) gas and liquid samples allegedly collected; (c) other samples collected from PacifiCorp's fuel nozzles, filter cartridges, a "pig," and "reference oil"; and (d) the fuel gas scrubbers that were installed before turbine units 1 and 2 and replaced with coalescing filters

---

[1] GTN notes that the Walker MSJ Declaration was filed at Doc. #250, however the Court has filed the exhibits to the declaration – which were filed under seal – at Doc. #270.  Assuming that Doc. #270 is the actual proper location of the exhibits, GTN references that docket number in this memorandum.  To avoid confusion, GTN incorporates Doc. #250 (the Walker Declaration proving up the exhibits) herein by reference.

beginning in March 2008.[2]  PacifiCorp's experts rely on PacifiCorp's evaluation of this evidence to support their opinions.  Declaration of Worthy Walker in Support of GTN's Motion for Sanctions for Spoliation ("Walker Decl."), Ex. 1, Choquette Rebuttal Report, pp. 1-10; *see also* Doc. #270-17, Ex. 8, Choquette Initial Report, 3-4, 13; Ex. 19, Kemal Report.

## 1.     PacifiCorp destroyed, discarded and/or refurbished nearly all turbine components which form the basis for its claims in this case.

All of PacifiCorp's claims are premised on the notion that the turbines at the Hermiston Plant were somehow rendered non-operational as a result of being "fouled" by lubricating oil in the natural gas supplied to the turbines.  Doc. #61, ¶14.  Of the 350 allegedly damaged fuel nozzles that underlie PacifiCorp's claims, PacifiCorp discarded or refurbished 339 nozzles, without any notice whatsoever to the Defendants in this case.[3]  Walker Decl., Ex. 2, Kemal Dep., p. 144:7-23; Ex. 3, Cook Dep., pp. 215:10-216:2 (all nozzles were refurbished); Ex. 4, Holst Dep, pp. 842:18-844:5 (nozzles, transition pieces, and liner caps at issue have been refurbished). An illustration of PacifiCorp's complete disregard for any duty to preserve this critical evidence is seen in the testimony of Russ Tenney – the Vice President that oversaw operations and engineering at the Hermiston Plant – who stated that he was unaware of any request to preserve damaged parts, and that as far as he knew, "there was no reason to retain them."  Walker Decl., Ex. 5, Tenney Dep., p. 183:1-20.

---

[2]  The Hermiston Plant has two GE 7FA turbines, that are commonly referred to as "Unit 1" and "Unit 2."

[3] For the Court's reference, a GE 7FA turbine with DLN 2.0 hardware (such as those installed at the Hermiston Plant) has 70 fuel nozzles in each turbine.  See Doc. #270-3, Kemal Dep., at pp. 80:20-81.6.  There are 14 combustor assemblies in each turbine, each of which has five fuel nozzles. *Id.*

Out of the hundreds of turbine components for which PacifiCorp claims damages, all that remains is a "subset" of five fuel nozzles allegedly removed from Unit 2 during the outage on July 30, 2007.[4]   Walker Decl., Ex. 2, Kemal Dep., p. 144:7-23.   No other fuel nozzles, combustion liners, transition pieces or other relevant parts were preserved by PacifiCorp.  And, one of PacifiCorp's key witnesses, Frank Glasgow, admits that refurbishment of the components destroyed any evidence of damage on those parts.  Doc. #270-17, Ex. 17, Glasgow Dep., pp. 63:1-13.[5]  Despite having retained outside counsel and sent demand letters, PacifiCorp admitted that it never sent any notice to GTN that parts were being removed, refurbished destroyed, scrapped or altered. Walker Decl., Ex. 4, Holst Dep., p. 438:3-7.

Though GTN and its experts were permitted to observe the five remaining nozzles at Exponent's offices, several had been altered through destructive testing.  *See* Doc. #270-19, Ex. 19 (Exponent Report) at 18-22.  During the "inspection" of these five remaining fuel nozzles, PacifiCorp took the position that Defendants would not be permitted to conduct any destructive testing of the nozzles.  And while Exponent conducted extensive testing (including destructive testing) on the nozzles, GTN is unable to provide its own experts with any raw data of the testing conducted by Exponent, as apparently no such data, notes, or evidence logs of any kind exist. *See* Doc. #222, Ex. J (e-mail from PacifiCorp's counsel stating that "Exponent created no notes,

---

[4] As previously briefed, Exponent also conducted testing on 6 fuel nozzles allegedly removed from Unit 1 during the January 2007 outage, but concluded that they were damaged by the Plant's operator error.  As such, PacifiCorp is no longer seeking damages pertaining to the Unit 1 nozzles from the January 2007 outage.

