IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PACIFICORP, an Oregon
corporation,

        Plaintiff,

                              3:10-cv-00099-PK

                              OPINION AND ORDER

NORTHWEST PIPELINE GP, a
Delaware Partnership, and GAS
TRANSMISSION NORTHWEST
CORPORATION, a California
corporation,

        Defendants.
_____

PAPAK, Judge:

      Plaintiff PacifiCorp brings this action alleging state law claims for negligence,

negligence/res ipsa loquitor, trespass, and nuisance against Northwest Pipeline ("Northwest")

and negligence /res ipsa loquitor and breach of contract against Gas Transmission Northwest

("GTN"), arising from shut-downs of the natural gas power generation plant in Hermiston,

Oregon purportedly caused by compressor oil in the gas supply that contaminated the generator

turbines.  Now before the court are motions for summary judgment by PacifiCorp, GTN, and

Northwest, (#253, #251, #243), motions for sanctions based on spoliation filed by GTN and

Page 1- OPINION AND ORDER

Northwest, (#284, #279), GTN's motion to stay proceedings and refer issues to the Federal

Energy Regulatory Commission ("FERC") (#240), and PacifiCorp's motions to compel against

GTN and Northwest (#196, #194). For the reasons described below, Northwest's motion for

summary judgment is granted, GTN's motion for summary judgment is granted in part and

denied in part, PacifiCorp's motion for summary judgment is granted in part and denied in part,

Northwest's spoliation motion is denied as moot, GTN's spoliation motion is granted in part and

denied in part, GTN's motion to stay is granted, PacifiCorp's motion to compel evidence from

Northwest is denied as moot while PacifiCorp's motion to compel evidence from GTN is granted

in part and denied in part.

## BACKGROUND

### I.    The Parties

Plaintiff PacifiCorp is an Oregon utility company that sells electricity to retail customers.

(First Amend. Compl., #61, ¶2.)  PacifiCorp and Hermiston Generating Company, L.P. ("HGC")

each own a 50% undivided interest in the Hermiston Station, a natural gas power generation

plant in Hermiston, Oregon. *Id.* at ¶5.  Under a Long-Term Power Sales Agreement and an

Ownership and Operating Agreement, PacifiCorp is entitled to purchase the electric power

generated by the Hermiston Station from HGC. *Id.*  The Hermiston plant consists of two General

Electric ("GE") 7FA gas turbines, referred to as Unit 1 and Unit 2, that generate power by

combusting natural gas.  PacifiCorp is responsible for providing all fuel for the plant.  (Skelton

Decl., #248, Ex. 1) (Tenney Dep., at 153:20-154:12.)

In general, gas combusted by the plant originates in Canada, travels through pipelines

owned and operated by defendant GTN, flows into a seven-mile-long local pipeline system

operated by Cascade Natural Gas Corporation ("Cascade") at the Hermiston Meter Station, and

arrives at the Hermiston plant.  GTN provides gas to the Hermiston Meter Station through two

parallel pipelines, the "A" and "B" lines.  GTN's predecessor entered into a transportation

agreement with HGC  (the "FT agreement") providing for the transport of natural gas from

Canada to the Hermiston Meter Station.  (Roscher Aff., #23, Ex. 1.)  The FT agreement

incorporated the terms and conditions of GTN's FERC gas tariff.  *Id.*, Ex. 1 at ¶ 1.2.  The tariff

sets certain quality standards for the gas that GTN transports on behalf of the "shipper" of the

gas.  *Id.*, Ex. 2, at ¶3.1.  In general, the tariff requires the gas to be "merchantable."  *Id.*  The tariff

also requires that the gas: "Shall be commercially free from sand, dust, gums, crude oil,

impurities and other objectionable substances which may be injurious to pipelines or which may

interfere with its transmission through pipelines or its commercial utilization."  *Id.* at ¶3.1(b)(1).

In addition to these general requirements, the tariff sets more specific gas quality standards, such

as for hydrocarbon dew-point, temperature, hydrogen sulfide, sulpher, carbon dioxide, water

vapor, and oxygen.  *Id.* at ¶3.1(b).

     Defendant Northwest Pipeline also operates a pipeline transporting natural gas from

Canada.  Northwest's pipeline interconnects with GTN's "A" line at the Stanfield Interconnect,

approximately 12 miles upstream from the Hermiston plant.   Northwest can both deliver gas to

GTN and receive gas from GTN at Stanfield.  Northwest typically provides gas to GTN in the

late spring through early fall and receives gas from GTN during the rest of the year.  Northwest

does not have a contract to provide fuel for HGC or PacifiCorp.  However, Northwest and GTN

have an Interconnect & Operating Agreement governing gas quality at Stanfield.  (Richards

Decl., #246, Ex. 4.)  That agreement provides that the gas quality tariff provision of the party

receiving gas governs the quality of gas delivered at Stanfield– when GTN receives gas from

Northwest, GTN's tariff applies, and when Northwest receives gas from GTN, Northwest's tariff

Page 3- OPINION AND ORDER

applies.  *Id.* at 8-9, 23-24.

## II.    Compressors and Compressor Oil

Because the Northwest pipeline operates at a lower pressure than the GTN pipeline, GTN

must compress gas that it receives from Northwest at Stanfield using a wet seal compressor.

(Sawyer Decl., #265, Ex. 4, at 1). Northwest also employs reciprocating gas compressors on its

pipeline, and some wet seal compressors not far from Stanfield.  *Id.*  Both the wet seal

compressor and reciprocating compressors require oil for either lubrication or sealing.  (Sawyer

Decl., #265, Ex. 5) (Zaitz Dep., at 117-118).  By design, a small amount of compressor oil enters

the gas stream such that compressor oil is known to be a normally occurring substance in natural

gas pipelines.  *Id.* (Zaitz Dep., at 101,118,141).

## III.    Gas Conditioning

Before arriving at the Hermiston plant, gas passes through several sets of gas conditioning

equipment to remove liquids from the gas stream.  GTN operates a scrubber at the Stanfield

metering station within the Stanfield Interconnect to removed liquids.   GTN also operates a gas

heater and particulate filter at the Hermiston metering station.  (Skelton Decl., #248, Ex. 7)

(Plaster Dep., at 57:5-19).  In addition, the gas passes through Cascade's particulate filter before

reaching the plant.  Upon entering the plant, the gas passes through two fuel gas scrubbers,

located upstream of each turbine.  (Skelton Decl., #248, Ex. 11, at 3) (Black & Veatch Report.)

## IV.    Oil and Fuel Nozzle Problems Before 2007

Hermiston plant manager Frank Glasgow states that, from the plant's opening in 1996

until January 2007, "the Plant had operated without any problems attributable to equipment

associated with a fuel nozzle, and it had never experienced a forced outage attributable to gas

quality."  (Glasgow Decl., #325, ¶7.)  However, Hermiston plant employees raised concerns to

Page 4- OPINION AND ORDER

GTN about the presence of oil in the gas supply as early as 2001, but GTN reported no presence of oil in the white paper filters at the Hermiston meter station. (Skelton Decl., #248, Ex. 24) (GTN submissions to FERC). Moreover, GE maintenance records starting in 2001 document a number of fuel nozzle problems. In 2001, GE inspections revealed burned fuel nozzle tips. (Skelton Decl., #248, Ex. 25.) Similarly, an inspection in 2003 found "a couple of burned fuel nozzle tips." (Walker Decl., #305, Ex. 24, at 7.) Then, in 2005, GE found fuel nozzle assemblies to be in "poor condition" due to gas tip diffusion, erosion, end cover insert leakage, and end cover heavy hydrocarbon contamination. (Skelton Opp. Decl., #310, Ex. 1, at 1.)

## V.   Claimed Outages

### A.   January 2007 Outage and Ensuing Investigation

From January 25, 2007 to January 28, 2007, the Hermiston plant experienced the first alleged forced outage of Unit 2. (Glasgow Decl., #325, ¶¶19-20.) The plant initially detected high carbon monoxide emission levels. *Id.* at ¶25. When the plant could not reduce the levels through tuning, the plant shut down Unit 2 on January 26, 2007. *Id.* at Ex. 14, at 5 (GE Inspection Report). GE staff removed the Unit 2 burner assemblies, installed a spare set of assemblies that the plant had on hand, and restarted Unit 2 on January 28, 2007. *Id.* In late February 2007, Glasgow watched while GE conducted flow testing and disassembled the Unit 2 fuel nozzle assembly at GE's inspection facility. *Id.* at ¶¶25-26. Glasgow observed what he described as "coking" on the inner fuel nozzles. *Id.* at ¶26. Two photographs were taken of a burner and burner tube, representing the "average condition" of the inner fuel nozzles after the January outage, two photographs were taken of the inside of the fuel nozzle orifices, and a series of photographs were taken while a GE engineer used a boroscope to inspect the annulus ring

within the fuel nozzle assembly.  *Id.* at ¶¶26, 28, 29, Ex. 1, Ex. 3, Ex. 5.  Given the "coking"

downstream from the annulus and the dark substance Glasgow observed in the annulus ring, he

concluded that stains visible in the annulus were likely dried compressor oil.  *Id.* at ¶29.  GE,

however, did not mention compressor oil in its inspection report.  Instead, GE noted the

boroscope inspection found debris "resembling masking tape particles" in two end covers and

concluded simply that "it is likely that contamination restricted the flow of fuel to the combustion

chamber, causing abnormal combustion."  *Id.* at Ex. 14, at 9.

     On March 14, 2007, HGC apparently convened a meeting with a GTN engineer, Doug

Zaitz, and employees of Cascade and the Hermiston plant to discuss concerns about gas

contamination.  (Sawyer Decl., #265, Ex. 5, at 13) (Zaitz Dep.)  Representatives of the

Hermiston plant told Zaitz that over the past few years they noticed that up to a few quarts of oil

per year had collected in the separator filters at the Hermiston plant.  (Sawyer Decl., #265, Ex.

20, at 3-5.)  This caused Zaitz to write that GTN was concerned that "oil may be passing through

[GTN's] metering facility undetected and unencumbered."  *Id.*  Zaitz communicated with the

company that sold the plant's filters, inquiring about ways to protect the plant's turbines from

contamination, including installing coalescing filter elements.  *Id.* at 4.  On April 10, 2007, Frank

Glasgow reported to Zaitz that the filter socks at the Cascade pipeline were "saturated" and the

scrubber at the plant contained "about 1 [gallon]" of oil.  *Id.* at 2.  About two weeks later, on

April 25, 2007, Zaitz wrote to the filter sales representative that GTN was concerned that "old

compressor lube oil . . . may be the source of the oil that is appearing [in] the cyclone filter

separators" at the Hermiston Plant.  *Id.*, Ex. 21, at 1.  Zaitz noted that GTN had seal oil systems

on its compressors until the early 1990s, but also stated that GTN's filters at the Hermiston

station were dry of liquids.  *Id.*  Zaitz later testified, however, that he lacked any independent

evidence about the nature of the liquid, as GTN had not collected any of the liquid at that time.

(Sawyer Decl., #265, Ex. 5, at 16) (Zaitz Dep.)

      In May 2007, Zaitz continued assisting the Hermiston plant in GTN's investigation,

searching for a lab that might be able to analyze the "mystery fluids" found in the plant filters.

(Sawyer Decl., #265, Ex. 4, at 3-8.)  Ultimately, Zaitz located Core Laboratories in Houston,

Texas, which could perform the appropriate analysis.  *Id.* at 3.  Also in May 2007, Zaitz

explained to a GTN supervisor that "lost" compressor seal oil was the only source of oil in

GTN's pipeline system, although GTN's only remaining wet seal compressor was losing little, if

any, oil.  (Sawyer Decl., #265, Ex. 15, at 2.)  Zaitz also raised the possibility that compressor oil

was coming from Northwest Pipeline gas transported in GTN's pipeline.  *Id.*  During this time

period, Frank Glasgow perceived that GTN was working with the plant to prevent increased

amounts of compressor oil from reaching the turbines.  (Glasgow Decl., #325, ¶59.)

      Also in May 2007, the plant shut down Unit 2 for regular maintenance, photographing

what Glasgow describes as "coking" below the inner fuel seal rings and in the fuel nozzle flow

orifices.  (Glasgow Decl., #325, ¶31, Ex. 7.)  GE visually inspected the fuel nozzles and observed

"[s]treaks of carbon/oxides,"  "grossly deteriorated" gas tip packing seals, and "[h]eavy

[h]ydrocarbon [c]ontamination."  (Glasgow Decl., #325, Ex. 8.)  GE also collected a sample of

about one-half cup of "carbon and packing seal residue."  *Id.*

### B.    July 2007 Outage and Further Investigation

      On July 30, 2007, the Unit 2 turbine "tripped" due to a high exhaust temperature spread

and the plant discovered a "burn through" on one of the burner nozzles.  (Glasgow Decl., #325,

Page 7- OPINION AND ORDER

Ex. 15, at 5) (GE Inspection Report).  The plant replaced the burner nozzle and several other

parts, but shut down the unit the next day after observing other problems.  *Id.*  GE recommended

sending the fuel nozzle assemblies to its shop in Jacksonville, Florida for repair.  *Id.* at 8.  GE

installed a set of refurbished nozzles and Unit 2 resumed operation on August 2, 2007.  (Glasgow

Decl., #325, Ex. 15 at 5.)  A few weeks later, on August 15, 2007, GTN closed the valve on its A

pipeline at the Hermiston metering station, preventing any gas from the Northwest pipeline from

being delivered to the Hermiston plant, to help determine the source of the liquids reportedly

arriving at the Hermiston plant.  (Skelton Decl., #248, Ex. 41).  The next day, Glasgow took

samples of the gas at Stanfield, the first of three such samples in August and October 2007.

(Skelton Decl., #248, Exs. 41, 42, 43.)  He reported seeing "oil vapor" on the rocks around the

sampling area and in the gas stream.  *Id.,* Ex. 41.  Glasgow sampled the gas a second time on

August 23, 2007, this time employing a consultant, McHale & Associates, to take samples of gas

and liquid from several locations on the Cascade and GTN pipelines and within the Hermiston

plant.  *Id.*, Ex. 43.   The third sampling occurred on October 5, 2007.  *Id.*, Ex. 42.

     The samples were analyzed by Texas Oil Tech and found to contain a "lubrication or

compressor range oil."  (Sawyer Decl., #265, Ex. 25.)  Texas Oil Tech did not attempt to quantify

the amount of the substance in the August gas samples, but reported that the October sample

contained 44 parts per million of residue.  *Id.* at 8.  Glasgow, however, admitted that the samples

had been collected from the bottom and sides of the pipelines to increase the likelihood that

liquids would be captured.  (Skelton Decl., #248, Ex.40, 10-11) (Glasgow Dep.); (Skelton Decl.,

#248, Ex. 45 at 2).  After Texas Oil Tech analyzed the samples, they were destroyed.

