IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PACIFICORP, an Oregon
corporation,

                Plaintiff,

                                    3:10-cv-00099-PK

                                    OPINION AND ORDER

NORTHWEST PIPELINE GP, a
Delaware Partnership, and GAS
TRANSMISSION NORTHWEST
CORPORATION, a California
corporation,

                Defendants.

PAPAK, Judge:

      The parties are very familiar with the facts and procedural history of this case and I need

not repeat them here.  Previously this court granted in part Northwest's motion for attorney's fees

(#375), ordering that PacifiCorp pay Northwest $27,148.36 in attorney fees – 20% of

Northwest's initial request – as a spoliation sanction for PacifiCorp's discovery misconduct.

Although Northwest sought fees to compensate for all of its motion practice concerning

PacifiCorp's alleged spoliation of evidence, this court recognized that fees were appropriate to

compensate only for time spent on three distinct areas: (1) investigating and pursuing spoliation

Page 1 - OPINION AND ORDER

sanctions for PacifiCorp's destruction of the Unit 2 fuel scrubber; (2) identifying and pursuing the 2008 Exponent report that PacifiCorp improperly failed to identify; and (3) re-opening the 30(b)(6) deposition of Shane Holst concerning the details of gas testing conducted by FERC. Before awarding fees as a sanction for the first two areas of misconduct, this court found that PacifiCorp's destruction of the fuel scrubber and failure to identify the existence of the 2008 report were "tantamount to bad faith." Such a finding is the minimal prerequisite for awarding attorney fees as a discovery sanction under the court's inherent power. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006).

Now before the court is PacifiCorp's motion to reconsider the court's award of attorney fees or, alternatively, to modify that order by eliminating findings that PacifiCorp acted in bad faith.[1] (#410.) PacifiCorp argues that this court committed clear error by finding that PacifiCorp's conduct was tantamount to bad faith. As described in more detail below, I disagree with PacifiCorp's contention that the court's findings constituted clear error. For that reason, PacifiCorp's motion is denied.

## LEGAL STANDARD

Federal Rule of Civil Procedure 54(b) provides in part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all of the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphasis added). The major grounds for reconsidering an interlocutory order under Rule 54(b) are "an intervening change in the law, the availability of new evidence, or

---

[1] PacifiCorp does not challenge the court's imposition of attorney fees associated with re-opening the Rule 30(b)(6) deposition of Shane Holst, even though it argues that the court's entire attorney fee award should be reversed. I therefore only address the court's ruling concerning the scrubber and the 2008 Exponent report.

the need to correct a clear error or prevent manifest injustice." *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n. 5 (9th Cir. 1989). Additionally, the Ninth Circuit has observed that "[a]s long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001).

## DISCUSSION

### I.    Overview of Bad Faith Standard

In *Leon*, the Ninth Circuit held that a district court "must make an express finding that the sanctioned party's behavior constituted or was tantamount to bad faith" as a prerequisite to awarding attorney's fees as a spoliation sanction. 464 F.3d at 961 (internal quotations omitted). "Bad faith . . . includes a broad range of willful improper conduct." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001). The Ninth Circuit's jurisprudence recognizes that the type of bad faith necessary to impose attorney's fees as a sanction requires conduct "substantially motived" by an improper purpose. *See Fink*, 239 F.3d at 992 ("a finding of bad faith does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of attorney's fees.") (internal quotation omitted).

### II.    Fuel Scrubber

PacifiCorp first challenges the court's finding that its destruction of the scrubber was tantamount to bad faith. In my original decision awarding fees, I attributed an improper motive to PacifiCorp for destroying the scrubber for two reasons: "First, PacifiCorp scrapped the scrubber well after this litigation commenced. And unlike with the damaged fuel nozzles,

PacifiCorp had no credible explanation for destroying this obviously relevant piece of physical evidence." (Opinion and Order, #409, at 20-21.) PacifiCorp challenges these predicate findings in several different ways.