[5] The record also establishes that PacifiCorp never instructed General Electric ("GE"), who conducted most of the refurbishment, to maintain the integrity of any fuel nozzles as evidence. See Ex. 6, Glasgow Dep., p. 64:20-23; 65:13-17.

logs, or other writings during the testing that it performed…").[6]  And, PacifiCorp's sole Rule 30(b)(6) witness testified that he had no knowledge of what if additional turbine parts remained, what parts had been scrapped, where any remaining parts were located, or what testing had been conducted on them.  Walker Decl., Ex. 4, Holst Dep., pp. 837:11-840-6.[7]  Mr. Holst further testified that the only parts that were preserved in their damaged condition after July 2007 were those provided to Exponent; and ultimately PacifiCorp stated in writing on October 14, 2011 that "[t]he turbine parts that PacifiCorp retained are in possession of its expert, Exponent, Inc., and are identified in Exponent's report sent to you on October 7, 2011."  Ex. 4, Holst Dep., pp. 304:1-10; Ex. 7, Sagalewicz 10/14/11 letter, p. 1.  A list of the parts retained by PacifiCorp was included with the Exponent protocol attached to the letter.  *See Id.*, p. 4.

Furthermore, in response to this Court's March 9, 2012 Order [Doc. #225], PacifiCorp finally produced the report authored by Exponent in 2008 concerning the fuel nozzle failures (the "Exponent 2008 Report").  The Exponent 2008 Report concluded that design defects in the fuel nozzles rendered them "susceptible to thermal failure" and advised PacifiCorp to upgrade the nozzles to a newer model in which the defect had been remedied.  Doc. #270-19, Ex. 19 (Exponent 2008 Report), pp. 43-46.  PacifiCorp did not follow this recommendation, but instead continued to refurbish their existing nozzles.  *See* Walker Decl., Ex. 8 (Dep. Ex. 23).  Because

---

[6] GTN notes that PacifiCorp's expert, Dr. Kemal, provides no direct evidence, such as laboratory analysis, of deposits on any fuel nozzles that would confirm the presence of hydrocarbon liquids. *See* Ex. 2, Kemal Dep., p. 192:17-25.  Obviously, it is now *impossible* for GTN to test any deposits on the fuel nozzles that were refurbished or discarded.  This prejudice to GTN cannot be understated.

[7] Mr. Holst testified that PacifiCorp does not know where particular nozzles are, whether GE still possesses any damaged components, what was "scrapped," what was provided to counsel[7] or Exponent or when, or where any refurbished nozzles are today. Walker Decl., Ex. 4, Holst Depo. pp. 565:25-566:7; 829:15-835:23; 836:3-25; 837:17- 838:3; 838:15-19*;* 839:1-21; 339:22-340:3.

the Exponent 2008 Report was not produced until after the close of fact and expert discovery, GTN did not have the opportunity to question any of PacifiCorp's witnesses about the conclusions in the Exponent 2008 Report, nor test the nozzles to determine whether any damage was consistent with "thermal failure."

**2.    PacifiCorp failed to preserve gas and "oil" samples on which it relies.**

PacifiCorp's claim of oil contamination rests primarily upon two sets of gas samples that were taken in 2007, by a consulting firm called McHale & Associates ("McHale"). None of these samples still exist. Ex. 4, Holst Dep. 847:11-23. Though PacifiCorp had retained counsel at the time, PacifiCorp did not instruct McHale to preserve the samples.

In fact, McHale's Rule 30(b)(6) designee testified that McHale was not asked to preserve any samples or records relating to them, that he did not know how or where the samples were taken, he did not know which bottles were used, and did not know where those sample bottles are currently located. Walker Decl., Ex. 9, Woods Dep., pp. 80:22-81:7, 111:12-18.  So, although PacifiCorp's counsel attached the alleged analyses of these samples to a demand letter sent to GTN in November 2007, PacifiCorp did not bother to retain the samples. Walker Decl., Ex. 10 (Dep. Ex. 365).  Defendants are left, therefore, with no opportunity to independently test these samples or to evaluate the veracity of the analyses upon which PacifiCorp relies.[8]  Accordingly, GTN had no opportunity to independently evaluate the samples or the sampling process.[9]

---

[8] GTN also notes that there are serious questions about the propriety and the chain of custody of the McHale samples. Because there were no serial numbers included on the analyses provided, it is not possible to confidently match an analysis with a bottle. Since the samples and bottles no longer exist, it is impossible to recreate the testing.