     Sometime before August 27, 2007, GTN apparently sampled liquids at the Hermiston

plant and Stanfield scrubbers, and sent them to Core Laboratories for analysis. *Id.*, Exs. 48, 49. The Core Laboratories testing eventually showed that the distillation results for the two samples were "not similar" and the liquids were "probably not" from the same source. *Id.*, Ex. 49. Core Laboratories also stated: "Both samples cover the correct range of distillation for compressor oils. The Hermiston scrubber oil appears to have a much narrower distillation range than is normally seen and could possible [sic] be a synthetic oil." *Id.*

On August 27, 2007, Zaitz wrote to various employees of GTN and the Hermiston plant that once the gas and liquid samples had been analyzed and the source of the liquid identified, he would be interested in discussing "long term" solutions to remove the liquid from the gas stream at various locations, depending on its source. (Sawyer Decl., #265, Ex. 14.)

## C.   August 2007 Outage

On  August 29, 2007, Hermiston again shut down the Unit 2 gas turbine.  (Glasgow Decl., #325, ¶22, Ex. 16 at 5.)  GE technicians arrived several days later and disassembled the nozzles, observing "moderate to heavy carbon deposits and burnt tips" on most of the old nozzles.  *Id.*, Ex. 16 at 5, 9.  Glasgow also viewed the disassembled nozzles and saw "coking," which he documented with several photographs.  (Glasgow Decl., #325, ¶30, Ex. 6.)  Unit 2 resumed service on September 10, 2077.  *Id.*, at ¶22, Ex. 16 at 5.

A few days prior, at the request of the Hermiston plant, Cascade "pigged" its pipeline, a process where foam gauges are run inside the pipeline.  (Skelton Decl., #248, Ex. 10) (Cooper Dep., at 100:7 -101:21).  One participant stated that only a "puff of dust" and a piece of grease about the size of a finger came out the end of the pipe, and that no free oil was discovered.  *Id.* But Glasgow, who was also present, states that at least 40 pigs removed from the Cascade

pipeline were discolored and covered with oil, as documented in photographs he took. (Glasgow Decl., #257, ¶12, Ex. 5.)

### D.    September 2007 Outage

Unit 2 suffered another outage from September 24, 2007 to October 10, 2007.  (Glasgow Decl., #325, ¶23.)  GE again inspected the fuel nozzle assemblies, finding them in various pre-stages of failure, and noting a "strong possibility of internal diffusion seal deterioration and coking due to liquid hydrocarbon contamination."  (Glasgow Decl., #325, Ex. 17, at 42.)  GE's report concluded that Hermiston "has experienced fuel gas contamination from their supply system." *Id.*, Ex. 17 at 4.  However, the author of the report testified only that the root cause of the outages "appeared to be" oil contamination, based on "reports" in September or October 2007 of "oil found in the gas piping itself."  (Sawyer Decl., #265, Ex. 40) (Crafts Dep., at 120-121).

Indeed, throughout 2007, Glasgow and other Hermiston plant employees reported seeing oil inside the plant.  (Glasgow Decl., #257, ¶¶4-8,10); (Journot Decl., #256, ¶¶3-5.)  At various times between January and July 2007, plant employee Terry Journot  reported seeing about a gallon of oil pour out of the filter where the plant receives gas from Cascade. (Journot Decl., #256, ¶4.)  Journot also observed oil in the plant piping and turbine equipment for Unit 2 later in 2007 during a cleaning of the gas lines.  *Id.* at ¶5.  Also during 2007, Frank Glasgow observed what he deemed to be oil at the gas metering orifice, the "witch's hat" filter, and the pigtails, all of which are downstream of the Unit 2 scrubber but upstream of the Unit 2 turbine.  (Glasgow Decl., #257, ¶¶4-7.)

### E.    FERC Hotline Call and Investigation

On September 28, 2007, PacifiCorp initiated a FERC hotline complaint concerning

contamination of gas received at Hermiston station.  (Erb Decl., #44, ¶2.)  During that call, a

FERC attorney suggested PacifiCorp notify GTN and Northwest Pipeline that they were the

suspected source of the contamination.  *Id.* at ¶3.  In February 2008, PacifiCorp withdrew its

hotline complaint.  Nevertheless, FERC continued its investigation and, in July 2008, FERC

determined that prior gas sampling conducted by GTN and PacifiCorp was unreliable and set out

a new protocol for collecting three different samples from GTN's lines A and B.  Those tests

occurred in November 2008, December 2008, and January 2009.  The testing revealed no

significant hydrocarbons or residues in the samples.  Based on these tests, FERC informed

PacifiCorp that its inquiry would be concluded.  In March 2010, FERC confirmed by letter that it

would take no further action regarding PacifiCorp's allegations that GTN's gas failed to meet

tariff quality standards, based on FERC staff's consideration of facts submitted and obtained

during its investigation.  (Aff. in Supp., #24, Ex. A).  That letter made clear that the FERC staff's

conclusions were not final or binding on FERC as a whole.  *Id.*

### F.    Scrubber Examination

 In early October 2007, after GE employee Sally Perkins hypothesized that the Unit 2

scrubber was malfunctioning, Glasgow visually examined the Unit 2 scrubber and found it to be

working properly, removing small amounts of liquid from the gas supply.  (Glasgow Decl., #325,

at ¶¶49-54.)  Indeed, records from that scrubber show that it consistently removed only a small

amount of liquid, totaling about .2 gallons in all of 2007.

### G.    Mitigation Outages

After the forced outages, the plant instituted what it has described as mitigation measures,

some of which required interrupting the gas supply and shutting down power generation.  During

the aftermath of the August 2007 outage of the Unit 2 generator, from September 8 to September 10, 2007, the plant cleaned its gas line, which also required shutting down the Unit 1 turbine. (Glasgow Decl., #325, ¶74.)  Another cleaning occurred during the September 2007 outage, from October 5 to October 8, 2007, which again shut down generation on the other turbine.  *Id.* at ¶¶75-76.  During that second cleaning, the plant installed a temporary coalescing filter in the gas yard at the recommendation of its consultant McHale & Associates.  *Id.* at ¶65.  The plant subsequently ceased operations twice to check on the functioning of that coalescing filter, on October 16 to October 17, 2007 and on November 10, 2007.  *Id.* at ¶69.  Then, on March 8, 2008, while Unit 1 was off-line for scheduled maintenance, the plant also interrupted Unit 2 generation to replace its original gas scrubbers with a permanent coalescing filter in the main gas yard.  *Id.* at ¶70.[1]  The plant also apparently installed a permanent coalescing filter specifically for Unit 2 several months later, an additional precaution recommended by consultant Scientific Process Solutions as early as October 2007. (Skelton Decl., #248, Ex. 50.)

### H.    2008 Exponent Report

PacifiCorp subsequently retained Exponent Failure Analysis ("Exponent") to investigate the root causes of the outages in January, July, August, and September 2007, as well as a Unit 1 shutdown in December 2007 for which damages are not sought in this suit.  (Skelton Decl., #248, Ex. 14.)  Exponent considered plant information, reports by PacifiCorp's consultants, and

---

[1] Unlike the original scrubbers which captured only liquid droplets of eight microns or larger, the permanent coalescing filters could remove smaller liquid droplets.  Interestingly, the plant experienced no further damage from fuel contamination following the installation of the permanent coalescing filter in March 2008.  (Skelton Decl., #248, Ex. 13) (Holst Dep., at 442-443.)  After being replaced, the original scrubbers were retained by the plant until 2010, when they were sold for scrap.

turbine operational data. *Id.* Also, at Exponent's request, the plant provided Exponent with a subset of damaged fuel nozzles from the July 2007 outage for laboratory inspection. *Id.* In its August 15, 2008 report, Exponent opined that the fuel nozzles installed at the plant were "susceptible to thermal failure" due to their lack of fairings and their propensity to trap liquid hydrocarbons, which, in the presence of minor temperature increases, could form coke and cause an internal failure of the nozzles. *Id.* at viii. Exponent also found that the tuning of Unit 2 differed from Unit 1, making it "less robust" in preventing intermittent flame flashback, an effect that can raise the temperature of the fuel nozzles sufficiently to transform trapped hydrocarbons into coke. *Id.* at ix-x. In sum, Exponent concluded that two concurrent conditions likely caused the Unit 2 failures: 1) intermittent flashback due to lack of fairings and differences in tuning; and (2) the presence of trapped liquid hydrocarbons in the fuel nozzles. *Id.* at x.

## LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v.*

*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the other.  *See* Fed. R. Civ. P. 56; *see also*, *e.g.*, *Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## DISCUSSION

### I.    Overview

As explained further below, I ultimately conclude that all claims against Northwest (negligence, negligence/res ipsa loquitor, nuisance, and trespass) must be dismissed, and that the negligence/res ipsa loquitor claim against GTN must also be dismissed, leaving only PacifiCorp's breach of contract claim against GTN as potentially viable at trial.  Moreover, as sanctions for PacifiCorp's spoliation of fuel nozzle assemblies and other turbine parts after litigation was reasonably foreseeable, PacifiCorp may not introduce expert testimony from Dr. Kemal about the cause of the August and September 2007 outages.  PacifiCorp is also subject to an adverse inference jury instruction concerning the numerous fuel nozzles that were not preserved from the July 2007 outage.  Given that expert testimony of causation is required for this type of complex mechanical failure, the scope of PacifiCorp's potential damages for forced outages is narrowed to the January and July 2007 outages.  Further, PacifiCorp fails to produce expert testimony to establish that oil contamination caused damage to the combustion liner replaced after the January 2007 outage.  PacifiCorp, however, need not introduce expert causation evidence for the mitigation outages and damages based on its mitigation efforts are therefore still available.  PacifiCorp's request for prejudgment interest is not properly pled.  Additionally, the doctrine of primary jurisdiction requires this court to stay proceedings pending

a referral to FERC, which must construe the tariff language that forms the basis of GTN's

disputed contractual duty.   In the meantime, GTN may conduct independent examination and

testing of the fuel nozzles in Dr. Kemal's possession, and PacifiCorp's is entitled to receive some

of the discovery sought in its motions to compel, namely, all communications considered by

GTN's non-reporting expert witnesses.

## II.    Northwest and GTN Motions for Summary Judgment— Availability of Negligence Claims

A good deal of the parties' briefing involves the question of whether PacifiCorp may even

assert negligence claims against Northwest and GTN.[2]  These claims attempt to enforce common

law obligations that PacifiCorp asserts are either identical to or "consistent with" the gas quality

provisions set out in GTN and Northwest's FERC tariffs.  In general, because these specific

FERC tariff gas quality provisions supplant any common law duties concerning gas quality, the

negligence-based claims against Northwest and GTN both fail.

### A.    Northwest

*Fazzolari v. Portland School Dist. No. 1J*, 303 Or. 1, 734 P.2d 1326 (1987) and its

progeny hold that the availability of a negligence claim turns on a two-step analysis.  First, court

consider whether there is evidence of a special relationship between the plaintiff and the

---

[2] PacifiCorp's other claims against Northwest all depend on the survival of PacifiCorp's negligence claim.  *Res ipsa loquitur* is a merely a theory by which negligence is proven, not an independent negligence claim.  Trespass requires proof of negligent, intentional, or reckless conduct, and PacifiCorp's argument focuses only on negligence.  *Carvalho v. Wolfe*, 207 Or. App. 175, 180-81, 140 P.3d 1161 (2006).  Similarly, nuisance requires proof of negligent, reckless, or intentional acts, an abnormally dangerous activity, or violation of a statute or ordinance defining a nuisance.  *See Raymond v. Southern Pacific Co.*, 259 Or. 629, 634, 488 P.2d 460 (1971).  Failure to establish negligent conduct precludes a claim for nuisance based on negligence.  *Stroda v. State Highway Comm.*, 22 Or. App. 403, 412-412, 539 P.2d 1147 (1975).

defendant due to "a status, a relationship, or a particular standard of conduct that creates, defines or limits the defendant's duty." *Buchler v. State By & Through Or. Corr. Div.*, 316 Or. 499, 504, 853 P.2d 798 (1993) (en banc) (quoting *Fazzolari*, 303 Or. at 19). Such a special relationship defining the defendant's standard of care can also be found in "a statute or an ordinance." *Little v. Wimmer*, 303 Or. 580, 584, 739 P.2d 564 (1987) (en banc). If a special relationship exists, the court analyzes defendant's duty under that standard. If there is no special relationship, the court proceeds to the second step, analyzing whether defendant's conduct "unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Buchler*, 316 Or. at 504, 509 (quoting *Fazzolari*, 303 Or. at 17.)

Here, PacifiCorp seems to identify two separate sources of Northwest's tort liability. At times, PacifiCorp argues that Northwest owed a duty to PacifiCorp not to deliver gas containing compressor oil based on Northwest's own tariff requirement to deliver gas "free of water and hydrocarbons in liquid form at the temperature and pressure at which the gas is delivered" and on Northwest's contractual obligation with GTN to adhere to the "merchantable" and "commercially free" gas quality provisions in GTN's tariff when transporting gas into GTN's pipeline. (Br. in Opp., #314, at 22, 23.) Elsewhere, PacifiCorp contends that Northwest's delivery of gas containing any compressor oil at the Stanfield Exchange created a foreseeable risk of damage to downstream users such as PacifiCorp. *Id.* at 24-25. Indeed, at oral argument, PacifiCorp tacitly admitted that relevant tariffs delineate the defendants' standard of care concerning gas quality, confirming that both Northwest and GTN owed a standard of care "consistent with" their respective gas quality tariffs.

In the first step of the two-step *Fazzolari* methodology, I conclude that Northwest and

Page 16- OPINION AND ORDER

GTN's gas quality tariff provisions set forth precisely the type of "particular standard of conduct that creates, defines or limits the defendant's duty"obviating resort to a foreseeability analysis. The parties do no dispute that FERC tariffs are effectively federal regulations.  (Br. in Opp., #314, at 23, n.15); *see also California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th Cir. 2004) (filed FERC tariffs are the equivalent of a federal regulation).  Thus, the FERC tariffs can form the basis for a particular standard of conduct limiting Northwest's duty.  Northwest's tariff limits its duty concerning gas quality by explicitly narrowing the scope of its obligations to gas delivered to a "Shipper" at a "Delivery Point." Richards Decl., #246, Ex. 3, ¶¶3.1, 3.2. While Northwest's tariff gives rise to a duty not to deliver contaminated gas to GTN (a Shipper) at the Stanfield exchange (a Delivery Point), it does not also obligate Northwest to a gas quality standard for gas received by PacifiCorp (not a Shipper) at the Hermiston station (not a Delivery Point).  The same analysis also obtains under Northwest's contractual obligation to satisfy the gas quality provisions of GTN's tariff when Northwest supplies gas to GTN at the Stanfield exchange.  Thus, assuming Northwest delivered contaminated gas to GTN which eventually reached the Hermiston plant, such conduct might give rise to a cause of action by GTN against Northwest, but it would not violate any tariff-created standard of care Northwest owed to PacifiCorp.  In sum, I reject PacifiCorp's attempt to manufacture a negligence claim against Northwest by expanding the scope of FERC tariffs to create a generalized duty of care to all foreseeable downstream users, in contradiction to the tariffs' express terms.