First, PacifiCorp argues that plant operator HGC discarded the scrubber, not PacifiCorp. The court has previously rejected simplistic attempts by PacifiCorp to hide behind HGC, noting that because PacifiCorp was the assignee of HGC's claims in this case, HGC's spoliation of evidence is also attributed to PacifiCorp. (Opinion and Order, #361, at 39.) PacifiCorp also insists that even if it is responsible for HGC's conduct, there is no evidence that HGC possessed an improper motive, noting that Hermiston plant maintenance supervisor Terry Journot declared he was not aware that the scrubber was defective or malfunctioning before the scrubber was removed from the site along with several other truckloads of equipment. (Journot Decl., #316, ¶7.) I find no evidence contradicting Journot's declaration, as far as it goes, and I recognize that HGC was not participating in this litigation as a party when the scrubber was destroyed. But as I recognized in my spoliation ruling, the nature of the scrubber's role in the plant– removing liquids from the gas stream directly before the gas reached the turbines– means that HGC was on constructive notice that the scrubber was relevant to the litigation, despite whatever Journot and other HGC employees thought about the scrubber's functionality. *Cf. Leon*, 464 F.3d at 959 (recognizing that despoiling party's after-the-fact determination about the relevance of destroyed evidence need not be heeded).

More important for this analysis, however, is the fact that PacifiCorp had an independent and more clear-cut obligation to preserve the scrubber than HGC did. As Northwest points out, PacifiCorp's 50% ownership of the Hermiston plant and direct involvement in testing to determine the cause of the outages in 2008 placed an affirmative duty on PacifiCorp (as distinct

Page 4 - OPINION AND ORDER

from HGC) to preserve the scrubber. *See, e.g., World Courier v. Barone*, No. C 06-3072 TEH, 2007 WL 1119196, at *1 (N.D. Cal. Apr. 16, 2007) (observing that "courts have extended the affirmative duty to preserve evidence to instances when that evidence is not directly within the party's custody or control so long as the party has access to or indirect control over such evidence"). PacifiCorp had several concrete and undeniable warnings that the scrubber may have contributed to the alleged gas contamination. Even two years before the scrubber was destroyed in the summer of 2010, Jim Griff, "Manager of Shared Generation Stations" for PacifiCorp, was notified by the Black & Veatch Report that the scrubber was potentially inadequate to filter lubrication oil in aerosol or mist form. (Skelton Decl., #248, Ex. 11, at 10.) PacifiCorp also commissioned and received the 2008 Exponent Report, which reiterated the Black & Veatch Report's suggestion that the Unit 2 scrubber allowed contaminants to remain in the fuel supply. (Skelton Decl., #248, Ex. 14, at 15.) Finally, when the scrubber was destroyed, PacifiCorp was in the midst of litigation that focused on the alleged existence and cause of gas contamination in the generator tubines that scrubbers were designed to prevent, having taken assignment of HGC's claims. These circumstances indicate that PacifiCorp, independent of HGC, knew the Unit 2 scrubber was highly relevant to ongoing litigation and still failed to preserve it.

Even more troubling, PacifiCorp was not forthcoming during the discovery process with either of the reports highlighting the relevance of the scrubber. PacifiCorp initially did not produce the Black & Veatch Report, despite Dr. Kemal listing it in the appendix of documents he reviewed in creating his own 2011 expert report. When challenged, PacifiCorp offered Dr. Kemal's declaration that he did not rely on the Black & Veatch Report or consider it relevant to the opinions offered in his 2011 report. (Opinion & Order, #170, at 3.) This court granted a

motion to compel that report anyway, because Dr. Kemal considered it among other documents

he reviewed. *Id.* In retrospect, Dr. Kemal's declaration and PacifiCorp's initial failure to

disclose the Black & Veatch report now appear more troubling, given that the authors of the 2008

Exponent report (Dr. Kemal among them) initially found the Black & Veatch Report relevant

enough to discuss it at some length and that PacifiCorp subsequently permitted the scrubber to be

destroyed. In sum, PacifiCorp's strenuous and unsuccessful resistance to disclosing documents

that surely alerted PacifiCorp to the scrubber's relevance in 2008 bolsters the court's conclusion

that PacifiCorp had an improper motive in failing to preserve the scrubber from being destroyed

two years later.