[9] Furthermore, it is undisputed that samples on which PacifiCorp relies were deemed to be unreliable by FERC. In the course of investigating PacifiCorp's complaint against GTN, FERC determined that the gas testing procedures employed in 2007 at the direction of HGC were

Walker Decl., Ex. 6, Glasgow Dep., p. 201:8-25.  According to Mr. Glasgow, it would be impossible for Northwest to ever recreate the conditions on the days the samples were taken.  *Id*. at 203:1-4.

**3.    Fuel gas scrubbers were sold for scrap long after litigation was anticipated.**

Finally, it is undisputed that PacifiCorp removed and scrapped the fuel gas scrubbers that were installed before each of the turbines at the Hermiston Plant.[10]  This did not occur until March 2008 at the earliest, seven months after PacifiCorp alleges it was anticipating litigation.[11]  PacifiCorp's Rule 30(b)(6) witness testified that the scrubbers were removed and then sold for scrap at some unknown point thereafter. Ex. 4, Holst Dep., pp. 845:12 - 846:4; 846:5-18. Mr. Holst could not: (a) testify when they were scrapped, (b) identify the party to whom they were

---

inadequate and ordered a re-test of the pipeline gas according to FERC's testing protocols.  Doc. #248 (Skelton MSJ Decl.), Ex. 57 (Dep. Ex. 366). After FERC sent PacifiCorp the required testing protocols, PacifiCorp elected not to participate in any further gas testing and withdrew its hotline complaint.  Walker Decl., Ex. 4, Holst Dep., pp. 617:10-25, 618:13-17.  The testing proceeded in accordance with the FERC protocol on both the GTN A and B lines.  Walker Decl., Ex. 11, Fox Dep., pp. 154:1-157:5, 177:22-179:12.  The testing overseen by FERC determined that there were no contaminants in the gas, and FERC concluded its investigation with no action against GTN.  Doc. #248 (Skelton MSJ Decl.), Ex. 59 (Dep. Ex. 368); Ex. 60 (Dep. Ex. 369); Ex. 61 (Dep. Ex. 370); Ex. 62 (Dep. Ex. 371); Walker Decl., Ex. 4, Holst Dep., pp. 607:20-610:5.

[10] The term "scrubber" is frequently used to refer to a type of gas conditioning equipment that separates liquids from gas. Mr. Holst testified that a "gas scrubber would [be] installed in the gas line leading to a gas turbine would be provided in order to remove liquids from the gas stream." Walker Decl., Ex. 4, Holst Depo. 876:19 to 877:1.

[11] GTN notes the actual date the new coalescing filter was installed in front of Unit 2 is unclear. PacifiCorp's discovery responses indicate that all the coalescing filters were installed on March 8, 2008, but Plaintiff's expert Peter Sobieski testified that only the gas yard and Unit 1 coalescers were installed in March 2008 and that the permanent coalescing filter in front of Unit 2 was not installed until May.  Walker Decl., Ex 12, Sobieski Dep., p. 132:5-133:5. The Exponent 2008 Report, on the other hand, indicates the Unit 2 coalescer was installed in June 2008.  Doc. #270-4, Ex. 4, Exponent 2008 Report, p. 2.

sold, (c) testify if any inspections were done of the scrubbers or (d) testify whether any oil samples were taken from the scrubbers. *Id.* at 846:5-18; 847:4-10.

The importance of the scrubbers is self-evident, since PacifiCorp's own witnesses testified that a "gas scrubber would [be] installed in the gas line leading to a gas turbine would be provided in order to remove liquids from the gas stream," and PacifiCorp's claims in this case necessarily imply that lubricating oil *somehow* (a) evaded these scrubbers and then (b) caused damage to the turbines. Ex. 4, Holst Dep., p. 876:19 to p. 877:1. The scrubbers – whose express purpose was to remove liquids (i.e. lubricating oil) from the fuel gas – are logical potential causes of the damage alleged by PacifiCorp, and therefore material evidence in this case. One likely and logical explanation of the harm allegedly suffered by PacifiCorp was that one or both scrubbers were not functioning properly. *See* Declaration of Christopher K. Lane, P.E in Support of GTN's Motion for Sanctions for Spoliation ("Lane Decl."). Since the scrubbers were scrapped, it is now physically impossible for GTN or its experts to test the scrubbers or otherwise conclusively determine if they were the cause (or even a contributing cause) to the harm alleged by PacifiCorp. This is underscored by the fact that, when PacifiCorp replaced its gas scrubbers with coalescing filters in 2008, its problems with alleged "fuel contamination" stopped. Walker Decl., Ex. 3, Cook Dep., p. 197:3-10.[12]