Although not necessary to my conclusion, I also note that PacifiCorp's approach also appears to violate a FERC policy statement and subsequent FERC authority holding that upstream gas transporters are only responsible for ensuring gas quality at their tariff delivery

Page 17- OPINION AND ORDER

points to their direct customers.[3]  *See, e.g., ANR Pipeline II,* 116 FERC ¶61,002, ¶61,014 (Jan. 3, 2006); *Dominion Cove Point, LNG, LP Dominion, Inc.* 126 FERC ¶61,036, ¶61,211 (Jan. 15, 2009).  For much the same reasons, PacifiCorp's negligence claim against Northwest also likely violates the filed rate doctrine, which prohibits challenging the tariff rate outside of FERC proceedings, attempted here through PacifiCorp's effort to impose an obligation to ensure gas quality as to non-Shippers, a requirement not present in Northwest's FERC tariff.  *See Brown v. MCI WorldCom Network Services, Inc.,* 277 F.3d 1166, 1170, 1172 (9th Cir. 2002).  Given my conclusion above, I need not resolve Northwest's other grounds for summary judgment, including that PacifiCorp's negligence claim is conflict and field preempted by federal law, that the doctrine of primary jurisdiction requires dismissal, that PacifiCorp cannot prove Northwest caused its alleged damages, that PacifiCorp's *res ipsa loquitur* claim fails as a matter of law, and that PacifiCorp's prejudgement interest claim also fails.

## B.    GTN

GTN also moves for summary judgment on the negligence claim against it, arguing that its gas transport agreement with PacifiCorp incorporating the gas quality provisions of its FERC tariff supplanted the common law duty of care regarding gas quality.  PacifiCorp, by contrast, insists that a negligence claim still lies because the gas transport agreement with GTN did not alter or eliminate GTN's common law duty.

---

[3] PacifiCorp argues that these decisions are limited to the context of hydrocarbon drop-out, a phenomenon where hydrocarbon gases naturally occurring in the gas condense into liquids with decreased temperature and pressure, and do not apply to contamination by foreign contaminants such as compressor oil. I need not definitively resolve this issue today.  However, it is telling that PacifiCorp cites no authority, either FERC decisions or otherwise, involving a remote downstream user maintaining a state law negligence claim against an upstream gas transporter to enforce the gas quality tariff provisions in the transporter's FERC tariff.

The Oregon Supreme Court's most recent pronouncement on the overlap between contract and negligence claims is *Abraham v. T. Henry Const., Inc.,* 350 Or. 29, 249 P.3d 534 (2011). There, the Court reiterated that *Fazzolari* still remains the touchstone for determining the existence of negligence liability, even in the presence of a contract between the parties. *Id.* at 37. The Court sketched what amounts to a variation on the *Fazzolari* two-step inquiry that courts should apply when determining whether a negligence claim exists:

> we first consider whether plaintiffs alleged that defendants unreasonably created a foreseeable risk of harm to a protected interest, resulting in injury to plaintiffs. If so, we must determine whether the contract between the parties altered or eliminated defendants' common law duty to avoid harming plaintiffs. If it did not, then the contract does not bar plaintiffs from bringing a negligence action against defendants.

350 Or. at 37. Consequently, the crucial question here is whether PacifiCorp and GTN's contract "altered or eliminated" GTN's common law duty regarding gas quality with respect to PacifiCorp. *Id* at 37. This is the effectively the same inquiry posed by *Fazzolari*, investigating whether the contract "creates, defines, or limits" the existing common law duty. *Id.* at 38.

As discussed above, the transport agreement incorporated the gas quality provisions of GTN's tariff. I agree with GTN that, in doing so, the contract replaced any preexisting common law duty regarding gas quality with the standards spelled out in the tariff. Thus, the tariff can be said to have "altered," "created," "defined," or "limited" GTN's common law duty – all different words used by *Fazzolari* and *Abraham* to refer to the same concept of replacement.

In briefing, PacifiCorp states conclusorily that "there is nothing in GTN's contract with PacifiCorp that purports to alter or eliminate GTN's common law duty under Oregon law to avoid harming PacifiCorp." (Br. in Opp., #314, at 17.) In oral argument, PacifiCorp advances several more specific, but ultimately unpersuasive theories. First, PacifiCorp seems to contend

that where the tariff provisions are incorporated into the contract, conduct breaching those provisions gives rise to a negligence claim so long as the foreseeability prong of *Fazzolari* is also satisfied.  According to this argument, for example, if the tariff and thus the contract required gas to contain no more than 10 parts per million of compressor oil, and delivery of more than 10 parts per million would also "unreasonably create[] a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff," *Fazzolari*, 303 Or. at 17, then delivery of gas with 15 parts per million compressor oil would give rise to both a contract and negligence claim, despite the fact that the contract specifically defined gas quality standards for compressor oil.  It is clear that this formulation conflicts with the holdings of *Fazzolari* and *Abraham*, preserving a contract claim even when the parties agree to a specific standard of care defining their respective duties.

Second, PacifiCorp also suggests that because compressor oil is know to be extremely harmful, unlike other substances naturally occurring in gas for which the tariff provides more specific quality standards, the tariff merely reiterates the common law duty to remove it from gas before delivery.  Indeed, the Oregon Supreme Court is clear that merely reciting or incorporating a common law duty into a contract does not somehow replace the common law standard of care. *See Abraham*, 350 Or. at 42-43 ("By merely reciting the obligation to build plaintiffs' house in a reasonably skilled manner and in accordance with the building code—and, by implication, in such a way as to avoid foreseeable harm to plaintiff—defendants did nothing to supplant the common law standard of care.").  But that is not what happened here.  PacifiCorp admits that the tariff's requirement that gas be "commercially free" of objectionable substances like compressor oil that would interfere with "commercial utilization" is a specific standard just like the other tariff standards for naturally occurring compounds.  There is no principled basis for

distinguishing between the tariff's quantitative standards for certain substances and the qualitative standard for compressor oil, which will ultimately be given a more precise construction either by FERC or this court.  Both replace the common law standard of care.

Third, PacifiCorp appears to argue that the common law duty of care is not supplanted unless the parties' contract contains an explicit limitation of remedies for negligence, such as an exculpatory clause.  This is surely one way for the parties to signal the unavailability of a negligence claim, but it not the only way.  As *Abraham* recognizes, parties can limit tort remedies either by "contractually limiting or specifying available remedies," or by "defining their obligations in such a way that the common law standard of care has been supplanted . . . ."  350 Or. at 40.  The tariff, and by extension the transport agreement, utilizes the latter method, defining GTN's obligations concerning objectionable substances in a manner supplanting the common law standard of care.  Accordingly, the transport agreement bars PacifiCorp's negligence claim against GTN.  I decline to address GTN's other arguments against the negligence claim as a whole.[4]

## III.    GTN's Spoliation Motion

Both defendants move for sanctions based on PacifiCorp's spoliation of evidence, although, since I grant Northwest's motion for summary judgment, I focus solely on GTN's motion.  GTN seeks dismissal of this action as a sanction for PacifiCorp's willful spoliation of: 1) turbine components that were allegedly damaged, including fuel nozzles, transition pieces, and combustion liners; (2) gas and liquid samples; (3) scrubbers installed in front of turbine Units 1

---

[4] GTN also argues that the doctrine of *res ipsa loquitur* is unavailable and the economic loss rule completely bars PacifiCorp's claim for damages under a negligence theory.

and 2 that were replaced with coalescing filters in March 2008; and (4) samples collected from fuel nozzles, filter cartridges, a "pig," and "reference oil". Alternatively, GTN seeks to have any reference to the allegedly spoliated materials excluded– including any other expert testimony relying on that evidence– and an adverse inference instruction that the destroyed scrubbers were malfunctioning or inadequate.

"A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1328 (9th Cir.1993). Thus, a district court has the discretion to impose sanctions based on its power "to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (internal citation omitted). Sanctions for spoliation include dismissal of claims, exclusion of evidence, and adverse jury instructions permitting a jury to draw an inference that the destroyed evidence would have been adverse to the party responsible for its destruction. *Unigard*, 982 F.2d at 368-370. Before a court imposes the "harsh sanction" of dismissal, "the conduct to be sanctioned must be due to willfulness, fault, or bad faith." *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995) (internal citation omitted). Even when a court imposes a lesser evidentiary sanction than outright dismissal, it must find that the party willfully destroyed the evidence. *Unigard*, 982 F.2d at 368 & n. 2; *Glover*, 6 F.3d at 1329; *see also Akiona v. United States*, 938 F.2d 158, 161 (9th Cir.1991).

A party's destruction of evidence is considered "willful" if the party "has some notice that the [evidence was] *potentially* relevant to the litigation before [it was] destroyed." *Leon v. IDX*

Page 22- OPINION AND ORDER

*Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (emphasis in original) (internal citation omitted). Because the relevance of destroyed evidence cannot clearly be ascertained, a party "can hardly assert any presumption of irrelevance" as to the destroyed evidence. *Id.* (quoting *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982)).

Circuit courts describe the duty to preserve evidence as attaching when a party should know that evidence may be relevant to litigation that is "anticipated," or "reasonably foreseeable." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590, 591 (4th Cir. 2001) (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).  As the Federal Circuit recently explained, "[w]hen litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) (citing *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).  Although "this standard does not trigger the duty to preserve documents from the mere existence of a potential claim or the distant possibility of litigation, . . .  it is not so inflexible as to require that litigation be imminent, or probable without significant contingencies . . . ." *Id.* (internal citations and quotations omitted).  Some district courts in the Ninth Circuit express the standard differently, holding that litigation must be "probable," before the duty to preserve evidence applies. *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 264 F.R.D. 517, 524 (N.D. Cal. 2009); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F.Supp.2d 1038, 1061 (N.D. Cal. 2006); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal. 2006).

### A.      When Duty to Preserve Attached

Page 23- OPINION AND ORDER

The first step in the spoliation analysis is to determine the point at which PacifiCorp became obligated to preserve all evidence that might be relevant to reasonably foreseeable future litigation. GTN argues that PacifiCorp's duty to preserve evidence arose in July 2007, the time when PacifiCorp's 30(b)(6) designee Shane Holst testified PacifiCorp first became aware that damage to turbine components parts was due to gas contamination. (Suppl. Walker Decl., #341, Ex. 6, at 303-304). At the very least, GTN contends that the duty arose on August 2, 2007, the date this court previously determined PacifiCorp anticipated this litigation for purposes of work product protection analysis. (Opinion and Order, #210, at 5.)[5]

PacifiCorp counters that the duty to preserve relevant evidence arose much later. PacifiCorp explains that this court erroneously reported PacifiCorp hired outside counsel on August 2, 2007. In fact, PacifiCorp involved only its in-house counsel on that date, and did not hire outside counsel until October 9, 2007. Thus, PacifiCorp contends that the duty to preserve potentially relevant evidence arose only on October 9, 2007. PacifiCorp insists that between August 2, 2007, when PacifiCorp's in-house counsel became aware of possible fuel contamination, and October 9, 2007, GTN worked cooperatively with the Hermiston plant to assure no further fuel contamination, which indicated that future litigation was not yet probable.[6]

_____

[5] The court based that earlier conclusion on PacifiCorp's representation or implication that PacifiCorp hired outside counsel on that date. (Campbell Decl., #188, ¶4) ("PacifiCorp's counsel became involved beginning August 2, 2007"); (P.'s Motion for Reconsideration, #218, at 7) ("When coupled with the fact that PacifiCorp had hired outside counsel in August 2007 . . .").

[6] PacifiCorp's focus solely on its own awareness of foreseeable litigation is inadequate. As discussion in briefing and especially at oral argument made clear, the crucial inquiry is not just when PacifiCorp became aware of reasonably foreseeable litigation, but when PacifiCorp or HGC, the plant operator, became aware of reasonably foreseeable litigation. In this suit, PacifiCorp stands in the shoes of HGC, having accepted HGC's tender of a claim on September 19, 2007 and obtained an assignment of HGC's claims on December 30, 2009.

Page 24- OPINION AND ORDER

It is clear that at least as early as September 19, 2007, both HGC and PacifiCorp reasonably foresaw litigation against gas suppliers like GTN based on gas contamination.  HGC's claim for reimbursement from PacifiCorp on that date announced that HGC's preliminary analysis showed the root cause of forced outages occurring on January 25, 2007, July 30, 2007, and August 29, 2007 was "the presence of lubrication/compressor seal oil as a contaminant in the gas fuel supply to the Plant."  (Sasaki Decl., #324, Ex. 18, at 2.)  Further, HGC notified PacifiCorp that "PacifiCorp has the sole right to seek indemnity for all such expenses from the Fuel Gas suppliers . . . ."  *Id.* at 3.

But PacifiCorp apparently predicted litigation even earlier, as of August 2, 2007.  In resisting a motion to compel based on the work product protection, PacifiCorp argued that emails and other documents identified as work product beginning on August 2, 2007 were prepared "in anticipation of litigation" and related "to the collection of information necessary to assess, develop, and establish PacifiCorp's claims and/or to identify and analyze anticipated defenses."  (P.'s Opp. to Mot. to Compel, #115, at 6.) Indeed, PacifiCorp stated:

> PacifiCorp is not claiming work product protection for documents related to this action earlier than August 2, 2007, which is when legal counsel became involved in investigating the outages at the Hermiston Plant . . . . GTN's contention that PacifiCorp could not have anticipated litigation prior to September 19, 2007, is simply mistaken.

*Id.* at 4.  In light of these earlier representations, PacifiCorp is judicially estopped from taking the position, advanced presently, that it did not anticipate litigation against GTN in early August 2007 because GTN was cooperating with the plant at that point to find the cause of the gas contamination.  *See Helfand v. Gerson,* 105 F.3d 530, 534 (9th Cir. 1997) (judicial estoppel precludes a party from gaining an advantage by taking one position and then seeking a second

Page 25- OPINION AND ORDER

advantage by taking an incompatible position).