PacifiCorp next argues that it and HGC had a credible explanation for discarding the

scrubber: HGC needed to clear space in the "boneyard" where the scrubber was being stored with

other equipment to make way for a new parts warehouse. (Journot Decl., #316, ¶6). PacifiCorp

made this same argument in response to the initial spoliation motions. Defendants responded

with photographs from a December 2011 visit to the plant (more than a year after the scrubber

was discarded) showing a large parts warehouse and ample space in the outdoor "bone yard" to

store the scrubber, which was about the size of a water heater, calling PacifiCorp's justification

for removing the scrubber because it needed space "completely absurd." (Walker Suppl. Decl.,

#341, Ex. 9); (Boyce Decl., #331, Ex. 2, at 59); (GTN's Reply, #342, at 25). This court labeled

PacifiCorp's arguments in resistance to a spoliation sanction –including the argument that the

scrubber was removed to make room in the boneyard– as "deficient" without making an explicit

finding that the boneyard explanation was not credible. (Opinion & Order, #361, 36-37.)

PacifiCorp now seeks to strengthen that explanation, arguing that GTN's December 2011

observations of the boneyard were irrelevant to the condition of the boneyard in 2010 when the scrubber was scrapped and that GTN's attorney was not qualified to opine about how much storage space is needed at a power plant. While this court's summary judgment opinion did not absolutely reject PacifiCorp's boneyard explanation, this court gave little, if any, weight to the explanation in the context of the spoliation analysis. If HGC lacked space in the boneyard to store even a small piece of equipment like the scrubber, it could always have stored the item off-site. Even assuming HGC innocently scrapped the scrubber along with other equipment in 2010 without recognizing its relevance, that act cannot excuse PacifiCorp's failure to safeguard the scrubber – it only explains the mechanism by which the scrubber disappeared. In other words, the boneyard explanation cannot serve as a credible justification for PacifiCorp's litigation conduct, even if it could arguably have been a credible explanation for why HGC destroyed the scrubber. Overall, this court did not commit clear error in finding PacifiCorp's destruction of the scrubber was conduct tantamount to bad faith.

## III.    2008 Exponent Root Cause Analysis

The parties engage in an even more extensive debate about the court's finding that PacifiCorp's concealment of the 2008 Exponent report was tantamount to bad faith. In reaching that conclusion, this court relied on the fact that PacifiCorp failed to explain the five-month delay in identifying the existence of the report (despite multiple forms of inquiry by defendants) and that the report contained damaging conclusions about PacifiCorp's partial responsibility for the outages. Now, PacifiCorp argues that the court committed clear error in two regards: (1) by making the improper finding that even though PacifiCorp was substantially justified in withholding the report as a draft expert report under Rule 26, it was still obligated to identify the

existence of that report; and (2) by concluding that PacifiCorp in fact concealed the report. I

address each argument in turn, although this discussion requires me to examine facts that were

not squarely before the court on the initial motion for attorney fees.

PacifiCorp's first argument posits that because this court found PacifiCorp had a good

faith belief that the 2008 report was a protected draft under Rule 26(b)(4)(B) not subject to

production, it had no obligation even to identify the report's existence during discovery.[2]

Although neither party provides any legal analysis of this issue, I find relevant guidance in Rule

26's discussion of the process for objecting to requests for privileged or protected discovery.

Rule 26(b)(5)(A) provides that when a party withholds otherwise discoverable information

pursuant to a privilege or the work product protection, it must: "(i) expressly make the claim; and

(ii) describe the nature of the documents, communications, or tangible things not produced or

disclosed—and do so in a manner that, without revealing information itself privileged or

protected, will enable other parties to assess the claim."[3] Fed. R. Civ. P. 26(b)(5)(A). Since the

---

[2] In response to the court's inquiry at oral argument, PacifiCorp now asserts that it did in fact identify the existence of the report in its privilege log. (Privilege Log, #87-1) (entries No. 99 and No. 216). I have reviewed those entries and cannot ascertain whether either even pertains to the 2008 Exponent report, let alone provides sufficient detail to assess the assertion of privilege or protection. The first entry, No. 99, is dated "01/00/2009" and refers only to a "Consultant communication" authored by an "Expert." By contrast, the 2008 Exponent Report was dated August 15, 2008, over three months before entry No. 99 in the privilege log, and has been consistently characterized by PacifiCorp as a "draft" version of Dr. Kemal's report, not a communication between PacifiCorp and its expert. The second entry, No. 216, has even less connection to the 2008 Exponent Report. Although the entry is dated 8/24/2009, just a week after the report itself, it purports to be a "Legal analysis" authored by Shane Holst, a PacifiCorp employee.