The removal and scrapping of the scrubbers is substantially prejudicial to GTN, particularly in light of communications at the relevant time frame about the Unit 2 scrubber. An October, 2007 e-mail from General Electric employee Sally Perkins states that, in speaking with

---

[12] Indeed, one of the employees at the Hermiston Plant, Gregory Cook, testified that in his opinion, if coalescing filters had been installed before 2007, the Hermiston Plant would not have seen the problems it did. Walker Decl., Ex. 3, Cook Dep., pp. 188:6-189:9.

Frank Glasgow, "we both agreed that there is high potential that the individual unit filter/scrubber for Unit 2 is bad." Doc. #270-18, Ex. 18 (Dep. Ex. 19). Likewise, even PacifiCorp's expert (Exponent) identified an inadequate/malfunctioning scrubber as a possible cause of damage in its Exponent 2008 Report. Doc. #270-4, Ex. 4, Exponent 2008 Report, p. 39. Yet, PacifiCorp conducted no testing of the scrubbers and sold them for scrap instead. *Id*., Ex. 5, Tenney Dep., p. 56:13-23; Ex 4, Holst Dep., p. 847:4-10.

Because PacifiCorp destroyed the scrubbers, Northwest is unable to evaluate this probable alternative cause of PacifiCorp's claimed damages. *See* Lane Decl., ¶¶7, 8. As with the fuel nozzles, there is no physical evidence or data GTN can provide to its own experts to analyze whether the scrubber was performing as designed, or whether it was operational, functioning properly and/or failing to remove naturally occurring impurities and other particulate matter from the gas stream before it entered the turbines.

**4.    PacifiCorp destroyed or discarded other physical evidence.**

In addition to the gas and oil samples that were not preserved, Mr. Holst revealed that PacifiCorp failed to retain other relevant samples and tested materials, including a "pig" from the Cascade pig run, a filter cartridge and samples of "reference oil." Walker Decl., Ex. 13 (Dep. Ex. 375), Ex. 4, Holst Dep., pp. 627:17-629:2, 633-634. Each of these items was evaluated and tested at the direction of PacifiCorp and/or HGC by a company called Herguth Labs in December 2007. *Id.* Apparently, they were not preserved. *Id.* Herguth Labs appears to have tested some filter cartridges, for which Mr. Holst was unable to confirm the identity or present location. *Id*., Ex. 14 (Dep. Ex. 376); Ex. 4, Holst Dep., pp. 629:4-630:25. Moreover, documents relating to Herguth Labs mentioned "reference oil" that was tested and compared to samples collected from the pig, but was also apparently not preserved. *Id*., Ex. 15 (Dep. Ex. 377); Ex. 4, Holst Dep., pp.

629:19-630:25.  In fact, PacifiCorp's sole Rule 30(b)(6) witness testified that he had never seen the Herguth reports before, did not know what they were about, did not know why PacifiCorp had produced them, and did not know if PacifiCorp was relying on them in this case.  *Id*., Ex. 4, Holst Dep., pp. 630:20-25.

Corrosion samples from the fuel nozzles also were taken and tested, but not preserved. *Id*. at 629, 634-635.  Although PacifiCorp produced a document in discovery from a company called Aptech Laboratories purporting to characterize a "corrosion sample," PacifiCorp's Rule 30(b)(6) witness testified that he did not know if PacifiCorp was relying on that testing to support its case. Walker Decl., Ex. 16 (Dep. Ex. 48); Ex. 4, Holst Dep., pp. 631:1-632:23.  He also did not know the present location of the corrosion samples, what nozzle(s) they were taken from, or where any of the sampled nozzles are now.  *Id*.   And, although PacifiCorp's consultant Dr. Kemal testified that Exponent never tested the deposits on the allegedly damaged fuel nozzles, Exponent did arrange for testing of samples from one or more of the nozzles by Anamet, Inc. to determine their metallurgical make-up. Walker Decl., Ex. 2, Kemal Dep., pp. 151:19-152:20; Doc. #248 (Skelton MSJ Decl.), Ex. 28 (Anamet Report); Ex. 15 (Kemal Dep.), pp. 33:19-34:7.  These samples also have not been made available.  Similarly, PacifiCorp's Rule 30(b)(6) witness, Mr. Holst, knew nothing about the whereabouts or results of testing performed by Ceway Chemical Services, who also apparently analyzed Pig #3, a filter cartridge, and "reference oil."  Walker Decl., Ex. 17 (Dep. Ex. 378).  Mr. Holst testified that the Ceway report indicated that the oil found on the filter cartridge matched the reference oil, but Pig #3 did not.  Walker Decl., Ex. 4, Holst Dep., pp. 634:20-635:15.  But he also testified that he had never seen the Ceway testing before, did not know where the samples were taken, and did not know if PacifiCorp was relying on this testing to support its case.  *Id*. at 633:22-636:14.  Mr. Holst did not even know if this