The fact that the court incorrectly identified August 2, 2007 as the date PacifiCorp retained outside counsel is of no moment.  PacifiCorp failed to correct, and even repeated, this court's misstatement of that fact in later briefing in support of its motion for reconsideration. Moreover, I reject PacifiCorp's hairsplitting attempt to distinguish between the standard for work product protection requiring only "possible" litigation and that for the duty to preserve relevant evidence, which PacifiCorp characterizes as requiring "probable" litigation. Courts analyzing this issue in depth endorse a flexible and fact-specific inquiry into when parties become obligated to preserve evidence, eschewing a hyper-technical reliance on terms like  "probable." *Cf. Micron Tech.*, 645 F.3d  at 1320.  Finally, even under PacifiCorp's proposed "probable" litigation standard, PacifiCorp's assertion that it was assessing, developing, and establishing claims and anticipated defenses in August 2007 surely suffices to establish that litigation was probable at that time.  Consequently, PacifiCorp was obligated to preserve any potentially relevant evidence relating to gas quality litigation as of August 2, 2007.

Evidence that PacifiCorp destroyed before that date cannot form the basis for spoliation sanctions.  In particular, although it is not clear from the record exactly when the turbine components from the January 2007 outage were destroyed, it is likely that they were refurbished or discarded sometime soon after GE's inspection report relating to the January 2007 outage, issued on April 22, 2007.  By contrast, components from the July 2007 outage were undoubtedly destroyed after August 2, 2007, because GE issued its report recommending the plant send the fuel nozzles damaged in the July outage to Florida for repair on October 31, 2007.  (Glasgow Decl, #325, Ex. 15 at 1,8.)

Page 26- OPINION AND ORDER

### B.    Destroyed Evidence

For each piece of destroyed evidence, I analyze whether the destruction was willful, the degree of prejudice to GTN, and the efficacy of less drastic sanctions than dismissal. Given that all the evidence for which GTN seeks sanctions was destroyed after August 2, 2007, when PacifiCorp anticipated litigation, the willfulness inquiry focuses on the potential relevance of the destroyed evidence. *See Leon*, 464 F.3d at 959 (destruction willful if the destroying party had notice that the evidence was potentially relevant to the litigation). Further, in assessing prejudice to GTN, I look to whether PacifiCorp's actions have impaired GTN's ability to go to trial or achieve a "rightful decision of the case." *Id*. Destruction that precludes a party from inspecting physical evidence can create prejudice. *Unigard*, 982 F.2d at 369. Similarly, forcing a party to rely on evidence selected by an opposing party's expert creates prejudice, because such evidence generally supports that party's case. *BTO Logging, Inc. v. Deere & Co.*, 174 F.R.D. 690, 694 (D. Or. 1997). However, the existence of secondary evidence can reduce prejudice caused by the inadvertent loss of primary evidence. *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 825 (9th Cir. 2002) (digital images of misplaced slides and records retained by lab and doctors examining those slides constitute secondary evidence).

### 1.    Turbine Fuel Nozzles

The destruction of turbine parts is a central dispute in this litigation. I primarily address the alleged spoliation of the turbine nozzles, which raise particularly troubling legal and factual issues. Overall, PacifiCorp preserved only 11 of the 350 fuel nozzles allegedly damaged due to contamination. Instead of preserving the other damaged fuel nozzles, PacifiCorp refurbished them, purportedly to avoid the higher cost of buying new replacements and to prevent plant

shutdowns and resulting loss of revenue that would occur if another failure struck while the plant operated without a back-up set of nozzles.  Although PacifiCorp never informed GTN of its plans to refurbish the nozzles, PacifiCorp argues that GTN "had to know that the nozzles would be refurbished" because GTN was informed of the outages, yet never objected to the refurbishment. (P.'s Mot. in Opp., #326, at 26-27.)

Of the 11 nozzles preserved, only five are relevant to the Unit 2 outages for which damages are claimed in this litigation.  Those five nozzles came from the July 30, 2007 Unit 2 outage and were provided to Dr. Kemal for examination at his request.  As each turbine has 14 combustor assemblies, and each assembly contains five fuel nozzles, these five nozzles constitute only a fraction of the nozzles from one of four outages which Dr. Kemal addressed in his expert report.  Dr. Kemal cross-sectioned several of the five Unit 2 nozzles to conduct his analysis, leaving others unaltered.  PacifiCorp's counsel represented that Dr. Kemal created no lab data or notes during his testing of the nozzles, although Kemal's recent declaration indicates he did create evidence logs and lab analysis reports, which so far have not been produced to defendants. (Kemal Decl., #319, ¶17.)  Dr. Kemal's expert report, deposition, and declaration offer somewhat different observations about the condition of the cross-sectioned nozzles and the alleged presence of "coke" within them.[7]  But Dr. Kemal consistently opines that, based on the comparison of the

---

[7] In his expert report, Kamal stated that he observed coke formed from the presence of liquid hydrocarbon in the Unit 2 nozzles.  Later, however, in deposition he stated that he did not actually observe coke itself, but rather only evidence of rupture and molten metal slag consistent with coking, since nearly all of the coke would have been burned by the time he received the nozzles. (Walker Supp. Decl., #341, Ex 3, at 126.)  Nevertheless, PacifiCorp has submitted a new declaration from Dr. Kemal in opposition to defendants' summary judgment motions in which Kemal states he observed extensive carbon deposits forming coke in the fuel passages. Defendants challenge this deposition as being an impermissible late supplementation of an expert report, and a sham affidavit. I need not resolve those objections now, as I would reach the same

Unit 2 nozzles he physically examined with photographs of nozzles from three other outages taken by plant employees, all nozzles exhibited similar patterns of coking and inside-out burning. He therefore concluded that the four forced outages of Unit 2 in 2007 were caused by the same mechanism– the presence of liquid hydrocarbons in the gas supply.[8]

Defendants were later provided an opportunity to examine the fuel nozzles in the possession of Dr. Kemal.  At that examination, communications apparently broke down when GTN requested permission to bring the nozzles to a different laboratory for additional testing, with PacifiCorp blaming GTN for unnecessarily delaying further examination and GTN blaming PacifiCorp for refusing to allow additional destructive testing.  Currently, several unaltered nozzles from the July 2007 outage remain in Kemal's laboratory.

Here, PacifiCorp does not dispute the relevance of the nozzles to the litigation.  It is self-evident that the destroyed fuel nozzles are relevant, both since PacifiCorp seeks damages for their refurbishment and for lost revenue allegedly caused by their failure.  Thus, I conclude that PacifiCorp's destruction of nozzles from the July, August, and September 2007 outages was willful, since litigation was reasonably foreseeable when PacifiCorp sent those nozzles to be refurbished.

PacifiCorp, however, argues that no sanctions should be imposed for two other reasons. First, PacifiCorp contends that refurbishing the nozzles was a reasonable measure necessary to

conclusion on these motions whether or not I consider Kemal's declaration.

[8] While Kemal also opined that fuel contamination was present in nozzles from a December 2007 outage of Unit 1, he concluded that the Unit 1 outage was caused by operator error.  (Kemal Decl., #319, Ex. 1, at 31.)  PacifiCorp does not pursue damages for that Unit 1 December 2007 outage.

Page 29- OPINION AND ORDER

mitigate additional damages.  PacifiCorp cites several cases supporting its position that refurbishment of the turbine nozzles was proper and necessary to carry out its countervailing obligation to mitigate damages, because preserving the nozzles would have jeopardized continued operation of the plant.  *See Flint Hills Res. LP v. Lovegreen Turbine Servs., Inc.*, Civil No. 04-4699 (JRT/FLN), 2006 WL 2472819, at *5 (D. Minn. Aug. 25, 2006) (plaintiff's immediate inspection and repair of gas compressor that was jammed with a cloth rag was an effort to mitigate significant damages from plant shutdown rather than an intentional destruction of evidence, because plaintiff documented the repair with photographs and notes and, importantly, avoided destroying or discarding any damaged property by saving all rag fragments); *McLaughlin v. Denharco, Inc.*, 129 F. Supp. 2d 32, 36 (D. Me. 2001) (plaintiff's repair of tree delimbing machine did not constitute conscious wrongdoing because he had to maintain the machine to mitigate damages and because defendants were not "responsive"); *Baliotis v. McNeil*, 870 F. Supp. 1285, 1292 (M.D. Pa. 1994) (finding no bad faith by insurer who failed to maintain the scene of a fire until all potential defendants were notified and could conduct inspections, but permitting an adverse inference instruction that lost evidence was unfavorable).

While these cases illustrate circumstances where failure to preserve evidence in its original state is necessary for purposes of mitigation, they do not assist PacifiCorp.  First, unlike in *McLaughlin* and *Baliotis*, here PacifiCorp never notified GTN that it planned to refurbish the nozzles or offered to let GTN inspect the nozzles before they were irrevocably altered.[9]  Indeed, PacifiCorp, as the party in control of evidence relevant to anticipated litigation, had the

_____

[9] PacifiCorp implies that GTN should have known the nozzles would be refurbished, yet failed request access to them anyway.  But there is no evidence in the record that GTN, in fact, was aware of PacifiCorp's plans to refurbish the nozzles.

obligation to notify GTN of that evidence and provide access before destroying it. *See Erlandson v. Ford Motor Co.*, No. 08–CV–1137–BR, 2009 WL 3672898, at *5 (D. Or. Oct. 30, 2009) ("The party in control of the evidence has 'an obligation to give the opposing party notice of access to the evidence . . . if the party anticipates litigation involving that evidence.'") (quoting *Silvestri*, 271 F.3d at 591).

Further, mitigation was not urgently required here, as in other cases where courts refused to impose sanctions for destruction of evidence on mitigation grounds. For example, in *Flint Hills*, damages of $1 million per day in lost revenue would necessarily have accrued unless the plaintiff repaired its damaged compressor immediately. *Flint Hills*, 2006 WL 2472819, at *5. By contrast, here, the plant resumed operation with spare nozzle assemblies and apparently sent the damaged nozzles for refurbishment months after the allegedly forced outages. PacifiCorp therefore had ample time to allow defendants to inspect the damaged nozzles without delaying PacifiCorp's chosen mitigation strategy.

Second, PacifCorp insists that GTN suffered no prejudice, as other adequate reliable evidence exists concerning the nature of the fuel nozzle failures. However, the prejudice from PacifiCorp's conduct is overwhelming, at least as regarding fuel nozzles from the August and September 2007 outages. PacifiCorp's refurbishment prevents GTN's experts from examining any damaged turbine nozzles from those outages to investigate the plausibility of alternate causes of damages besides oil contamination– causes such as design defects, plant operation error, or other mechanical error that defense experts raise. *See Unigard*, 982 F.2d at 369.

Moreover, PacifiCorp applies an incorrect standard by arguing that GTN suffers no prejudice because the remaining evidence of nozzle failure is "adequate and reliable." The loss

Page 31- OPINION AND ORDER

of *all* nozzles from the August and September 2007 outages places GTN in the position of

relying on the photographs taken by plant employees and the analyses of the plant's turbine repair

contractor (GE) from those outages, which likely support PacifiCorp's failure theory while

failing to document evidence supportive of other failure theories.  *See BTO Logging*, 174 F.R.D.

at 694.  These photographs and GE analyses do not constitute secondary evidence that can be

easily substituted for the original.  It is obvious that where the crucial issues of causation revolve

around identifying the presence or indicia of a chemical compound– compressor oil– in a

damaged machine, photographs of the machine are hardly an adequate substitute for the thing

itself.  The GE reports contain photographs that suffer the same flaw as the plant photographs,

and the reports' observations about the condition of the nozzles are even less reliable as

secondary evidence of the refurbished nozzles.  Finally, the one preserved fuel nozzle assembly

from the July 2007 outage cannot replace nozzles from other outages because the two outages are

distinct events with potentially different causes.  GTN will be prejudiced if it is forced to accept

Dr. Kemal's assertion that the failure mechanism he identified for the July 2007 outage also

occurred in August and September 2007 without the opportunity to examine the equipment

damaged in those outages.

Because the despoiled fuel nozzles are at the heart of this case and absolutely no physical

evidence remains of the parts damaged in the August and September 2007, the most appropriate

sanction is exclusion of all expert testimony concerning those damaged parts and whether

compressor oil caused their damage.[10]  *Napster*, 462 F. Supp.2d at 1066 (as a sanction for

---

[10]  It is clear that no lesser sanction is feasible. Imposing a rebuttable presumption adverse
inference instruction would still allow PacifiCorp to introduce evidence concerning the condition
of the nozzles, for example from plant employees who inspected them or GE technicians who

spoliation, a court may exclude "witness testimony proffered by the party responsible for destroying the evidence and based on the destroyed evidence."). This includes Dr. Kemal's testimony concerning causation of the August and September outages, plus any other expert's testimony relying on those conclusions. The Ninth Circuit has affirmed imposition of a somewhat similar sanction in *Unigard*, where the district court excluded testimony of an expert about the cause of damages where plaintiff destroyed the instrumentality allegedly causing its damages, reasoning that plaintiff's introduction of the expert testimony would unfairly prejudice defendant and preclude a fair trial. *Unigard*, 982 F.2d at 368. This ruling does not constitute an outright dismissal of PacifiCorp's breach of contract claim, but rather a limitation on the evidence PacifiCorp may introduce in support of that claim, commensurate with PacifiCorp's spoliation. As I discuss more thoroughly below, this ruling precludes PacifiCorp from establishing that GTN's alleged gas contamination was the factual cause of the August and September 2007 outages and, consequently, prevents PacifiCorp from recovering any damages associated with parts, labor, services, or lost power generation flowing exclusively from those outages.

A slightly different analysis applies to the July 2007 nozzles. 65 of those nozzles were refurbished, but importantly, five were given to Dr. Kemal, a few of which were cross-sectioned and others of which remained in their original condition. PacifiCorp's spoliation of almost every turbine component from the July 2007 outage also might warrant exclusion of Kemal's testimony concerning the cause of the July 2007 outage, for some of the same reasons described above. But

refurbished them, which GTN would be "helpless" to overcome without access to the parts themselves. *See Leon*, 464 F.3d at 960.

imposing that sanction would likely prevent PacifiCorp from establishing causation as to any damages whatsoever, since Kemal's opinions about the July 2007 nozzles form the basis for his conclusions about the cause of all other forced outages.  A lesser, adequate sanction is available that will remedy GTN's prejudice from the destruction of the July components.  First, following this ruling, this court is prepared to reopen discovery for the limited purpose of allowing GTN to inspect and test the remaining July 2007 nozzles, if GTN desires.[11]  The opportunity to independently examine some of the same July 2007 nozzles that PacifiCorp sent its expert reduces GTN's prejudice significantly.  GTN still cannot inspect the remaining 65 nozzles from the July 2007 outage, and the possibility remains that PacifiCorp selected the nozzle assembly for preservation that was most consistent with its theory.