[3] Similarly, Rule 34(b) has been interpreted to require some more detailed explanation if asserting a privilege in response to requests for production. Fed. R. Civ. P. 34(b); *see Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005) (analyzing a number of factors in a "holistic reasonableness analysis" to determine whether

2010 Amendments to Rule 26, initial expert disclosures must include the "facts or data" considered by the expert witness in forming his opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii). However, draft expert reports are exempt from that initial disclosure and, instead, are protected by the work product protection. *See* Fed. R. Civ. P. 26(b)(4)(B) ("Rules 26(b)(3)(A) and (B) [the work product doctrine] protect drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded."). Predictably, the comments to the 2010 amendments to Rule 26 treat draft reports the same as any other document with work product protection. Fed. R. Civ. P. 26, 2010 Advisory Committee Notes, Subdivisions (a)(2)(B), (b)(4). And the parties present no authority suggesting that draft reports somehow escape the ordinary obligation under Rule 26(b)(5)(A) to identify the existence of a protected document in a privilege log or similar communication.[4]

Given these general principles, the question becomes when, if ever, PacifiCorp became obligated to expressly claim work product protection on the draft report and thereby identify the existence of that report to defendants. Here we transition to squarely address PacifiCorp's second argument– that it did not actually conceal the existence of the 2008 report. PacifiCorp challenges the five reasons the court cited in its earlier ruling supporting the conclusion that

---

privilege is waived by failing to provide a privilege log within the 30 days required for responses under Rule 34, including "the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged.").

[4] PacifiCorp argues that as a matter of accepted practice draft expert reports are not generally included on privilege logs and that defendants also have not identified their draft expert reports in this litigation. Both may be true, but they cannot overcome the binding legal authority indicating that documents with putative work product protection must be identified with specificity in the discovery process.

PacifiCorp concealed the report.

The first is GE service manager Dana Craft's June 2011 deposition testimony that GE never performed a root cause analysis at the plant. I agree with PacifiCorp that the court incorrectly relied on this testimony as an example of PacifiCorp's concealment in its earlier ruling. Craft was neither a PacifiCorp nor HGC employee. The fact that GE testified it did not perform a root cause analysis cannot provide evidence of PacifiCorp's concealment.

The second is Northwest's June 2011 request for production of all reports provided to and considered by PacifiCorp's testifying experts. (Walker Decl., #146, Ex. 2) (RFP No. 11). At the time, PacifiCorp objected on the grounds that the request prematurely sought expert discovery before the deadline for expert disclosures– the initial deadline for expert disclosures by PacifiCorp was September 16, 2011 and was later extended until October 7, 2011. (Sniffen Decl., #412, Ex. 2 at 2.) Admittedly, Northwest's discovery request came before the court's expert disclosure deadline. Consequently, under Rule 26(a)(2)(D) PacifiCorp was justified in refusing to actually produce the requested evidence at that time. *See* Fed. R. Civ. P. 26(a)(2)(D) ("A party must make these [expert] disclosures at the times and in the sequence that the court orders."). But in addition to the timing objection, PacifiCorp also invoked the "recent amendments to Fed[.] R[.] Civ. P[.] 26" as a response to Northwest's request, apparently alluding to it's position that draft reports were guaranteed work product protection. (Sniffen Decl., #412, Ex. 2 at 2.) By doing so, PacifiCorp placed itself squarely under the obligations of Fed. R. Civ. P. 26(b)(5) to identify and describe the 2008 report in a manner that would allow Northwest to assess PacifiCorp's work product protection claim. Fed. R. Civ. P. 26(b)(5) (indicating that the obligation to make a work product claim and describe the nature of the withheld documents

arises "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation [i.e., work product] material").

Even if the untimeliness of Northwest's request for production somehow allowed PacifiCorp not to even acknowledge the 2008 report, that justification ceased to be valid once PacifiCorp exchanged its expert reports in October 2011.   By that point PacifiCorp was obligated to acknowledge the existence of the 2008 report and invoke its claim of work product protection as a supplementation of its earlier discovery responses as required under Fed. R. Civ. P. 26(e).   Yet PacifiCorp did not.