analysis had been presented to PacifiCorp, even though he conceded that outside counsel had been retained at the time it was done. *Id.* at 636:15-22.

<u>**ARGUMENT & AUTHORITIES**</u>

This Court should dismiss PacifiCorp's claims with prejudice that are related to those turbine outages for which PacifiCorp did not preserve material and relevant evidence. There can be no question that PacifiCorp failed to preserve material and potentially relevant evidence *after* it anticipated litigation. As a result, PacifiCorp has willfully and knowingly spoliated crucial evidence. Not only were PacifiCorp's actions willful and knowing, because the spoliated evidence relates to the critical damage issues in this case (the cause of the damage to the turbine components), PacifiCorp has destroyed the very evidence that is critical damage issues and necessary for GTN to defend against these claims. Indeed, PacifiCorp's actions have made it virtually impossible for GTN to prove its defenses, including alternative theories of causation. Under controlling precedent, PacifiCorp's claims relating to evidence it did not preserve should be dismissed. Alternatively, the Court should exclude all evidence, whether from fact or experts witnesses, regarding the alleged cause or the damages associated with the failures that PacifiCorp did not preserve.

**1.    PacifiCorp had a duty to preserve evidence.**

The duty to preserve material evidence exists not only when litigation is pending, but extends to the period of time before litigation when "a party should reasonably know that the evidence may be relevant to anticipated litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). Thus, the duty to preserve evidence applies to evidence that may be "*potentially* relevant" to litigation. *Leon v. IDX System Corp.*, 464 F.3d 951 (9th Cir. 2006)(emphasis in original, citing *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)).

2.    **The Court has inherent authority to issue sanctions for spoliation.**

If a party fails to preserve potentially relevant evidence, the district court has the inherent power to impose sanctions upon the culpable party. *Leon*, 464 F.3d at 958; *Uniguard Sec. Inc. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).  The ability to impose sanctions for spoliation arises from the court's inherent power to control the judicial process and to address conduct that abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). Underlying this power is the district courts' "need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth." *Silvestri v. General Motors Corp.*, 271 F.3d 583, 589 (4th Cir. 2001).  The judicial process depends on the "adversarial presentation of evidence." *Id.* (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)). If the courts do not protect the integrity of the judicial process "people are then justified in abandoning support for the system." *Shaffer Equip. Co.*, 11 F.3d at 457.  This inherent power to sanction a party for destroying evidence includes the ability to dismiss the party's claims or its entire case. *Anheuser-Bush, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995).

3.    **PacifiCorp's destruction and spoliation of evidence was willful, and dismissal is appropriate.**

In order to sanction a party for the destruction or spoliation of evidence and dismiss its claims, the court must find that the party willfully destroyed the evidence. *Uniguard*, 982 F.2d at 368, n.2. In order to make this willfulness finding, however, the district court need *only* find that the party that destroyed the evidence had "some notice that the [evidence was] potentially relevant to the litigation before [it was] destroyed." *Leon,* 982 F.2d at 368 (*quoting Kitsap*

*Physicians Serv.*, 314 F.3d at 1001); *see also Pirv v. Glock, Inc.*, 2009 WL 54466 (D.Or. 2009). A finding of bad faith is *not* a prerequisite for a dismissal sanction; it is sufficient that the party that destroyed the evidence was on notice that the evidence was potentially relevant. *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991).

Here, not only has PacifiCorp willfully spoliated evidence, which alone justifies a dismissal sanction, dismissal is also necessary because the destruction of the very evidence upon which PacifiCorp's claims rest has irreparably prejudiced GTN's ability to defend against those claims. *Uniguard*, 982 F.2d at 369.