Therefore, in addition to granting GTN the opportunity to test the preserved July nozzles, if PacifiCorp's breach of contract claim reaches trial, this court will give an adverse inference instruction establishing a rebuttable presumption that the 65 despoiled fuel nozzles and associated turbine parts damaged in the July 2007 outage that were not preserved by PacifiCorp did not exhibit signs of compressor oil contamination.  *See Brodle v. Lochmead Farms, Inc.*, No. 10–6386–AA, 2011 WL 4913657, at *5 (D. Or. Oct. 13, 2011) ("A court may 'permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior.'")  (quoting *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)). PacifiCorp, of course, will still have the opportunity to rebut that presumption by offering evidence concerning the uniformity of compressor oil contamination throughout the various

---

[11] The parties deadlocked in negotiations about further inspection of those nozzles, apparently with each side contributing to that result.

turbine fuel nozzle assemblies and the method it used to select the five nozzles in the single assembly it eventually preserved.

### 2.    Gas and Liquid Samples

In August and October 2007, PacifiCorp hired McHale & Associates to take gas and liquid samples collected from GTN's pipeline, Cascade's pipeline and the Hermiston plant's scrubbers. Texas Oil Tech analyzed those samples, finding the presence of heavy hydrocarbons with some characteristics of compressor or lubricating oil. Testing could not identify the precise type of hydrocarbon or the concentration in the gas stream, although McHale stated that other tests could be performed to determine its source. The gas and liquid samples and bottles that held them were destroyed. Several of PacifiCorp's experts rely on these analyses to conclude that a substance consistent with lubricating oil was present in the plant and could have damaged the plant's turbines.

Neither party contests that the nature of the liquid gathered in August 2007 is highly relevant. However, PacifiCorp asserts that its destruction of the samples was not willful because GTN was present when the samples were collected and did not object to the manner in which they were collected or analyzed, nor did GTN request the samples be preserved. GTN notes that PacifiCorp justified its need for samples to help determine the proper size of a proposed coalescing filter and heater, not to determine whether GTN's gas violated tariff quality requirements, ostensibly undercutting PacifiCorp's argument that GTN knowingly failed to ask PacifiCorp to preserve samples relevant to anticipated litigation. (Suppl. Walker Decl., #341, Ex. 4, at 2.) GTN primarily argues that the destruction of these samples was particularly prejudicial because GTN cannot now verify the accuracy of the sampling and evidence tracking

Page 35- OPINION AND ORDER

methodology.  PacifiCorp disputes that the labeling of the sample bottles were improper.

PacifiCorp also insists that because the Texas Oil Tech certificates of analysis provide reliable

secondary evidence of the gas samples and because GTN obtained its own sets of gas and liquid

samples in August 2007, October 2007, December 2007, and again in 2008 and 2009, GTN's

prejudice from the lost samples is not sufficient to justify sanctions.

Overall, I agree with GTN that PacifiCorp's destruction of the samples was willful, since

PacifiCorp was anticipating litigation and the presence of contaminants in the gas was

undoubtedly relevant to that litigation.  However, the prejudice to GTN from the destruction of

the McHale & Associates samples is not sufficient to justify dismissal, exclusion of evidence,

adverse inference instruction, or any other sanction.  GTN apparently has its own samples from

the period in question.  Moreover, GTN can attack the sample collection methodology with the

standard techniques of cross-examination just as effectively as if the samples were still available,

since the presence of the samples does not illuminate the manner in which the oil and liquid was

sampled and there appears to be no factual dispute about the manner in which McHale &

Associates labeled the samples.

### 3.    Fuel Gas Scrubber

Sometime in March or May 2008 – the date varies in materials from PacifiCorp and its

experts – PacifiCorp replaced the scrubbers on Units 1 and 2 with more advanced coalescing

filters and scrubbers that could remove smaller particles and mists.  PacifiCorp then scrapped and

sold the scrubbers in the summer of 2010, purportedly to make room for a new warehouse.[12] As a

---

[12] Northwest offers evidence that the plant had ample room to store the scrubbers on-site
with other unused equipment.

sanction, GTN seeks dismissal of all claims or, alternatively, an adverse inference instruction that the destroyed scrubber for Unit 2 would not have supported PacifiCorp's theory of causation and that the scrubber was either malfunctioning or inadequate.  PacifiCorp argues that spoliation sanctions are not warranted regarding the scrubber because it was found to have been working properly in October 2007 and was therefore irrelevant to the litigation when PacifiCorp disposed of it.[13]  Furthermore, PacifiCorp takes the position that, because neither defendant previously requested access to the scrubber nor suggested it would be relevant to the litigation, spoliation sanctions now are inappropriate.

Again, I find PacifiCorp's explanations to be deficient.  Given that the scrubber's purpose was to remove liquids from the gas stream that could damage the turbines, the scrubber's condition would undoubtedly be relevant to allegations that the contaminated gas nonetheless passed through the scrubber and reached the turbine nozzles.  And neither GTN nor this court need accept PacifiCorp's assurance that the scrubber was irrelevant to this litigation because it was working properly.  *See Leon*, 464 F.3d at 959.  Also, GTN's failure to specifically request to examine the scrubber before it was scrapped and sold in the summer of 2010 is not dispositive, because PacifiCorp bears the burden of preserving evidence, not GTN.  Further, defendants are

---

[13] PacifiCorp relies on a declaration from Frank Glasgow (which defendants seek to exclude in part as inadmissible and irrelevant), who inspected the scrubber on October 6, 2007 and found it to be in good working order and on plant records showing the scrubber was indeed removing liquids throughout 2007, which would indicate it was doing its job.  GTN, however, takes issue with Glasgow's current declaration, noting he previously voiced concerns about the scrubber's efficacy.  Defendants also point to testimony from other plant employees and GE employees that a bad scrubber could have caused the Unit 2 outage, which prompted PacifiCorp to hire a consultant to recommend a replacement.  Moreover, both the Black & Veatch report in late March 2008 and the Exponent report in August 2008 discussed the possibility that the current scrubbers were not able to sufficiently remove liquid hydrocarbons from the gas.

not obligated to rely on PacifiCorp's assertions that the scrubber was observed to have been

functioning properly in 2007 or their suspect logical syllogism that the scrubber was sufficient

merely because it performed the function for which it was designed, removing liquids.  The

crucial inquiry is *how well* the scrubber was removing liquids, not whether it was completely

defective.  Preservation of the scrubber would have facilitated that inquiry.

PacifiCorp offers some secondary evidence of the scrubber's function in the form of

records detailing the amount of liquid the scrubber removed.  The records indicate the scrubber

removed less than .648 liters (less than .2 gallons) of liquid during the whole of 2007.   GTN

argues that, in light of these scrubber records, the scrubber was either capturing insufficient

liquids and therefore malfunctioning, or it was properly capturing liquids as intended and GTN's

gas supply therefore contained only a *de minimus* amount of compressor oil that would not have

breached its tariff gas quality provisions.  In oral argument, while attempting to respond to the

paradox posed by these scrubber logs, PacifiCorp undermined the reliability of those very

records.  PacifiCorp pointed to an email in April 2007 in which Frank Glasgow reported

observing about a gallon of liquid in the scrubber, suggesting that compressor oil was

overwhelming the scrubber's capacity to remove liquids and that the scrubber logs were

incomplete.  (Sawyer Decl., #265, Ex. 20, at 2.)  But PacifiCorp cannot have it both ways– it

cannot attack the scrubber logs as inaccurate, while also relying on them as sufficient secondary

evidence of the scrubber's functioning to ameliorate prejudice to GTN and avoid sanctions.

I leave PacifiCorp with an unpleasant choice.  If at trial PacifiCorp attacks the accuracy of

the scrubber records, I will conclude that GTN suffered prejudice from the sale of the scrubber

and give an adverse inference instruction along the lines of that requested by GTN.  If PacifiCorp

Page 38- OPINION AND ORDER

refrains from undermining the records, I will find that the records provide sufficient secondary evidence of the scrubber's function for PacifiCorp to avoid spoliation sanctions.  In that scenario, of course, a fact-finder could very well conclude from the scrubber records that either the scrubber was malfunctioning or that very little compressor oil was present in the gas supply, either of which advances GTN's position.

###       4.       Other Physical Evidence: "pig", filter cartridge, "reference oil", corrosion samples, and metallurgical samples

GTN also seek spoliation sanctions of dismissal or exclusion for PacifiCorp's failure to preserve a "pig," filter cartridge, and samples of reference oil tested by Herguth Labs in December 2007 and by Ceway Chemical Services, a corrosion sample from a turbine nozzle tested by Aptech Laboratories, and metallurgical samples of nozzles tested by Anamet, Inc. GTN suffers no prejudice from the loss of the corrosion and metallurgical samples taken from the turbine nozzles, since the court intends to allow GTN to reopen discovery to facilitate an independent inspection and analysis of the remaining fuel nozzles, including any testing it desires.  As for the other items, I agree with GTN that the pig, filter cartridge, and samples of reference oil are relevant to determining the nature of the oil that was alleged to have penetrated the Hermiston plant, and that GTN is prejudiced from their destruction.[14]  PacifiCorp does not suggest otherwise, but instead contends that HGC's employees and its various testing companies are at fault for failing to preserve the evidence, not PacifiCorp.  Of course, since PacifiCorp is the assignee of HGC's claims, this argument is unpersuasive.  To the extent that PacifiCorp even

---

[14] The degree of prejudice GTN has suffered is uncertain, however, because there is no indication of where the "reference oil" was collected.

intends to rely on the results of the Herguth and Ceway reports, those reports must be excluded.

## IV.  GTN Motions for Summary Judgment— Causation of PacifiCorp's Damages

With the scope of PacifiCorp's breach of contract claim against GTN narrowed to account for PacifiCorp's spoliation of evidence, I examine the extent of damages PacifiCorp may seek to recover at trial.  In its motion for summary judgment, GTN argues that PacifiCorp fails to present evidence establishing a question of fact concerning whether GTN's conduct caused PacifiCorp's claimed damages.  First, GTN contends that PacifiCorp offers no evidence establishing causation of damages for the so-called mitigation outages.  Moreover, even regarding the forced outages, GTN submits that PacifiCorp only produces evidence that GTN caused damage to the turbine components that Dr. Kemal actually reviewed and opined about, i.e., the five fuel nozzles from the July 2007 outage.  GTN contends that any other damage claims– regarding other fuel nozzles, all other turbine parts such as combustion liners and transition pieces, and from premature wear– necessarily fail.  In other words, GTN seeks partial summary judgment on most aspects of PacifiCorp's alleged damages for its breach of contract claim, while accepting that a triable issue exists on a small subset of PaciCorp's damages claims.

To establish damages for a common law breach of contract claim, "a plaintiff must show that his or her harm was both the factual and the foreseeable consequence of the defendant's conduct." *Wilcher v. Amerititle, Inc.*, 212 Or. App. 498, 506, 157 P.3d 790 (2007); *see also Logan v. D.W. Sivers Co.*, 207 Or. App. 231, 243, 141 P.3d 589, 596 (2006), *rev'd in part on other grounds*, 343 Or. 339, 169 P.3d 1255 (2007) ("A plaintiff may recover damages for breach of contract if the damages are (1) caused by the breach, (2) foreseeable, and (3) not too speculative.").  Here, GTN only challenges the sufficiency of PacifiCorp's evidence regarding the

factual causation of its damages.  A defendant's conduct is the factual cause of all harm that would have not occurred but for the defendant's actions.  *See Towe v. Sacagawea,* Inc., 246 Or. App. 26, 40, 264 P.3d 184, 194 (2011) (discussing factual causation in the analogous context of negligence claims).

### A.    Adjudication of Various Damages Categories

As a threshold matter, I disagree with PacifiCorp's position that as long as a factual dispute remains as to the availability of any damages whatsoever, piecemeal adjudication of the various other categories of damages is inappropriate on summary judgment.  The authority PacifiCorp cites for this proposition reflects an outdated view that summary judgment is limited to addressing only whole claims, not elements or parts of those claims.  Rule 56(a), amended in 2010, explicitly provides for summary judgment on "part of" a claim or defense.  Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.").  This case does not present the usual breach of contract scenario where one alleged breach accounts for defendants damages.  Instead, PacifiCorp's breach of contract claim encompasses distinct subparts associated with each forced outage for which damages are claimed, and with the so-called mitigation outages.  Thus, as a procedural matter, GTN appropriately moves for summary judgment on certain aspects of damages sought by PacifiCorp in its breach of contract claim, which I construe as "part of" the overall claim.

Additionally, if the court does not grant all of a movant's requested relief on summary judgment, the court may, in its discretion, "enter an order stating any material fact—including *an item of damages* or other relief—that is not genuinely in dispute and treating the fact as

established in the case." Fed. R. Civ. P. 56(g) (emphasis added).  This provision, added to Rule

56 in 2010, also explicitly permits the court to adjudicate the availability of certain items of

damages on summary judgment, even if other damages items remain for trial.  In this case

involving a number of different alleged breaches and sources of damages, a summary judgment

ruling addressing the validity of various the types of damages sought is entirely appropriate under

Fed. R. Civ. P. 56(g) to help the parties prepare for trial.

### B.    Types of Damages Sought

PacifiCorp seeks four different types of damages: (1) the value of parts damaged by oil

contamination from each forced outage; (2) the labor and parts necessary to return the turbines to

service after each forced outage; (3) the net lost power production during each forced outage; and

(4) the labor, parts, and services expended to mitigate against future damage from oil

contamination.  The first three categories of damages arise from each separate forced outage,

while the last category addresses a need to prevent future contamination dissociated from any

particular outage but arising from the alleged oil contamination more generally.  Therefore, I

address damages from the forced outages and mitigation outages separately.

### C.    Forced Outages

 To establish a triable issue on whether GTN's alleged provision of gas contaminated

with compressor oil was the factual cause of all of its damages related to each forced outage,

PacifiCorp must present evidence that: (1) GTN's gas contained compressor oil; (2) that

compressor oil reached the Unit 2 turbine prior to the outages; and (3) that compressor oil caused

the Unit 2 turbine to fail, resulting in PacifiCorp's various claimed damages.

There are clearly questions of fact about the first and second steps of the causal chain.

Page 42- OPINION AND ORDER

Core Laboratory and Texas Oil Tech testing indicated that liquid removed from the GTN pipeline, the Stanfield exchange, the Cascade line, the plant's Unit 2 scrubber and other locations in the plant were consistent with compressor oil, even if the liquid taken from Stanfield and the plant were dissimilar. PacifiCorp's expert Ben Asante opined that the liquid discovered in the plant was compressor oil rather than the product of condensation or glycol, the two other main sources of liquid contamination in gas pipeline systems. (Sawyer Decl., #265, Ex. 2.) Glasgow reported seeing oil while sampling gas at Stanfield and on the pigs that cleaned the Cascade line, while Journot observed oil at the end of the Cascade line where it fed into the plant. And Glasgow and Journot both observed what they described as oil in various turbine parts downstream of the Unit 2 scrubber.[15] Finally, there is testimony that any liquid arriving at the plant necessarily came through the GTN pipeline. (Sawyer Decl., #265, Ex. 26) (Toews Dep., at 189-190). Even without considering the challenged testimony from Journot, Glasgow, and others that they observed "coking" in damaged turbine nozzles indicative of oil contamination, a reasonable jury could infer that compressor oil in the gas delivered by GTN found its way to the Unit 2 turbine throughout the period of the forced outages.