Alternatively, PacifiCorp argues that the 2008 Exponent report was not even within the scope of Northwest's RFP No. 11 because it was "not a report provided to a testifying expert, it was a report *prepared* by a testifying expert." (PacifiCorp's Memo. in Supp. of Reconsid., #411, at 8-9) (emphasis in original).  I disagree.  To be clear, RFP No. 11 requested, among other things, "all documents considered by each such expert or person in forming his or her opinion . . . ." (Sniffen Decl., #412, Ex. 2 at 2.)  It is inconceivable that Dr. Kemal managed to form his opinion, as expressed in his 2011 Exponent report, without considering the 2008 Exponent report, much of which he repeated verbatim.  I do not dispute that, as PacifiCorp puts it, "PacifiCorp reasonably believed that the 2008 report was a draft of the final report disclosed in October 2011, which means that it was not subject to disclosure under Rule 26(b)(4)(B)." (Br., #411, at 9.)  But that reasonable belief did not excuse PacifiCorp from the obligation to at the very least identify the document and assert a work product protection, just as it would with any other arguably protected or privileged document requested in discovery.  Consequently, as early

Page 11 - OPINION AND ORDER

as July 18, 2011, the date of PacifiCorp's response to RFP No. 11, PacifiCorp improperly concealed the existence of the 2008 Exponent report.

Third, PacifiCorp takes issue with the court's conclusion that PacifiCorp improperly refused to identify the 2008 report when required by the court during a July 27, 2011 discovery hearing. PacifiCorp and Northwest each point to a different portion of that hearing to support their respective positions. Northwest argues that this court instructed PacifiCorp to produce all testing and reports from consultants[5] who were to become testifying experts, so that defendants could adequately prepare for Rule 30(b)(6) depositions. (Transcript, #127, at 73-74.) Northwest describes the 2008 Exponent report as a discoverable report containing testing conducted by a consultant who would later be designated as a testifying expert. PacifiCorp counters that the fuller context of the court's words indicate the court's instruction applied only to objective testing concerning gas quality performed or considered by consultants, rather than reports containing the consultants' own conclusions about causation, which were attorney-client privileged or work product protected. *Id.* at 71-74. Requiring a party to produce earlier versions of a report containing conclusions of consultant-turned-testifying expert, PacifiCorp insists, would in any case have violated Rule 26(b)(4)(B), the provision protecting draft reports.

In fact, PacifiCorp argues that it actually revealed the existence of that report in open court during the July 27th hearing. PacifiCorp points to an earlier moment in the hearing where it freely admitted that it was withholding consulting experts' reports exploring issues of

---

[5] The parties use "consultant" as a shorthand for what Rule 26 calls an "Expert Employed Only for Trial Preparation." *See* Fed. R. Civ. P. 26(b)(4)(D). Reports by such experts are not discoverable, except as relevant here, upon a showing of exceptional circumstances. Fed. R. Civ. P. 26(b)(4)(D)(ii).

causation under the theory that those reports were attorney-client privileged. (Transcript, #127, at 71) ("[PacifiCorp]: All testing was produced. To the extent any other non-attorney-client privileged communication was withheld, there were consultants that were retained by counsel to explore causation– not testing the quality of the gas or any of the type of information that [GTN] is referring to, but instead to explore theories of liability and causation. Now, we withheld those reports on the grounds that those are consulting experts that we are using in connection with the litigation."). PacifiCorp notes that the 2008 Exponent report is an example of such a consultant's report obtained in anticipation of litigation. Although PacifiCorp attorneys never communicated directly with Exponent, in February 2008 PacifiCorp general counsel Jeffery Erb sent an email to PacifiCorp employees Joe Moor and Jim Griff entitled "ATTORNEY CLIENT PRIVILEGE-Direction for Study" instructing them to "commence the launch of a root cause analysis investigating the presence of lubricating oil or other contaminants in the natural gas feeding the Hermiston Generating Plant" and asking them to forward the results back to Erb. (Sasaki Decl., #219, Ex. 1.)

  After examining the record of the hearing, I conclude that the court's discussion with regard to producing consultant's "testing" reports was sufficiently ambiguous as to support both PacifiCorp and Northwest's explanations. However, I reject the notion that PacifiCorp's vague reference in open court to its withholding of consultants' reports concerning "theories of liability and causation" under "attorney-client privilege" was sufficient to satisfy the requirements of Fed. R. Civ. P. 26(b)(5)(A), discussed above, with regard to the 2008 Exponent report that is the subject of this motion. PacifiCorp's conduct at the July 27, 2011 hearing did not absolve it of any future responsibility to identify the existence of the report and does not undermine this

Page 13 - OPINION AND ORDER

court's finding of conduct tantamount to bad faith.