The *Uniguard* case is instructive. There, an insurer of a yacht that caught fire brought a subrogation action against the manufacturer of a space heater to recover the claim paid to the insured. *Id.* at 365. The insurer, however, destroyed the space heater prior to filing suit but after its experts conducted an investigation of the yacht and the space heater. The Ninth Circuit affirmed the court's decision to dismiss the insurer's case on the grounds that the destruction of the space heater precluded the space heater manufacturer from any opportunity to inspect the evidence and that this "rendered unreliable virtually all of the evidence that a fact finder could potentially consider." *Id.* at 369. The Ninth Circuit affirmed the district court's conclusion that the defendant was unfairly prejudiced by the destruction of this critical evidence. *Id.* at 368. The same sanction is appropriate here, where PacifiCorp willfully destroyed countless turbine components for which it now seeks damages,  as well as the and oil and gas samples upon which it relies and the scrubbers.

## 4.    GTN is prejudiced by PacifiCorp's spoliation.

Since PacifiCorp destroyed or failed to preserve nearly all the physical evidence in support of its case – as well as evidence that could prove alternate causation theories and

disprove PacifiCorp's theory of causation – GTN is prejudiced in presenting its defense at trial. *Leon*, 464 F.3d at 959 ("The prejudice inquiry looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case."). Where one party precludes the other from inspecting physical evidence, prejudice is shown. *Unigard*, 982 F.2d at 369. In showing prejudice, courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence, because doing so would subvert the sanction and would allow parties who have destroyed evidence to profit from the destruction. *Great N. Ins. Co. v. Power Cooling, Inc.*, 2007 WL 2687666 (E.D.N.Y. 2007). Thus, in a case where party destroys evidence that is the subject of the underlying claim itself, that spoliation is extremely prejudicial to the non-destroying party because it effectively precludes that party from disputing the evidentiary accuracy or authenticity of the evidence, from introducing contradictory evidence, or challenging damages calculations. *See id.*

GTN is severely prejudiced by PacifiCorp's destruction of nearly all physical evidence relevant to this case. GTN is precluded from challenging PacifiCorp's speculative theory of the cause of damage to the turbine components that were not preserved. *See* Lane Decl., ¶¶ 7-8; *see also* Doc #280, Boyce Decl., Ex. 2 (Boyce Rebuttal Report), pp. 14-15 (inspection of allegedly damaged parts is necessary to determine cause of damage) and p. 66 (A proper forensic investigation would include a review and analysis of all of the combustor assemblies as well as the fuel manifolds and lines). The importance of the physical evidence here is apparent. Not only do GTN's experts explain the problem created by the spoliation, even PacifiCorp's experts concede that the damage alleged by PacifiCorp could have been caused by combustion dynamics and tuning of the turbines alone – without any fuel contamination whatsoever! Doc. #270-6, Ex.

6 (Sobieski Dep.), pp. 33:2-34:11. Indeed, Peter Sobieski testified that there can be "a lot of causes" for heavy burning and erosion of fuel nozzle tips, including tuning of the engine, internal fuel gas leaks within the assemblies, upsets in the flow of the air through the fuel nozzles. *Id.* at pp. 68:1-69:3. He testified that in order to actually identify one cause, you have to rule out the rest, which highlights the prejudice resulting from PacifiCorp's spoliation. *Id.* at p. 69:4-6.[13] Furthermore, GTN cannot evaluate and prove alternative theories of causation such as mechanical failures or insufficiency of the scrubber, as identified in GE e-mails and the Exponent 2008 Report.

Here, throughout discovery in this lawsuit, PacifiCorp refused to provide even the most basic information concerning what parts remained in existence, their locations or any testing conducted by PacifiCorp or its consultants. Walker Decl., Ex. 4, Holst Dep., pp. 837:11-840-6. Tellingly, PacifiCorp even refused for months to acknowledge that the Exponent 2008 Report existed, because it obviously showed that a root cause analysis of components was conducted, and that the same consultant identified a defect with the nozzles and also the scrubber as being a potential problem. The situation in this case is more prejudicial than in many other reported cases, because such alternate causes were actually identified by PacifiCorp's own expert as the "principal causes" of the damage PacifiCorp alleges. Doc. #270-4, Ex. 4, Exponent 2008 Report, pp. 44-46.

---

[13] GTN notes that, contrary to PacifiCorp's positions in this case that pipeline-quality gas must be liquid "free," Mr. Sobieski also testified that it is common for plants to see oil in dry scrubbers, and he hasn't seen anything more than a small amount of liquids being encountered by the dry scrubbers that were installed at Hermiston. Doc. #270-6, Ex. 6 (Sobieski Dep.), pp. 63:4-22.