Evaluating the sufficiency of PacifiCorp's evidence for the third step of the causation chain is more complicated. GTN contends that PacifiCorp must be limited to damages for outages and components on which it offers expert testimony of causation based on actual

---

[15] GTN objects that Glasgow's statements concerning observations of "oil" are conclusory and speculative. But both Glasgow and Journot are competent to offer lay testimony under Fed. R. Evid. 701 that they observed a substance they identified as oil, based on their personal experiences with oil. *See, e.g., United States v. Durham*, 464 F.3d 976, 982 (9th Cir. 2006) (lay witnesses familiar with marijuana from personal experience permitted to identify substance as marijuana based on firsthand impressions).

physical examination.  As a basic premise, I agree with GTN's assumption that proof of factual

causation for the three categories of damages arising from the forced outages– damaged parts,

costs of restoring the turbines, and lost revenue –  requires resort to expert testimony because of

the complex nature of the causation mechanism.  The well-settled rule in Oregon is that "where

injuries complained of are of such character as to require skilled and professional persons to

determine the cause and extent thereof, the question is one of science and must necessarily be

determined by testimony of skilled, professional persons."  *Uris v. State Comp. Dep't*, 247 Or.

420, 424, 427 P.2d 753 (1967).  This rule is frequently invoked in negligence cases involving

medical causation, as it was in *Uris*.  *See, e.g., Baughman v. Pina*, 200 Or. App. 15, 18, 113 P.3d

459 (2005) ("When the element of causation involves a complex medical question, as a matter of

law, no rational juror can find that a plaintiff has established causation unless the plaintiff has

presented expert testimony that there is a reasonable medical probability that the alleged

negligence caused the plaintiff's injuries.") (citing *Uris*).  However, since negligence and contract

claims utilize the same standard for factual causation, *Wilcher*, 212 Or. App. at 506, the

requirement for expert evidence of causation applies equally to this breach of contract claim.

This requirement pertains to the causation mechanism at issue here. As the summary

judgment briefing makes clear, the failure of the plant's gas turbines from alleged compressor oil

contamination implicates complex issues of mechanical and chemical engineering, as well as

intensely specialized understanding of the particular gas turbines installed in the plant and their

proper operation.  If any non-medical case requires expert testimony of factual causation, this is

it.

PacifiCorp urges the court to consider lay testimony from GE investigators and Glasgow

Page 44- OPINION AND ORDER

on the issue of causation.[16] Even if that were permissible under Oregon case law, under Fed. R.

Evid. 701 prohibits it.  Rule 701 permits lay testimony from a GE investigator or Frank Glasgow

offering opinions that are rationally based on their personal observations of the condition of

turbine components.  But such lay opinion testimony must also be helpful to determine "a *fact* in

issue" and must not be based on "scientific, technical, or other specialized knowledge within the

scope of Rule 702."  Fed. R. Evid. 701 (emphasis added).  As I explained above, the GE

investigator or Glasgow could testify that they observed a substance appearing to be oil on

turbine parts, assuming they possessed sufficient experience with oil to offer that opinion, since

the identity of a substance is a fact at issue and their opinions about the identity of the substance

are based on "personal knowledge" rather than "scientific, technical, or other specialized

knowledge."  *See* Fed. R. Evid. 701, Advisory Committee Notes, 2000 Amendments.  Those

witnesses, however, exceed the mandate of Rule 701 if they testify that oil they observed *caused*

any particular turbine damage or that the "coking" they observed was indicative of hydrocarbons

in the gas supply.  *See id.* (illustrating the distinction between lay and expert opinion testimony

by noting that "a lay witness with experience could testify that a substance appeared to be blood,

but that a witness would have to qualify as an expert before he could testify that bruising around

the eyes is indicative of skull trauma").  PacifiCorp's attempt to use a GE investigator or Frank

Glasgow to opine about the cause of its damages without disclosing them as experts under Rule

---

[16] GE issued an analysis following the September 2007 outage stating that various of the plant's prior outages had experienced fuel contamination causing the various outages. (Sawyer Decl., #265, Ex. 54, at 4.)  Also, Glasgow provides a declaration describing his efforts to determine the cause of the turbine failures, his observation of "coking" in various inner fuel nozzles after outages and his conclusion "that the forced outages occurred because compressor oil was transported in the gas supplied to the fuel nozzle assembly which created coking when it was burned up in the nozzles." (Glasgow Decl., #325, ¶34.)

26 is precisely what Rule 701 is meant to prohibit.  *See id.* ("Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing . . .  By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 . . . by simply calling an expert witness in the guise of a layperson.") (internal citations omitted).

PacifiCorp cited *Rodriguez v. General Dynamics Armament* in briefing and relied upon that case in oral argument for the proposition that a lay witness may testify to the ultimate issue of causation.  *Rodriguez v. Gen. Dynamics Armament & Technical Prods., Inc.*, No. 08–00189 SOM/KSC, 2011 WL 2116422, (D. Hawaii May 25, 2011).  But *Rodriguez* does not assist PacifiCorp.  There, the Court explicitly did not allow a lay witness to address the legal question of factual causation.  Instead, the Court conducted a very careful question-by-question determination of what was permissible lay opinion, as opposed to impermissible expert opinion testimony, disallowing certain questions that called for expert opinion testimony while allowing only opinion testimony that was necessarily included in factual testimony, rationally based on the witness' own observations, and not requiring any scientific, technical, or other specialized knowledge.  *Id.* at *9-10 ("The court permitted Leong to testify regarding what he had done during his investigation, but sustained objections to questions calling for expert testimony. . . defense counsel rephrased questions to ask Leong what he had actually observed in his own job experience, rather than asking questions calling for generalized statements of Leong's opinion").

Consequently, Dr. Kemal is the only possible source of expert testimony sufficient to establish that compressor oil in the gas supply caused the failures of the Unit 2 turbine and the

plant's forced outages.  Since factual causation is a requirement to recover damages and Dr.

Kemal's testimony pertaining to the August and September 2007 outages is precluded, there is no

genuine factual dispute for trial regarding whether GTN's conduct caused any damages flowing

from the August and September outages.

By contrast, Dr. Kemal provides sufficient expert testimony to create a question of fact on

causation for damages related to the January and July 2007 outages.  In his expert report, Kemal

examined damaged nozzles from the July 2007 outage as well as reviewed photographs of

turbine components from the January 2007 outage (among the other forced outages) showing

"early to intermediate stages of damage."  (Kemal Decl., #319, Ex. 1, at 21, 50-52.)  Kemal

opined that his inspection of both the July 2007 parts and the photographs from the other forced

outages, "showed the thermal damage to the failed Unit 2 nozzles was consistent with an inside-

out head load."  *Id.* at 21.  Kemal concluded that the Unit 2 forced outages "were the direct result

of fuel contamination," resulting in coke accumulation, melting of the outer wall of the diffusion

gas assembly, significant overheating, and subsequent damage to the Unit 2 turbines.  *Id.* at 38.

To the extent GTN argues that Kemal cannot establish causation for damages from forced

outages other than July 2007, this concern goes either to the reliability of Kemal's testimony

under Fed. R. Evid. 702 or to the weight of his testimony, both trial issues that are not raised by

GTN in the present motions.

GTN also argues that Kemal's report cannot create a question of fact on causation for

damage to any turbine parts that he did not physically examine, such as damaged transition

pieces and combustion liners.  That is, GTN suggests that even if PacifiCorp offers expert

testimony to create a question of fact on whether gas contamination caused each forced outage as

Page 47- OPINION AND ORDER

a whole, it must also offer expert testimony to link each allegedly damaged turbine component associated with the outage to gas contamination.  PacifiCorp responds that Glasgow's declaration tracking parts replaced and labor charges incurred following each outage suffices as proof that those parts were damaged as a result of gas contamination.

As a practical matter, it appears that GTN's argument applies to only one part allegedly damaged in the January or July outage– the combustion liner replaced by GE after the January outage.[17]  (Glasgow Decl., #325, Ex. 14, at 9, 11).  There, GE stated that "[t]he customer replaced outer crossfire tube packing rights that were leaking during operation"and billed for replacement of the "combustion liner caps" in addition to replacement of the fuel nozzles.  *Id.* at 9.  The nature of damage to a turbine combustion liner appears to be every bit as technical and complex as the failure mechanism for turbine fuel nozzles.  Moreover, Kemal nowhere references the effect of fuel contamination on combustion liners in a manner similar to his discussion of the failure of fuel nozzles.  Thus, PacifiCorp lacks sufficient evidence to create a genuine factual dispute that the combustion liner replaced following the January outage was damaged by gas contamination.   Damages sought for that part and associated labor are unavailable.  To the extent that PacifiCorp argues that oil contaminated other turbine components besides fuel nozzles during the January and July 2007 outages, the court will address the sufficiency of PacifiCorp's proof of causation for those parts at trial.

### D.    Mitigation Outages

GTN also challenges the sufficiency of PacifiCorp's evidence that gas contamination was

---

[17] Following the July 2007 outage, GE replaced the fuel nozzle assemblies, but no other turbine parts.  (Glasgow Decl., #325, Ex. 15)

the but-for cause of the several "mitigation" outages identified by PacifiCorp, arguing that expert testimony is also required to establish a causal link to these outages, just as with the forced outages.  I disagree.  Unlike causation of the forced outages, the factual cause of the so-called mitigation outages is a much simpler issue.  Glasgow declares that PacifiCorp shut down power generation to clean the gas supply (September 8-10, 2007 and October 5-8, 2007), pig the Cascade lateral pipeline (September 8-10, 2007), inspect a newly installed temporary filter (October 16-17, 2007 and November 10, 2007), and install permanent coalescing filters (March 8, 2008).  (Glasgow Decl., #325,  ¶¶69-77.)  He states that the plant would not have undertaken each of these shutdowns but for the reduction in gas quality starting in 2007.  (*Id.* at ¶¶ 71, 77.)  Thus, PacifiCorp presents some evidence that these mitigation outages were instituted by the plant to reduce future damages and would not have occurred absent the alleged gas contamination.

There may be argument at trial about whether these outages would have occurred even in the absence of alleged gas contamination, especially because PacifiCorp's 30(b)(6) designee Shane Holst testified that all were originally labeled as "maintenance" outages unrelated to contamination.  (Walker Decl., #250, Ex. 7, at 779-781.)  Similarly, the parties may disagree about whether the steps the plant took were reasonably necessary to mitigate against further damages, as is required under Oregon case law.  *See Bixler v. First Nat'l Bank of Or.*, 49 Or. App. 195, 203, 619 P.2d 895 (1980) ("[u]nder general contract law, a plaintiff is required to take reasonable steps to avoid the enhancement of his damages.").  But, unlike the failure of the gas turbines, these causation issues rest within the common knowledge of a juror, not requiring resort to expert testimony based on technical expertise.  Given the question of fact as to whether

Page 49- OPINION AND ORDER

contaminated gas caused two of the plant's forced outages and Glasgow's declaration indicating the plant took mitigation measures because of past contamination, there is also a factual dispute about whether gas contamination was the but-for cause of the mitigation outages.

## V.    GTN's Motion for Summary Judgment – Prejudgment Interest

Finally, GTN argues that PacifiCorp's request for prejudgment interest must also fail. Although PacifiCorp does not plead a claim for prejudgment interest in its complaint, PacifiCorp's damages expert Dr. Lon Peters adds simple interest based on the "net value of lost output and the cost of equipment repairs and new capital equipment" through September 2011, amounting to $2,884,924.  (Peters Decl., #315, ¶¶44-45, 47.)  Because PacifiCorp does not pray for prejudgment interest in its complaint, there is no claim for prejudgment interest currently before the court.  As this court has recognized previously, under Oregon law "[f]acts sufficient to state a claim for prejudgment interest must . . . be specifically pled in the plaintiff's complaint, and a specific request for prejudgment interest must be pled in the prayer of the complaint, before prejudgment interest may be awarded."  *S-Tronix v. Submedia, LLC*, No. CV-08-272-PK, 2010 WL 331785, at *6 (D. Or. Jan. 28, 2010) (citing *Emmert v. No Problem Harry, Inc.*, 222 Or.App. 151, 158 (Or. App. 2008)).  I therefore deny GTN's motion for summary judgment against PacifiCorp "request" for prejudgment interest as moot.  Should PacifiCorp seek leave to amend its complaint to plead a prejudgment interest claim, I will address it then.

## VI.    GTN's Motion To Stay Proceedings and Refer Tariff Construction to FERC

Now that I have clarified the scope of damages PacifiCorp may seek in its remaining contract claim against GTN, I turn to the nature of GTN's contractual obligations to PacifiCorp. The crux of those obligations are the gas quality standards in GTN's tariff, which are

Page 50- OPINION AND ORDER

incorporated into the gas transport contract between GTN and PacifiCorp.   GTN's tariff both

requires gas to be "merchantable" and provides that gas "[s]hall be commercially free from . . .

objectionable substances which may be injurious to pipelines or which may interfere with its

transmission through pipelines or its commercial utilization."  (Roscher Aff., #23, Ex. 1 at

¶3.1(b)(1)).  GTN argues that FERC possesses primary jurisdiction over the interpretation and

application of these gas quality standards and proposes this court stay the current proceedings

and refer the case to FERC for construction of the gas quality provisions of GTN's tariff.

    This court previously rejected a similar argument by GTN on its motion to dismiss.

(Findings and Recommendation, #55, at 21-22.)  Although GTN styles its current motion simply

as a request to stay proceedings, in effect it is a motion for reconsideration of this court's earlier

ruling concerning primary jurisdiction.  A court should reconsider its earlier decision if it "(1) is

presented with newly discovered evidence, (2) committed clear error or the initial decision was

manifestly unjust, or (3) if there is an intervening change in controlling law."  *Sch. Dist. No. 1J v.*

*ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).  This court reached its earlier conclusion based

on representations by PacifiCorp that interpreting the gas tariff would not require factual

determinations involving technical expertise or policy concerns about uniform gas quality

standards.  Since GTN and PacifiCorp present new evidence that calls into question those

representations– especially conflicting expert opinions about the nature of compressor oil and the

meaning of "commercially free" in the context of compressor oil in gas pipelines– it is

appropriate for this court to reconsider its earlier decision.