Fourth, PacifiCorp argues that the HGC plant manager Frank Glasgow's deposition also does not provide any evidence of concealment or bad faith. Northwest insisted that Glasgow testified that PacifiCorp/HGC never performed a root cause analysis, testimony which was false and which PacifiCorp should have corrected by identifying the existence of the 2008 Exponent report. By contrast, PacifiCorp contends that Glasgow testified truthfully that HGC never conducted a root cause analysis; Glasgow was never asked the crucial question of whether PacifiCorp, as opposed to HGC, performed such an analysis.

The relevant Glasgow testimony states:

Q: Did you deal with -- did you -- when -- when the issues came up on this 7FA unit that allegedly suffered this damage due to gas quality, are you the point person that was working with GE on trying to resolve that issue?
A: Trying to figure out the root -- figure it out, yes, I was the point person that was working with General Electric.
Q: Well, you almost said root cause, didn't you, sir?
A: Yes.
Q: Was there a root cause analysis done at some point in time?
A: We use that term kind of loosely. We did not do a root cause analysis. We worked with GE to figure out where the issue was.
Q: Do you know -- you know in the industry root cause has an industry meaning, don't you, sir, root cause analysis?
A: It varies between facility and company and -- and stuff like, you know -- that -- that's why I wanted --was backing off from that word because at the plant it just means, you know, figure out where the -- where the issue is coming from.
Q: Okay. So you're telling me today no root cause analysis was ever actually done?
A: Well, we went through the binders and basically we, you know -- that was kind of our analysis of, you know, where the issues were coming from.
Q: Okay. So you're the person who worked with GE to try to figure out where the issues were coming from?
A: Yes.
Q: Did GE ever recommend that a root cause analysis be done?
A: No, they did not.
Q: Did GE ever do a root cause analysis, to your knowledge?

A:To my knowledge, no.
Q:We know the Hermiston facility didn't, right?
A:Well, we did an analysis, yes. But did we do a root cause analysis? No.
Q:Tell me how you're differing [sic] a root cause analysis from the analysis that you did.
A: A root cause analysis, you know, looking at it from a GE perspective you have, you know, charts and stuff. We didn't do all that. What we did is we produced the binders. We basically said here's the chronological order of events. Here's the issues that we're seeing and here's how we think we can solve them and here's what we, you know, came across in the outages.

(Skelton Decl., #222, Ex. 7) (Glasgow Dep. at 42-43.)

Upon a careful reading, I believe Glasgow's testimony was ambiguous. Glasgow testified that "[w]e did not do a root cause analysis." While PacifiCorp interprets "we" to refer to the Hermiston plant, Northwest believes "we" should be understood to include at least HGC and PacifiCorp. Glasgow was never asked specifically whether he assisted PacifiCorp to conduct a root cause analysis.[6] Nor was he asked what he meant by "we." Thus, I agree with PacifiCorp that Glasgow never gave demonstrably false testimony. But because of that ambiguity, his testimony gave the *impression* that no root cause analysis of the Hermiston plant outages had ever been completed, an impression that PacifiCorp knew to be false, that assisted PacifiCorp, and that PacifiCorp chose not to disturb. PacifiCorp's failure to correct Glasgow's testimony lies in a grey area. While not necessarily a discovery violation itself, in the context of PacifiCorp's repeated failure to identify the 2008 report and the damaging nature of the report's findings, PacifiCorp's decision not to clarify Glasgow's testimony supports this court's conclusion that PacifiCorp possessed an improper motive.

---

[6] If he had been asked that question, he undoubtedly would have answered in the affirmative, as the record shows that Glasgow was one Dr. Kemal's main contacts at the plant during Kemal's preparation of the 2008 report, which purported to identify the root causes of the outages. (Skelton Decl., #222, Ex. 3) (Kemal Dep. at 264, 269-270).