**5.      Photographs cannot remedy the prejudice of the destruction of evidence.**

Furthermore – and in anticipation of PacifiCorp's likely response to this motion – the fact that pictures may exist of the destroyed evidence does not remedy the prejudice to the party that was unable to inspect the evidence that was destroyed. *State Farm Fire and Cas. Co. v. Broan Mfg. Co., Inc*., 523 F.Supp.2d 992 (D. Ariz. 2007).  GTN should not be required to rely on the analyses conducted by PacifiCorp simply because they failed to preserve the relevant evidence.[14] And in *State Farm,* after a residential insurer determined that a faulty exhaust fan was the cause of a fire in the home of its insured, it allowed the homeowner to proceed with repairs; which destroyed the evidence as to the cause of the fire. *Id* at 995. When the insurer sued the manufacturer, the manufacturer moved to dismiss the insurer's claims. *Id.* The insurer asserted that its claims should not be dismissed because the Defendant could still defend the action because some of the evidence of the fire scene was preserved, the insurer's experts had taken photographs of the fire scene and the defendant's experts had been able to formulate opinions based on the evidence that was preserved. *Id*. at 966. The district court rejected all of these arguments, finding that, because the defendant was unable to inspect the fire scene itself, dismissal was warranted. *Id.* The *State Farm* court held that the "Plaintiff's position places the Defendant in the role of a supplicant rather than on equal footing to test the evidence." *Id*. at 996. A critical factor favoring dismissal of the insurer's claims was that – similar to the case at hand – the fan manufacturer's experts were deprived of the ability to determine whether the evidence would have supported alternative theories of causation. Because these alternative causes could

---

[14] *See BTO Logging*, 174 F.R.D. at 694 ("Naturally, the evidence assembled by an opposing party's expert is ordinarily evidence that supports the opposing party's case…It is prejudicial to [the Defendant] to require it to base its defense on evidence chosen and retained by [Plaintiff's] expert.").

not be explored, any lesser sanction would not remedy the fact that "the Defendant has limited evidence available upon which to construct its defense." *Id.* at 998. Stated another way, dismissal was appropriate because the defendant's defense was limited by what the plaintiff chose to preserve. *Id.* at 997; *see also Silvestri*, 51. F.3d at 594 (noting the plaintiff's experts' inspection of vehicle and then destruction of vehicle warranted dismissal of claims and not an adverse instruction because requiring "General Motors to rely on the evidence collected by Silvestri's experts in lieu of what it could have collected would result in irreparable prejudice."). In this case, it is important to note that even Dr. Kemal's analysis did not show actual hydrocarbon coke on the fuel nozzles, but rather molten metal. So, PacifiCorp's to speculation that photographs show "coking" versus burned metal is something that could have been easily disproved with actual physical evidence of the nozzles themselves.

GTN believes that there is no lesser sanction that would solve the harm caused to GTN than dismissal of all of the claims related to the failures for which the physical evidence was destroyed. GTN was never allowed to inspect the evidence that is material to the failures or develop alternative theories of causation for the failures. *See Leon*, 982 F.2d at 960. Moreover, it should not be required to limit its defense to relying upon what PacifiCorp selectively took pictures of rather than its own independent inspection. *See BTO Logging, Inc. v. Deere & Co.*, 174 F.R.D. 690, 694 (D.Or. 1997). *BTO Logging, Inc.*, 174 F.R.D. at 694.

**6.     In the alternative, reference to the spoliated evidence must be excluded.**

GTN believes that PacifiCorp's claims should be dismissed relating to spoliated turbine parts because of the irreparable prejudice. At the very least, reference to spoliated evidence must be excluded. The Court's inherent power to make appropriate evidentiary rulings in response to the destruction or spoliation of evidence also includes the authority to order the exclusion of

evidence.  *Glover*, 6 F.3d at 1329; *BTO Logging, Inc.*, 174 F.R.D. at 692 (citing *Unigard*, 982 F.2d at 368)).

PacifiCorp's experts rely on the spoliated evidence.  Mr. Choquette, in particular, relies on the samples and analyses conducted by McHale and Texas Oil Tech. Exponent also references the McHale samples and the Herguth Labs reports in its report appendix. Mr. Asante relies on "all the lab analyses performed on the samples collected to date."  Dr. Kemal obviously provides opinions on nozzle damage for outages other than the July 2007 outage on Unit 2.  This evidence and reference to it by PacifiCorp's experts should, at the very least be excluded.