    In addressing GTN's initial primary jurisdiction argument, this court set forth the

applicable legal standard for motions based on an assertion of an agency's primary jurisdiction:

Page 51- OPINION AND ORDER

Under the doctrine of primary jurisdiction, a district court may, under narrow circumstances, elect in its discretion to refrain from exercising jurisdiction in favor of permitting a federal agency with applicable regulatory authority to decide threshold matters relevant to the dispute. *See Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 68 (1970). A court may properly invoke the doctrine where there is: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987).

The doctrine of primary jurisdiction allocates lawmaking power by transferring from court to agency the power to determine aspects of commercial relationships. *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 65 (1956) (citation omitted). Thus, a court should not defer to an agency unless "Congress has vested [the agency] with the authority to regulate an industry or activity such that it would be inconsistent with the statutory scheme to deny the agency's power to resolve the issue in question." *General Dynamics Corp.*, 828 F.2d at 1363.

With regard to FERC's authority to address questions of pure contract interpretation, this court has previously found that "questions of pure contract interpretation . . . are not within FERC's statutory grant of authority." *Portland General Elec. Co.*, 2007 WL 1655545 at *7. "For that reason alone this court may not properly refrain from exercise of jurisdiction in favor of hypothetical FERC proceedings." *Id.*

Additionally, "[p]rimary jurisdiction is not implicated simply because a case presents a question, over which the [a federal agency] could have jurisdiction, regarding the interpretation of a single tariff." *Brown*, 277 F.3d at 1172. When resolution of a plaintiff's claim "involves a straightforward interpretation of [a] filed tariff, the district court will be competent to resolve the claim without resort to the [federal agency]." *Id.* at 1173. "But where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning . . . , so that the enquiry is essentially one of fact and of discretion in technical matters," then the court should defer to the agency. *Western Pac. R.R. Co.*, 352 U.S. at 66.

(Findings and Recommendation, #55, at 21-22.)

Construction of an ambiguous tariff is ordinarily a matter of law. *Western Transportation Co. v. Wilson and Co.*, 682 F.2d 1227, 1230 (7th Cir.1982); *Western Pacific*, 352 U.S. at 66.

*Western Pacific Railroad*, the seminal United States Supreme Court case on the topic of primary

jurisdiction, recognizes that tariffs  usually should be construed by the court, rather than the originating federal agency.  The court appropriately construes a tariff where the agency "has already construed the particular tariff at issue or has clarified the factors underlying it."  352 U.S. at 69.  Morever, the Ninth Circuit recognizes that an agency lacks primary jurisdiction to construe tariff terms if they are used only "in their ordinary sense." *United States v. Yellow Freight Sys., Inc*., 762 F.2d 737, 740 (9th Cir. 1985).  In those situations, courts apply a set of construction maxims for tariff interpretation derived from contract and statutory interpretation principles.  For example, courts avoid unjust, absurd, or improbable interpretations; consider the tariff as a whole; strictly construe exceptions to tariffs; avoid nullifying specific or substantial tariff provisions; and, as a last resort, construe ambiguity against the tariff's drafter.  *See Coca-Cola Co. v. Atchison, T. & S. F. Ry. Co.*, 608 F.2d 213, 220–222 (5th Cir. 1979); *TADMS, Inc. v. Consol. Freightways*, 619 F. Supp. 385, 392 (C.D. Cal. 1985).

However, there are also instances when courts cannot interpret tariff terms as a matter of law.  *Western Pacific* holds that "where words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that the inquiry is essentially one of fact and of discretion in technical matters," tariff construction must be done by the agency.  352 U.S. at 66 (internal quotation omitted).  This is particularly true when the agency's cost-allocation decisionmaking underlying the setting of the tariff is relevant to construction, because "questions of construction and reasonableness are so intertwined that the same factors are determinative on both issues . . . ."  *Id.* at 69.

GTN contends that the "commercially free" language in its tariff is of the latter type, whose interpretation requires resolution of factual issues involving technical expertise and

implicating the reasonableness of the tariff rate and underlying cost-allocation policies.  After reconsidering the issue, I agree with GTN.  Since I issued my previous Findings and Recommendation, it has become clear that "commercially free" and "commercial utilization" are terms used in their  "technical" sense, not their "ordinary" sense.  One need only look at the clashing expert testimony presented by the party about the amount of compressor oil that may exist in gas while still remaining "commercially free" of that substance to grasp the techical nature of the standard established by the tariff.  The experts apparently all agree that "commercially free" contemplates gas containing only a *de minimis* amount of contaminant. However, while they all rely on technical expertise in defining "commercially free," they differ in their views of how much compressor oil surpasses the *de minimis* threshold.

    For example, PacifiCorp's expert Gary Choquette testified that "commercially free" means gas containing liquid contaminants only "in a mist form . . . smaller than a drop."  (Walker Decl., #239, Ex. 1) (Choquette Dep., at 109, 199-201).  GTN's expert Meherwan Boyce testified "commercially free" gas contains "some amount" of lubricating oils. (Walker Decl., #239, Ex. 2 at 23.)  GTN expert Christopher Lane agreed that "commercial" gas is not expected to be 100% free of liquids and contains "some small amount" of oil.  (Walker Decl., #239, Ex. 3, at 18-19.) Finally, GTN 30(b)(6) deponent John Roscher testified that "commercially free" gas need not be 100% liquid-free, but allows for impurities only to the extent that gas remains commercially utilizable.  (Sawyer Decl., #277, Ex. 3) (Roscher Dep., at 21); (Walker Suppl. Decl., #295,  Ex. 3) (Roscher Dep., at 91-92.)  Thus, at the very least, construing the term "commercially free" presents a factual question requiring resort to extrinsic evidence presented by dueling experts, not just an issue of interpreting ordinary language as a matter of law using maxims of tariff

Page 54- OPINION AND ORDER

construction.  In addition, construing the term "commercial utilization" likely also presents similar difficulties, in light of the parties' views about the sufficiency of the plant's gas conditioning systems for the particular type of gas turbines used at the plant.

PacifiCorp argues that even the existence of conflicting expert testimony over the meaning of a tariff term does not indicate that tariff interpretation is within the agency's primary jurisdiction.  But the cases cited by PacifiCorp for that proposition required more straightforward tasks of tariff construction, where the federal agency had already provided guidance on the proper interpretation of the tariff term.  One case, *Export Drum*, involved a dispute about whether a rail yard and a factory approximately 12 -25 miles away from each other were within the same "shipping point," a term used in the tariff.  *La. & A. Ry. Co. v. Exp. Drum Co.*, 359 F.2d 311 (5th Cir. 1966).  There, the court observed that the reasonableness of the tariff rates was not in question, the purpose of the tariff was clear to laymen, and the tariff was particularly susceptible to construction without reference to the underlying cost-allocation factors.  *Id.* at 314-315.  In addition, the court had the benefit of guidance from the federal agency, which had previously construed the term "point" in the context of shipping to encompass at least an entire city. *Id.* at 315.  The other case, *St. Clair v. Kroger Co.*, involved the construction of the term "aged beef" that was already clearly defined in USDA regulations as "beef products . . . maintained in a fresh unfrozen state for a minimum of 14 days from the day of slaughter."  581 F. Supp. 2d 896, 900 n.4 (N.D. Ohio 2008).  Neither of these cases even approaches the level of technical complexity raised by the terms "commercially free" and "commercial utilization" in the context of gas contamination by compressor oil, a subject about which FERC offers very little guidance.

Indeed, examining the single FERC decision to discuss the meaning of "commercially

free" illustrates precisely how that term is used in a technical manner. In *Texas Eastern Transmission Corp.*, FERC stated that "gas containing 0.2 gallons per thousand cubic feet" of "liquid hydrocarbons" or "liquifiable hydrocarbons" (terms used interchangeably in this FERC opinion) is recognized to be "commercially free" of that substance, citing the Gas Engineers Handbook, "a widely accepted reference for the industry." *Texas Eastern Transmission Corp.*, 63 FERC ¶ 61358, 63253 (Jan. 30, 1993). At oral argument and in briefing, GTN suggested that this standard of .2 gallons per thousand cubic feet should apply to interpreting the tariff as applied to compressor oil, which its experts deem to be a liquifiable hydrocarbon that transitions between liquid and gaseous form in the pipeline. But PacifiCorp and its experts dispute that compressor oil is a liquifiable hydrocarbon of the type addressed in *Texas Eastern*, proposing instead that compressor oil always remains in a liquid form at bottom of the pipeline without becoming entrained in the gas stream. Thus, even determining whether compressor oil is a "liquifiable hydrocarbon" and whether the definition in *Texas Eastern* can be used with compressor oil requires a level of technical expertise only found with FERC. This realization further reinforces my conclusion that construction of GTN's tariff involves factual, technical decisions, not merely ordinary matters of tariff construction.

Moreover, the construction of tariff terms such as "commercially free" implicates the same type of cost-allocation and policy decisions that FERC made when setting the tariff rate originally.[18] When FERC approved GTN's tariff with this term, it ostensibly balanced gas

---

[18] These concerns about uniformity and rate-making, however, are not strictly necessary to invoke primary jurisdiction, since the construction of GTN's tariff otherwise requires weighing extrinsic evidence based on technical discretion. *See General Dynamics Corp.*, 828 F.2d at 1362 ("There are four factors uniformly present in cases where the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an

shippers' needs to receive usable gas, pipelines' needs to manage costs, the overriding need for efficient sale of gas of various qualities, and other policy issues. To construe "commercially free," this court would necessarily engage in a similar analysis to determine the level of compressor oil that is commercially acceptable in the gas supply. Although PacifiCorp is correct that FERC has declined to impose a uniform mechantability provision in all gas tariffs or prescribe uniform gas quality standards for all pipelines, it is obvious that FERC still has vastly superior expertise in understanding and balancing the competing needs of the stakeholders in the gas transport market, the background required to interpret this particular gas quality standard.

Finally, PacifiCorp's other arguments against referral to FERC are unpersuasive. PacifiCorp cites several cases where courts refused to refer contract disputes to FERC under the doctrine of primary jurisdiction. I find those cases inapposite, however, because none required the court to directly construe FERC tariffs, as is required here. *See, e.g., Great W. Sugar Co. v. N. Natural Gas Co.*, 661 P.2d 684, 690 (Colo. App. 1982) (affirming refusal to refer common law breach of contract claim to FERC, where FERC tariffs "affect[ed] some of the dealings between the parties" but did not supply the relevant contract language); *Bd. of Pub. Works, City of Blue Earth, Minn. v. Wis. Power & Light Co.*, 613 F. Supp. 2d 1122, 1124, 1130-1131 (D. Minn. 2009) (FERC did not have primary jurisdiction over interpretation of contract that was permitted, but not required, by terms of a FERC tariff).

Further, PacifiCorp's proposed construction of the GTN tariff, even if tenable, would not eliminate the need for FERC's technical expertise. PacifiCorp advocates that the court interpret

---

administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise *or* uniformity in administration.") (emphasis added).

the "commercially free" language to be coextensive with the tariff's requirement for delivery of

"merchantable gas."  Drawing on the Uniform Commercial Code definition of merchantable

goods as those which are "fit for the ordinary purposes of which such goods are used," Or. Rev.

Stat. 72.3140(2), PacifiCorp proposes that the court interpret "commercially free" as that which

contains objectionable substances in amounts low enough not to "render the gas unsuitable for its

intended use."  (P.'s Br., #276 , at 9.)   First, this construction violates the maxim of tariff

construction requiring meaning to be given to each tariff provision because it effectively strikes

the "commercially free" language from the tariff altogether.  *See TADMS*, 619 F. Supp. at  392

("a court should avoid interpreting a tariff in a manner that would nullify specific or substantial

tariff provisions") (citing *Southern Pacific Co. v. Lothrop*, 15 F.2d 486, 487 (9th Cir. 1926)).

Even assuming PacifiCorp's focus on merchantability was permissible, it would still not

eliminate the need for FERC's expertise.  PacifiCorp argues that "merchantable" gas must be

suitable for PacifiCorp's intended use of the gas at the Hermiston plant.  In its motion for

summary judgment proposing this interpretation, PacifiCorp contends that GTN's gas was not

merchantable because it contained compressor oil that caused the turbine failures at the plant.

This construction, however, departs fromm the UCC definition of merchantability.  The actual

definition of merchantability focuses on quality of the goods provided relative to other goods

with the same description and the fitness of those goods for the "ordinary purposes" for which

such goods are used, not on the fitness of the goods for the purchaser's particular intended use.[19]

---

[19]  The UCC defines merchantable goods as those which:
       (a) Pass without objection in the trade under the contract description; and
       (b) In the case of fungible goods, are of fair average quality within the description; and
       (c) Are fit for the ordinary purposes for which such goods are used; and

Page 58- OPINION AND ORDER

Even were this court were to equate "commercially free" with merchantable, it would still have to determine what the "ordinary purpose" for which natural gas is transported to power generating plans and whether GTN's gas was "fit" for that purpose. *See,e.g., Carpenter v. Land O'Lakes, Inc.*, 976 F. Supp. 968, 972–973 (D. Or. 1997) (holding that cattle feed supplied to farmers breached the implied warranty of merchantability, since the ordinary purpose of the feed was to nourish dairy cows without making them ill, but the moisture in the feed caused mold spores that bloomed into mold, sickening the cows.)   That, in turn, would require the court to determine what level of compressor oil is acceptable, industry-wide, in pipeline natural gas, the very same vexing inquiry that requires FERC's technical expertise.

In sum, I find that the doctrine of primary jurisdiction prevents this court from construing the "commercially free" tariff language, which involves words used in a technical sense, and which requires weighing of extrinsic evidence "so that the inquiry is essentially one of fact and of discretion in technical matters." *Western Pacific*, 352 U.S. at 66 (internal quotation omitted). However, I do not agree with GTN's suggestion that FERC also has primary jurisdiction over the adjudication of PacifiCorp's breach of contract claim in its entirety, even after the tariff has been construed.  The application of the tariff to the facts of this case is a separate analysis properly within this court's role in adjudicating PacifiCorp's breach of contract claim.  I therefore order the parties to submit this matter to FERC, along with  today's opinion, requesting FERC exercise its

---

       (d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
       (e) Are adequately contained, packaged and labeled as the agreement may require; and
       (f) Conform to the promises or affirmations of fact made on the container or label if any.
Or. Rev. Stat. §72.3140(3).

Page 59- OPINION AND ORDER

primary jurisdiction to construe the phrase "commercially free from . . . objectionable substances . . . which may interfere with  . . .  its commercial utilization" as applied to compressor oil.  Until FERC responds, all future deadlines and proceeding will be stayed, although GTN may pursue the limited additional discovery permitted by this ruling.