Finally, PacifiCorp argues that it did not conceal the 2008 report's existence in the face of

this court's November 9, 2011 order. That order addressed Northwest's motion to compel,

among other items, a more thorough listing of all documents that Exponent relied upon in

producing its 2011 expert report in order to determine whether all of those documents had

previously been produced. This court granted that portion of the motion, ordering "PacifiCorp to

create and exchange an amended Appendix A to its Exponent report including Bates numbers for

all documents reviewed by Exponent."[7] (Opinion & Order, #170, at 3.) PacifiCorp's amended

Appendix A apparently did not include a reference to the 2008 Exponent report. PacifiCorp now

insists that since it reasonably believed the 2008 report was a draft expert report protected under

Rule 26(b)(4)(B), it had no obligation to identify that report in response to the court's order. This

argument merely recapitulates PacifiCorp's unpersuasive position regarding Northwest's June

2011 request for production, and my analysis is essentially the same. Dr. Kemal obviously

"reviewed" the 2008 Exponent report in writing his 2011 report, since he used some of the earlier

report verbatim. Again, the fact that the 2008 report was arguably protected work product did

not alleviate PacifiCorp's obligation to identify it in the new Appendix A, as the court directed.

If PacifiCorp had followed the court's order, defendants would have become aware of the 2008

report's existence, and could have litigated whether the report was entitled to work product

protection.

Overall, my original conclusion that PacifiCorp's concealment of the 2008 Exponent

Report was tantamount to bad faith is only corroborated by the in-depth review of evidence

---

[7] Contrary to Northwest's briefing on the attorney fee motion, the court did not order
PacifiCorp to "produce" all such documents reviewed by Exponent.

Page 16 - OPINION AND ORDER

necessitated by this motion for reconsideration. As described above, PacifiCorp repeatedly

neglected to disclose the existence of the 2008 report, presuming without any colorable basis in

law that a putative draft expert report need not be identified like any other arguably work-product

protected item. In some instances PacifiCorp violated straightforward statutory discovery

obligations; in others PacifiCorp avoided acknowledging the existence of the report through

technically permissible but nonetheless concerning litigation tactics. PacifiCorp had multiple

opportunities to acknowledge the existence of the 2008 report without divulging its allegedly

protected contents. Instead, PacifiCorp remained silent, and likely would have succeeded in

concealing the existence of the 2008 report to this day, had one of the 2008 report's authors not

fortuitously listed the document in his curriculum vitae published on the Exponent website.

　　If the 2008 report's contents had been relatively benign, I would not have so strongly

inferred a improper motive. But the 2008 report is perhaps the most crucial piece of evidence in

this litigation. It contains damaging conclusions about PacifiCorp's own potential responsibility

for the outages. Furthermore, the report is of paramount importance because PacifiCorp's own

spoliation made it so. PacifiCorp destroyed all the damaged turbine fuel nozzles except those

that it selected to give to Exponent, some of which Exponent destructively tested. And because

Exponent inexplicably failed to keep any raw data or testing notes from those analyses, the 2008

report is the closest approximation to testing data from those nozzles.

　　Despite these unusual circumstances, this court was rather restrained in its attorney fee

ruling, finding PacifiCorp's conduct only "tantamount to" bad faith, and awarding 20% of

Northwest's requested fees for the combined spoliation of the scrubber and the failure to identify

the existence of the 2008 Exponent report. This court takes the practice of imposing sanctions

and awarding fees very seriously, and rarely imposes fees to sanction conduct.  In this case, I found attorney fee sanctions warranted because of the multiple indicia of PacifiCorp's improper motives.

Finally, during oral argument counsel for PacifiCorp asked this court specifically to reconsider what it described as a "harsh" comment at the end of my original attorney fee ruling. (Opinion & Order, #409, at 23-24) (stating that PacifiCorp's "deceptive activity" with regards to the 2008 report "reflects poorly on the counsel who permit or encourage it, hinders the efficiency of the litigation process, and ultimately undermines the public's faith in the courts.").  In light of the foregoing discussion, I find no reason to depart from that particular observation, which summarizes the policy considerations underlying my decision to impose these limited monetary sanctions.

## CONCLUSION

The court's prior opinion awarding attorney fees to Northwest (#409) is modified as discussed herein and PacifiCorp's motion for reconsideration (#410) is denied.

IT IS SO ORDERED.

Dated this 8th day of February, 2013.

Honorable Paul Papak
United States Magistrate Judge