**7.    The Court should issue an adverse inference instruction concerning the spoliated evidence and the discarded scrubbers.**

Even if the Court decides not to dismiss PacifiCorp's claims, the Court should issue an adverse inference instruction concerning all of the spoliated evidence including the discarded scrubbers. An adverse inference instruction is also appropriate where a party has knowingly or negligently destroyed evidence.  *See Great N. Ins. Co.*, 2007 WL 2687666 at *10.  Because PacifiCorp knowingly destroyed the scrubbers at the Hermiston Plant despite the obvious relevance to its claims – which is heightened now in light of the Exponent 2008 Report that directly addresses the scrubbers – the Court must instruct the jury that the scrubbers were malfunctioning or inadequate.

"[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *In re Napster,*

*Inc. Copyright Litig.,* 462 F. Supp. 2d 1060, 1074 (N.D. Cal. 2006).  Each of these elements is met with respect to PacifiCorp's destruction of evidence, including the scrubbers.  PacifiCorp had control over the nozzles and turbine parties, as well as the scrubbers and had a duty to preserve them.  And, as this Court already determined, PacifiCorp was anticipating litigation at least by August 2, 2007.  PacifiCorp replaced the Unit 2 scrubber sometime between March and June 2008 and "scrapped it" shortly thereafter.  *See* n.11, *supra*; Walker Decl., Ex 4,  Holst Dep., pp. 845:12-22.  PacifiCorp is admittedly "culpable" for the destruction, as it admittedly "scrapped" the scrubber without conducting any testing on it or giving notice to GTN that it intended to dispose of the scrubber.  Walker Decl., Ex. 5, Tenney Dep., pp. 56:13-23, 107:1-4.

PacifiCorp's 30(b)(6) witness even admitted that the scrubber itself would be necessary to perform any analysis of whether it was functioning properly or not, and that Hermiston employees had discussed whether the scrubber was adequate and whether it should be replaced. Walker Decl., Ex. 4, Holst Dep., pp. 877:20-878:1, 888:2-20.  Finally, the scrubber's relevance to PacifiCorp claims is undisputed, and was obvious to PacifiCorp, as HGC and GE employees had previously opined that the Unit 2 outages were likely caused by a "bad" scrubber and contracted with David Burns to recommend a replacement coalescing filter. Doc. #248 (Skelton MSJ Decl.), Ex. 33 (Dep. Ex. 19); Ex. 50 (Dep. Ex. 38).  As mentioned above, Exponent likewise suggested in the Exponent 2008 Report that the scrubber was possibly malfunctioning or inadequate. Id., Ex. 14 (Exponent 2008 Report), pp. 3, 39. Critically, PacifiCorp conceded that its "fuel contamination" problems ended when the scrubber was replaced with a coalescing filter.

Accordingly, if this case proceeds to trial, GTN is entitled to an adverse inference instruction that the jury can assume that the spoliated turbine parts would not support PacifiCorp's theory of causation, and that the scrubber was malfunctioning or inadequate.

## CONCLUSION

For the reasons stated above, GTN respectfully requests that the Court order sanctions against PacifiCorp in the form of a dismissal of its claims.  In the alternative, GTN requests that the Court exclude all reference to spoliated evidence and issue an adverse inference instruction concerning the spoliated evidence and the scrubbers.  GTN also requests such other and further relief to which it may be justly entitled.

Dated:  April 13, 2012

ELROD, PLLC

By  /s/ David W. Elrod

David W. Elrod, Texas State Bar No. 06591900
Of Attorneys for Gas Transmission
Northwest Corporation

## CERTIFICATE OF SERVICE

I certify that, on this 13th day of April 2012, a copy of the foregoing was served via the Court's CM/ECF system on the following:

| | |
|---|---|
| Bruce L. Campbell<br>Joshua M. Sasaki<br>Justin C. Sawyer<br>Miller Nash LLP<br>111 SW Fifth Avenue, Suite 3400<br>Portland, OR 97204<br>*Attorneys for Plaintiff PacifiCorp* | Philip S. Van Der Weele (OSB 863650)<br>phil.vanderweele@klgates.com<br>K&L Gates LLP<br>222 SW Columbia Street, Suite 1400<br>Portland, OR 97201-6632<br><br>Matthew Segal<br>Jessica A. Skelton<br>Pacifica Law Group, LLP<br>1191 Second Ave., Suite 2100<br>Seattle, WA 98101<br>*Attorneys for Defendant Northwest Pipeline GP* |

By  /s/  David W. Elrod

David W. Elrod, Texas State Bar No. 06591900