## VII.    PacifiCorp's Motion for Summary Judgment

### A.    Breach of Contract Claim

PacifiCorp moves for partial summary judgment on its breach of contract claim against GTN, arguing that GTN breached its contractual duty to deliver tariff quality gas by providing gas that was unusable.  In light of this court's decision refering to FERC the construction of the tariff language that forms the basis of GTN's contractual obligation, PacifiCorp's motion for summary judgment on the contract claim must be denied, with leave to refile following a response from FERC.

### B.    GTN's Affirmative Defenses

PacifiCorp also makes a number of motions for summary judgment against Northwest and GTN's affirmative defenses.  I deny PacifiCorp's motion as moot as to Northwest's defenses and address only GTN's defenses.  PacifiCorp first moves for summary judgment on GTN's Third Affirmative Defense, which alleges that PacifiCorp and its gas suppliers failed to provide tariff-quality gas to GTN for transportation, a condition precedent to GTN's performance of its contract.  PacifiCorp notes, however, that GTN admits the gas supplied to it by PacifiCorp and others at the Kingsgate Station "meets the quality set forth in the tariff."  (Sawyer Decl., #265, Ex. 16, at 8) (Resp. to RFP No. 29.)  GTN fails to produce any evidence disputing its own admission and showing that gas delivered by PacifiCorp for shipping indeed fell below tariff

Page 60- OPINION AND ORDER

standards.  Accordingly, GTN has not carried its burden to demonstrate that a genuine issue of material fact exists as to this affirmative defense and PacifiCorp's motion for summary judgment against it is granted.

Next, PacifiCorp moves for summary judgment on GTN's Fourth Affirmative Defense, which alleges comparative fault by PacifiCorp.  Because the comparative fault affirmative defense is not valid against a breach of contract claim, PacifiCorp's motion for summary judgment on that defense as applied to GTN's contract claim is granted.  *See Hampton Tree Farms, Inc. v. Jewett*, 158 Or. App. 376, 389 n.10, 974 P.2d 738 (1999) (comparative fault defense does not apply to breach of contract claim).

PacifiCorp also moves for summary judgment on GTN's Sixth Affirmative Defense, which alleges PacifiCorp is precluded from relief under the doctrine of unclean hands.  That doctrine traditionally applies only to a claim seeking relief in equity.  *See Casteel v. King*, 201 Or. 234, 235, 269 P.2d 529 (1954) ("It is well settled that the assumption of equitable jurisdiction in a given case is dependent upon an exercise of discretion in accordance with the dictates of judicial conscience. In the exercise of this discretion, courts are guided by well known maxims of equity, a cardinal one of which is that one who comes into equity must come with clean hands.") However, in *McKinley v. Weidner*, 73 Or.App. 396, 400, 698 P.2d 983 (1985), the Oregon Court of Appeals analyzed an unclean hands affirmative defense to a claim for money damages as *in pari delicto* affirmative defense, indicating that Oregon law treats the two defenses interchangeably.  *Rapid Funding Group, Inc. v. Keybank Nat. Ass'n*, No. CV 07–1348–PK, 2009 WL 2878545, at *15  (D. Or. 2009).    The doctrine of *in pari delicto*, meaning "in equal fault," can "prevent recovery in a law action, when the party against whom it is to be applied is as

Page 61- OPINION AND ORDER

culpable as, or more culpable than, his opponent." *McKinley*, 73 Or. App. at 401.  Therefore, I construe GTN's unclean hands defense as an *in pari delicto* defense asserting that PacifiCorp was at least equally culpable for causing its damages and deny PacifiCorp's motion for summary judgment on that defense.

PacifiCorp also moves against GTN's Eighth Affirmative Defense alleging conflict and field preemption, as well as the filed rate doctrine.  GTN admits that this defense applies only to PacifiCorp's negligence claim.  Since that negligence claim is barred, PacifiCorp's motion is denied as moot.

PacifiCorp next moves against GTN's Ninth Affirmative Defense alleging *res judicata* and collateral estoppel based on FERC's prior involvement in this dispute.  Here, GTN contends that FERC's decision that GTN's gas did not violate its tariff is binding on this court.  Alternatively, GTN suggests in oral argument that at least FERC's rejection of PacifiCorp's prior gas sampling results and imposition of a new gas testing protocol are binding, such that any evidence of gas quality not adhering to FERC's testing protocol must be excluded.  I disagree.

*Res judicata*, also known as claim preclusion, bars litigation of any claims that were raised or could have been raised in the prior action, and applies when there is: "(1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).  Collateral estoppel, also known as issue preclusion, bars litigation of issues previously adjudicated in litigation between the parties, and applies when: "(1) the issue at stake [is] identical to the one alleged in the prior litigation; (2) the issue [was] actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation [was] a critical and necessary part of the judgment in the earlier

Page 62- OPINION AND ORDER

action." *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992).

It is clear that claim preclusion and issue preclusion do not bar PacifiCorp's contract claim in this suit.  First, as to claim preclusion, there is no identity of claims.  PacifiCorp's FERC hotline complaint did not raise a claim for damages, as in this suit. Also, FERC analyzed GTN's gas quality on three dates in late 2008 and early 2009, whereas this suit concerns alleged gas contamination in 2007 and early 2008, a different time period.  Second, as to both claim and issue preclusion, there was no final judgment on the merits.  The hotline complaint did not involve any formal proceeding that would have allowed a final adjudication on the merits, even on the limited issue of the validity of PacifiCorp's gas quality testing results.  Therefore, PacifiCorp's motion for summary judgment on this affirmative defense is granted.  This ruling does not prevent the parties from arguing about the import of FERC's decision to re-test gas quality, assuming evidence from the FERC hotline complaint is otherwise admissible.

## VIII.   PacifiCorp's Motions to Compel

PacifiCorp also moves to compel documents from Northwest and GTN.  PacifiCorp's motion to compel documents from Northwest is denied as moot.  With respect to GTN, PacifiCorp seeks: (1) all photos and video taken on site inspections that were considered by GTN's experts; (2) a report that a GTN engineer purportedly prepared assigning fault for the outages to Northwest; and (3) documents and communications considered by GTN's non-retained experts that relate to those experts' opinions.

The first two requests are easily resolved.  In its motion to compel, PacifiCorp acknowledged that GTN had already provided some photographs taken by two of GTN's experts, but nevertheless maintained its motion "because it is unclear whether this production constitutes

*all* pictures and/or video considered by GTN's experts." (P.'s Br., #197, at 7 n.4.)  In responsive

briefing, GTN confirmed that it has already produced all pictures considered by its experts.

(GTN's Br., #231, at 5-6.)  PacifiCorp has therefore received all the photographs it requested, as

well as GTN's confirmation that none more exist.  Regarding the second request, GTN flatly

denies the existence of the 2007 GTN engineering report that PacifiCorp seeks.  Again,

PacifiCorp is not entitled to documents that do not exist.  Nor does PacifiCorp present any

competent and admissible evidence that there is such a report.[20]  Therefore, PacifiCorp's motion

is denied as to this first and second categories of discovery.

     The third request is more involved.  PacifiCorp seeks discovery of at least 76

communications authored by, received by, or copied to GTN non-retained experts on topics

about which they intend to testify, many of which involved GTN's in-house and outside counsel.

GTN objects that these communications are protected by the attorney-client privilege and that the

non-retained experts did not consider any of the requested communications in reaching their

expert opinions.

     Prior to 2010, Rule 26 addressed only a single category of expert witnesses, those

"retained or specially employed to provide expert testimony in the case or one whose duties as

the party's employee regularly involve giving expert testimony," and required them to provide a

written report containing the "data or other information" they considered in forming their

---

     [20] PacifiCorp bases its request for that report solely on a declaration of PacifiCorp's trial counsel containing hearsay statements lacking a basis in personal knowledge.  (Sasaki Decl., #198, ¶¶25-26, 34-35) ("In September 2007 GTN's counsel Laurie Newton told PacifiCorp's counsel Jeremy Weinstein that a GTN engineer had prepared a report assigning fault for the outages at the Hermiston Generating Plant to Northwest Pipeline. Ms. Newton noted that the engineer was assisted by two other GTN employees and that she would provide PacifiCorp with the report.GTN counsel Lauri Newton.")

Page 64- OPINION AND ORDER

opinions. *United States v. Sierra Pac. Indus.*, No. CIV S–09–2445 KJM EFB, 2011 WL

2119078, at *2 (E.D. Cal. May 26, 2011). The Rule did not impose any disclosure requirements

on other types of expert witnesses, such as employees whose duties *did not* regularly involve

giving expert testimony. *Id.* In 2010, Rule 26 was amended, modifying the disclosure

requirements for that original category of expert witnesses (now called reporting witnesses) and

establishing different disclosure requirements for the category of non-reporting experts. As the

court in *U.S. v. Sierra Pacific Industries* explains:

> Reporting experts (i.e ., experts who are retained, specially employed, or whose duties as
> a party employee include regularly giving testimony) must now reveal in their reports
> only the "facts or data" they considered in forming their opinion, rather than "data or
> other information." See Fed.R.Civ.P. 26(a)(2)(B) (effective December 1, 2010).
> Non-reporting experts must disclose the subject matter of their testimony and a summary
> of the facts and opinions they will testify to. Fed.R.Civ.P. 26(a)(2)(C).

*United States v. Sierra Pac. Indus.*, No. CIV S–09–2445 KJM EFB, 2011 WL 2119078, at *2

(E.D. Cal. May 26, 2011). Importantly, the amended Rule 26 now explicitly protects

communications between a party's attorney and reporting experts. See Fed.R.Civ.P. 26(b)(4)(C)

("Rules 26(b)(3)(A) and (B) protect communications between the party's attorney and any

witness required to provide a report under 26(a)(2)(B), regardless of the form of the

communication," with certain exceptions).

The 2010 amendments, however, did not create similar protection for communications

between attorneys and non-reporting expert witnesses, instead leaving in place existing

protections for such those communications. *Sierra Pacific*, 2011 WL 2119078, at *7 ("It is clear

that the amended rule neither created a protection for communications between counsel and

non-reporting experts witnesses, nor abrogated any existing protections for such

Page 65- OPINION AND ORDER

communications.")  Unfortunately, no Ninth Circuit authority clearly addresses whether designating a witness as a non-reporting expert waives all applicable privileges and protections of communications with that expert.[21] In *Sierra Pacific*, the Court fashioned a somewhat flexible rule about the effect of designating a non-reporting witnesses, based on policy considerations voiced during the debate over the 2010 amendments.  That rule distinguishes between non-reporting experts who more resembled reporting experts (e.g., employees who intermittently testified as experts) and so-called "hybrid fact and expert opinion witnesses" who should be treated unlike reporting experts.  *Id.* at *10 (recognizing the importance of insuring that witnesses testifying about their personal knowledge of facts be unbiased and noting that sometimes "discovery should be permitted into such witnesses' communications with attorneys, in order to prevent, or at any rate expose, attorney-caused bias").  *Sierra Pacific* held that by designating hybrid fact and expert witnesses who had investigated the cause of a fire and therefore had percipient knowledge of facts at issue in the litigation, plaintiff waived all applicable privileges and protections for communications between counsel and those witnesses, because the fact-finder was entitled to evaluate potential biases in the witnesses' testimony revealed in communications with counsel.  *Id.* at *10.  I find the Court's analysis of the history of Rule 26 to be extremely thorough and lucid, and apply the method espoused by *Sierra Pacific* to this case.

Here, PacifiCorp argues that GTN's non-reporting expert witnesses Trent Van Egmond,

---

[21]    Prior to 2010, district courts in the Ninth Circuit expressed the majority view that all communications with what were then called "testifying experts"– a term encompassing both the current categories of reporting and non-reporting experts – were discoverable, even attorney work-product.  *Sierra Pacific*, 20111 WL 2119078, at *7.  However, the *Sierra Pacific* court noted that none of those cases actually involved what are now called non-reporting experts, making those cases less useful in addressing the effect of designating a non-reporting witness.  *Id.*

Ed Toews, John Plaster, Larry Fox, and John Roscher are all hybrid fact and expert witnesses,

since each has personal knowledge of topics for which he was designated as an expert.  Indeed,

GTN's expert disclosures for these witnesses – with the exception of John Roscher – indicate the

witnesses may provide both expert *and* lay testimony, suggesting that, like the witnesses in

*Sierra Pacific*, they possess percipient knowledge of disputed facts in this litigation.  (Sasaki

Decl., #198, Exs. 8,9.)  Therefore, Van Egmond, Toews, Plaster, and Fox fall in the category of

hybrid fact and expert witnesses whose designation as non-reporting experts serves to waive all

applicable privileges and protections for items they considered that relate to the topic of their

testimony.

Finally, I am not persuaded by GTN's argument that its witnesses' deposition testimony

indicates they did not "consider" the withheld communications in reaching their opinions. Non-

reporting expert witnesses "consider[]" all documents and communications that they "generated,

saw, read, reviewed, and/or reflected upon, regardless of whether the documents ultimately

affected their analysis."  *Sierra Pacific*,  2011 WL 2119078, at *11 (citing *Western Resources

Inc. v. Union Pacific Railroad*, No. 00–2043–CM, 2002 WL 181494, *9 (D. Kan. January 31,

2002); *Synthes Spine Co., L.P. v. Walden*, 232 F.R.D. 460, 464 (E.D. Pa. 2005)). Thus, the fact

that GTN's witnesses did not affirmatively identify certain communications as informing their

opinions does not mean they did not consider those communications.  Accordingly, I grant

PacifiCorp's motion to compel all documents generated or seen by GTN non-reporting expert

witnesses Trent Van Egmond, Ed Toews, John Plaster, and Larry Fox that relate to the subject of

their expert opinions.

//

Page 67- OPINION AND ORDER

## CONCLUSION

For the reasons described above, Northwest's motion for summary judgment (#243) is granted, and GTN and PacifiCorp's motions for summary judgment (#251, #253) are granted in part and denied in part.  Northwest's motion for sanctions (#279) is denied as moot and GTN's motion for sanctions (#284) is granted in part and denied in part.  GTN's motion to stay proceedings and refer issues to the Federal Energy Regulatory Commission ("FERC") (#240) is granted, and the parties are ordered to refer this case to FERC requesting FERC exercise its primary jurisdiction to construe the phrase in GTN's tariff "commercially free from . . . objectionable substances . . . which may interfere with . . . its commercial utilization" as applied to compressor oil.  This action shall be stayed until FERC responds to the parties' request, except as set forth herein.  PacifiCorp's motion to compel (#194) evidence from Northwest is denied as moot and PacifiCorp's motion to compel (#196) evidence from GTN is granted in part and denied in part.  All evidentiary objections not specifically addressed are denied as moot, with leave to reassert at a later stage in the proceeding.

IT IS SO ORDERED.

Dated this 16th day of July, 2012.


/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge