IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PACIFICORP, an Oregon
corporation,

                Plaintiff,                        3:10-cv-00099-PK

v.                                           OPINION AND ORDER

GAS TRANSMISSION
NORTHWEST CORPORATION,
a California corporation,

                Defendant.

---

PAPAK, Magistrate Judge:

    Plaintiff PacifiCorp brings this action against defendant Gas Transmission Northwest

Corporation ("GTN") arising out of the alleged contamination of natural gas causing damage to

PacifiCorp's Hermiston power plant. Now before the court is GTN's motion for leave to amend

its rebuttal expert disclosures and to disclose a new rebuttal expert (#468). For the reasons

Page 1 - OPINION AND ORDER

discussed below, GTN's motion for leave is granted in part and denied in part.

## BACKGROUND

The instant discovery dispute arises out of the unexpected passing of Dr. M. Mohitpour, GTN's rebuttal expert. On August 29, 2013, GTN filed the present motion, seeking leave to disclose a substitute rebuttal expert—Dr. Kamal K. Botros. GTN argues that, "[b]ecause Dr. Mohitpour can no longer serve as an expert in this case, just cause exists to allow GTN leave to disclose Dr. Botros as a rebuttal expert." GTN's Memorandum in Support of Motion, #469, at 3.

In its resistance, PacifiCorp does not contest that GTN is entitled to disclose a substitute rebuttal expert. However, PacifiCorp objects on the basis that Dr. Botros's report includes opinions not contained in Dr. Mohitpour's report and opinions that are not in rebuttal of any of PacifiCorp's experts' reports. "To conserve resources and to save the Court from the task of dissecting Dr. Botros's report, PacifiCorp has no objection to allowing Dr. Botros's report in its entirety *on the condition that* PacifiCorp is allowed 45 days to supplement its own expert reports to address the opinions expressed by Dr. Botros." PacifiCorp's Resistance, #475, at 2. Alternatively, if the court were to find such a proposal unacceptable, PacifiCorp requests that the court "carefully analyze the expert reports of Drs. Ben Asante, Botros, Mohitpour, and Gary Choquette and exclude all opinion that (1) extend beyond the opinions of Dr. Mohitpour and (2) are not rebuttals of Dr. Asante and Mr. Choquette." *Id.*

In its reply, GTN argues that it would be "improper" for Dr. Botros "simply to adopt and parrot the opinions of" Dr. Mohitpour. GTN's Reply, #476, at 4. GTN also argues that PacifiCorp inaccurately labels many of Dr. Botros's opinions as new or non-rebuttal. Finally, "[i]n the interest of efficiency, and simply to move this along, GTN does not object to PacifiCorp

Page 2 - OPINION AND ORDER

addressing any opinion contained in the Botros Report which the Court determines is beyond the scope of rebuttal." *Id.* at 7.

## ANALYSIS

Pursuant to Federal Rule of Civil Procedure 26(a), a party must disclose the identity of any expert witness and, if the expert witness is retained or regularly gives expert testimony, such "disclosure must be accompanied by a written report." Fed. R. Civ. P. 26(a)(2). "A party must make these [expert] disclosures at the times and in the sequence that the court orders." *Id.* Rule 37(c) instructs that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Courts have held that the death of an expert witness substantially justifies a party's late expert disclosure. *See Brooks v. Cnty. of San Joaquin*, No. 2:09-cv-03343-MCE-GGH, 2012 WL 5928416, at *1 (E.D. Cal. Nov. 26, 2012) ("Courts have approved supplemental disclosures where a critical expert witness has died after the deadlines have passed for expert discovery disclosure."); *Baumann v. Am. Family Mut. Ins. Co.*, 278 F.R.D. 614, 615-16 (D. Colo. 2012) (finding that a late expert disclosure was substantially justified by the original expert's "untimely and unexpected death"); *Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 20 (D.P.R. 2009) ("[D]eath of an expert witness falls squarely within the category of circumstances that require a late disclosure . . . .").

The death of an expert witness, however, should not result in a "windfall" for either party. *Baumann*, 278 F.R.D. at 616. Thus, "the substitute expert's report and testimony is usually

limited to the subject matter and theories already espoused by the former expert." *TIC—The Indus. Co. Wy., Inc. v. Factory Mut. Ins. Co.*, No. 4:10CV3153, 2012 WL 2830867, at \*9 (D. Neb. July 10, 2012); *see also Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 784 (6th Cir. 2003) (finding that the district court did not err by allowing a substituted expert to testify but preventing the substituted expert "from deviating from [the original expert's] prior conclusions"); *Baumann*, 278 F.R.D. at 616 ("Professor Allen's opinion should not stray from the subject matter of Mr. Hodges' opinion. To the extent that Professor Allen covers new material in his deposition, Defendant may file a motion to exclude that portion of Professor Allen's opinion."); *Morel*, 259 F.R.D. at 21 (finding that the plaintiff would not be prejudiced by a substituted expert witness as long as the new expert did not cover any new subjects). "Although the substitute expert's testimony and report are generally restricted to the same subject matter as the prior expert, the substitute is not normally required to simply adopt the prior expert's conclusions verbatim—in effect, doing little more than authenticating and confirming the prior expert's conclusions." *Lincoln Nat'l Life Ins. Co. v. Transamerica Fin. Life Ins. Co.*, Nos. 1:04-CV-396, 1:06-CV-317, 2010 WL 3892860, at \*3 (N.D. Ind. Sept. 30, 2010). "Rather, the substitute expert 'should have the opportunity to express his own opinions in his own language after reviewing the evidence and performing whatever tests prior experts on both sides were allowed to perform.'" *Id., quoting Morel*, 259 F.R.D. at 22.

In this case, the difficulty is determining whether Dr. Botros's report is "limited to the subject matter and theories already espoused by" Dr. Mohitpour. *TIC*, 2012 WL 2830867, at \*9. At a general level, both experts opine that hydrocarbon dropout was possible, that "pigging" could not have been the source of the contaminates, that there was no evidence of "slugging," and

that PacifiCorp needed a heater and coalescing filter. *See* Mohitpour Report at 4, 12, 15-16;

Botros Report at 4-6. Dr. Botros's report, however, appears to be more detailed and reaches at

least some of these conclusions in a different manner.

PacifiCorp suggests that the court can avoid attempting to parse out which portions of Dr.

Botros's report are new or extend beyond the scope of rebuttal if the court allows PacifiCorp

forty-five days in which to respond to Dr. Botros's report. I find such a proposal unacceptable.

As GTN notes in its reply, Dr. Botros is a rebuttal expert. Ordinarily, PacifiCorp would not have

the opportunity to submit a sur-rebuttal report.[1] The fact that Dr. Mohitpour unexpectedly passed

away should not result in a "windfall" for PacifiCorp. *See Baumann*, 278 F.R.D. at 616.

Similarly, Dr. Mohitpour's passing should not result in a "windfall" for GTN; that is, GTN should

not be allowed to submit a substituted report that contains theories and opinions that are

materially different than those contained in Dr. Mohitpour's report. Thus, while PacifiCorp's

proposal is tempting insofar as it would relieve the court of determining which of Dr. Botros's

opinions are new, it unfairly benefits PacifiCorp.

Consequently, the court must determine what portions, if any, of Dr. Botros's report

should be excluded. PacifiCorp identifies ten opinions that it contends are absent from Dr.

Mohitpour's report or exceed the scope of rebuttal. I shall examine each in turn.

1.    **"Stratified gas-liquid two-phase flow in the main 36" and 42" pipelines (even if it existed) does not allow migration of liquids from the bottom of these large pipelines into the small diameter lines at the tie-in to the Hermiston meter/regulating station."**

PacifiCorp contends that this opinion, contained on pages 5, 33-36, and 44 of Dr. Botros's

---

[1] Furthermore, any sur-rebuttal report by PacifiCorp would inevitably result in a request by GTN for the opportunity to file a further reply to that report.

report, is absent from Dr. Mohitpour's report. I disagree. In his report, Dr. Mohitpour comments:

> [Dr. Asante's] report concludes on two-phase flow gas transportation through the 12" pipeline without any indication of the amount of liquid dropout/compressor oil volume that could have [led] to a two phase flow pipeline situation. Generally such two phase flows would effect a reduction in pipeline capacity or affect measurement and monitoring systems.

Mohitpour Report at 10. In other words, Dr. Mohitpour appears to conclude that Dr. Asante did not account for the volume of liquid needed to create a "two phase flow pipeline situation." *Id.*

This appears to be Dr. Botros's opinion as well. For instance, Dr. Botros states:

> For the liquid to move up and into the 8" line, its stratification level had to be at least approximately 12" high . . . in the 36" pipeline, and approximately 17" high . . . in the 42" pipeline, for the liquid to have a chance to move up and into the 8" lines. Such liquid heights in the main pipelines and at the tie-in location cannot simply develop with the alleged volume of liquid flows . . . .

Botros Report at 35-36. While Dr. Botros goes into more detail in explaining why Dr. Asante's two-phase-flow theory is untenable, his opinion does not appear to be new. *See Lincoln Nat'l Life Ins. Co.*, 2010 WL 3892860, at *3 ("[T]he substitute expert should have the opportunity to express his own opinions in his own language after reviewing the evidence . . . ." (citation omitted) (internal quotation mark omitted)). Accordingly, I find that this portion of Dr. Botros's report is "limited to the subject matter and theories already espoused by" Dr. Mohitpour and, therefore, is not subject to exclusion. *TIC*, 2012 WL 2830867, at *9.

2.  **"[I]f there were a slug of liquid of appreciable amount that made itself through to the gas turbines, most certainly Peerless scrubber would have caught much more than this minute amount of 0.59 litres . . . ."**

    PacifiCorp contends that this opinion, contained on page 5 of Dr. Botros's report, is

absent from Dr. Mohitpour's report. I disagree. In his report, Dr. Mohitpour states that he saw

"no evidence of any slugging that reached" the Hermiston plant. Mohitpour Report at 12; *see*

*also id.* at 20 ("There is no customary evidence of a slug event . . . ."). While Dr. Botros goes

into more detail in explaining the type of evidence one might see had there been a slug event, his

opinion does not appear to be new. *See Lincoln Nat'l Life Ins. Co.*, 2010 WL 3892860, at *3

("[T]he substitute expert should have the opportunity to express his own opinions in his own

language after reviewing the evidence . . . ." (citation omitted) (internal quotation mark omitted)).

Moreover, PacifiCorp can hardly claim it is surprised by such an argument. The relatively small

amount of liquid captured by the Peerless scrubber has long been an issue in this case. *See, e.g.*,

Opinion and Order, #361, at 38. Accordingly, I find that this portion of Dr. Botros's report is

"limited to the subject matter and theories already espoused by" Dr. Mohitpour and, therefore, is

not subject to exclusion. *TIC*, 2012 WL 2830867, at *9.

3.      **"The composition of the two sample analysis [sic] collected from Stanfield Scrubber
        and from the Hermiston Scrubber are distinctly different . . . . The peak between
        C24 and C28 in the Hermiston scrubber sample analysis is typical to synthetic
        grease which leads to a suspicion that there might have been grease applied to valves
        and equipment somewhere in the system which ended up captured in the Peerless
        scrubber."**

        PacifiCorp contends that this opinion, contained on pages 5, 38, and 44 of Dr. Botros's

report, is absent from Dr. Mohitpour's report. I agree. Nothing in Dr. Mohitpour's report

suggests that synthetic grease used on the equipment at the Hermiston plant could have caused

the outages. Rather, Dr. Mohitpour's report merely concludes that GTN facilities were not "the

reason for the Hermiston generating plant unit GT #2 failure in 2007" and posits that, under

"transient situations," hydrocarbon dropout was possible. Mohitpour Report at 20. Dr. Botros's

Page 7 - OPINION AND ORDER

report goes considerably further by suggesting another possible cause of the outages—synthetic grease. GTN points to nothing in the record suggesting that it has previously advanced this theory. Indeed, GTN itself acknowledges that the court could find that this theory is new. *See* GTN's Reply, #476, at 7 (noting that Dr. Botros's opinion "that grease may have been applied to valves and equipment" could conceivably be considered outside the scope of rebuttal). Accordingly, I find it appropriate to exclude this opinion.

4.      **"There was a misunderstanding of the term seal oil 'consumption' that was misconstrued as being 'injection' into the gas stream."**

PacifiCorp contends that this opinion, contained on pages 6, 38-39, and 44 of Dr. Botros's report, is absent from Dr. Mohitpour's report. I disagree. On page 12 of Dr. Mohitpour's report, Dr. Mohitpour discusses Mr. Choquette's report, noting that Mr. Choquette's reference to wet gas seals leaking 1 to 100 gallons per day into the pipeline is erroneous; rather, "the 1-100 gallons/day is wet seal consumption of oil and does not refer to injection of oil into gas stream." Mohitpour Report at 12, *citing* Choquette Report at 5. While Dr. Botros goes into more detail in explaining the role of wet seal oil, including a figure depicting the "seal oil circulation system," Botros Report at 39, his opinion—that Mr. Choquette's report erroneously refers to injection rather than consumption—is not new. *See Lincoln Nat'l Life Ins. Co.*, 2010 WL 3892860, at *3 ("[T]he substitute expert should have the opportunity to express his own opinions in his own language after reviewing the evidence . . . ." (citation omitted) (internal quotation mark omitted)). Accordingly, I find that this portion of Dr. Botros's report is "limited to the subject matter and theories already espoused by" Dr. Mohitpour and, therefore, is not subject to exclusion. *TIC*, 2012 WL 2830867, at *9.

5.    "If pigging operation have [sic] caused the left-behind liquid in the main pipeline to
be picked up by the flowing gas, the impact would be felt within much less [than] 2.8
hours following recommencement of the normal gas flow as the disturbed liquid
would have been in a mist/aerosol form and would be readily picked up by the gas
flow."

PacifiCorp contends that this opinion, contained on pages 6, 39-40, and 44 of Dr. Botros's

report, is absent from Dr. Mohitpour's report. I disagree. In his report, Dr. Mohitpour opines that

pigging could not have caused liquids to move downstream because, "in such a pigging

operation, the materials pushed by the pigs are thence moved to a pig receiver, for the purpose of

removal from the pipe." Mohitpour Report at 12. In other words, Dr. Mohitpour suggests that

any liquid removed by the pig would have exited the pipe and, therefore, could not have been the

cause of the outages at the Hermiston plant. Dr. Botros agrees that pigging was not the cause of

the outages, although he reaches that conclusion in a different manner. In his report, Dr. Botros

agrees with Mr. Choquette that pigging could potentially disturb and redistribute liquids;

however, Dr. Botros contends that, had that been the case, "a problem would have occurred after

2.8 hours following recommencement of the normal gas flow." Botros Report at 40. Thus,

unlike Dr. Mohitpour, Dr. Botros acknowledges that pigging could potentially move liquids

downstream. However, Dr. Botros agrees with Dr. Mohitpour that pigging was not the cause of

the outages because the effect would have been apparent in a matter of hours, which was not the

case. Despite the fact that Dr. Botros reaches this conclusion through a different analysis, he is

not covering a new subject or positing a new theory to explain the outages. Accordingly, I find

that this portion of Dr. Botros's report is not subject to exclusion. *See TIC*, 2012 WL 2830867, at

\*9 ("When experts are substituted, the substitute expert's report and testimony is usually limited

to the subject matter and theories already espoused by the former expert."); *see also Lincoln Nat'l*

*Life Ins. Co.*, 2010 WL 3892860, at \*3 ("[T]he substitute expert should have the opportunity to express his own opinions in his own language after reviewing the evidence . . . ." (citation omitted) (internal quotation mark omitted)).

6.    **"Hermiston Power Generation plant data shows that in winter, the gas delivered to the gas turbine was as low as 55°F according to measurements by PacifiCorp. Such low fuel gas temperatures, will lead to liquid dropping out at the combustor nozzle tips (estimated up to 2 lb/minute) as the gas expands to approximately 170-200 psig combustor pressure."**

PacifiCorp contends that this opinion, contained on pages 4-5, 15-20, 35, and 40 of Dr. Botros's report, is absent from Dr. Mohitpour's report. I disagree. In his report, Dr. Mohitpour opines that, under transient upset conditions, the temperature of the gas could drop, which could lead to hydrocarbon dropout. Dr. Botros agrees that hydrocarbon dropout is a potential cause of the outages; however, Dr. Botros opines that, during the winter months, the fuel gas delivery temperature was as low as 55°F. At such a temperature, "the inlet condition at the combustion chamber crosses the dew point line and deeper into the two phase region . . . and HC liquid will be dropping out." Botros Report at 15. Thus, while Dr. Mohitpour discusses only hypothetical conditions under which hydrocarbon dropout was possible, Dr. Botros points to specific conditions that existed that would "lead to liquid dropping out." *Id.* at 5. Nevertheless, both experts reach the same conclusion—that is, that hydrocarbon dropout was possible and that it could be the cause of the outages. Thus, while Dr. Botros reaches this conclusion through a different analysis, he is not covering a new subject or positing a new theory to explain the outages. Accordingly, I find that this portion of Dr. Botros's report is not subject to exclusion. *See TIC*, 2012 WL 2830867, at \*9 ("When experts are substituted, the substitute expert's report and testimony is usually limited to the subject matter and theories already espoused by the former

expert."); *see also Lincoln Nat'l Life Ins. Co.*, 2010 WL 3892860, at *3 ("[T]he substitute expert

should have the opportunity to express his own opinions in his own language after reviewing the

evidence . . . ." (citation omitted) (internal quotation mark omitted)).

7.    **"The conditions and equipment used at 'three compressor stations on TransCanada pipeline Alberta system (NGTL) were examined as examples to determine the degree of preheating the fuel gas before delivery to the gas turbines that drive the gas compressors.'"**

PacifiCorp contends that this opinion, contained on pages 20-23 of Dr. Botros's report, is

absent from Dr. Mohitpour's report and is improper because it exceeds the scope of rebuttal. I

agree that Dr. Mohitpour's report makes no mention of equipment at other compressor stations

and, thus, the portion of Dr. Botros's report examining the equipment at other compressor

stations is outside the scope of Dr. Mohitpour's original report. Moreover, I agree that

PacifiCorp would be prejudiced if I were to allow Dr. Botros to testify on this subject. In its

resistance, PacifiCorp argues that "Dr. Botros provides an opinion regarding three TransCanada

turbines, but no documents reflecting the make, model, operation history, drawings, or other

pertinent information for these turbines have been provided to PacifiCorp. Thus, GTN seeks to

introduce not only additional theories, but also additional facts." PacifiCorp's Resistance, #475,

at 5 n.3. GTN offers no response. Allowing GTN to offer this testimony would require

PacifiCorp to investigate the equipment at these other compressor stations, which certainly poses

an undue burden in light of the fast-approaching trial date. Accordingly, I find it appropriate to

exclude this opinion.

///

///

8.      "Removal efficiency [for the Hermiston Plant's scrubber] is quite low for aerosols or
        mists which are the likely form for low concentrations of any liquid . . . since
        separation of this type of scrubber is based on cyclone effect (centrifugal
        separation), removal efficiency could suffer considerably at reduced flow.  That is, if
        the scrubber is slightly oversized, the consequence is low removal efficiency of any
        liquid droplets."

PacifiCorp contends that this opinion, contained on pages 26 through 34 of Dr. Botros's

report, is absent from Dr. Mohitpour's report and is improper because it exceeds the scope of

rebuttal.  I agree that this opinion is outside the scope of Dr. Mohitpour's report.  While Dr.

Mohitpour opines that PacifiCorp needed additional equipment—a coalescing filter and a gas

pre-heater—he does not suggest that PacifiCorp was using the wrong type or size of scrubber.

To the contrary, Dr. Mohitpour states that "regular cleaning of the scrubber . . . would have

helped avoid[] any failure situation," thereby suggesting that PacifiCorp's Peerless scrubber was

an appropriate type and size of scrubber.  Mohitpour Report at 12.  While PacifiCorp was on

notice that whether its scrubber was functioning properly was at issue in the case, there is no

indication that PacifiCorp knew that it also needed to defend the type and sizing of the scrubber

installed at its plant.  In its reply, GTN itself appears to acknowledge that the court could

conceivably consider this opinion to be new.  *See* GTN's Reply, #476, at 7 (noting that Dr.

Botros's opinion regarding "whether the scrubber was properly sized" could conceivably be

considered outside the scope of rebuttal).  Accordingly, I find it appropriate to exclude this

opinion.

9.      "Based on industry common practices in the design and operation of gas fired gas
        turbines, there is always a coalescing type filter (and not a cyclone type scrubber)
        right upstream of the fuel gas delivery system to the engine."

PacifiCorp contends that this opinion, contained on page 33 of Dr. Botros's report, is

absent from Dr. Mohitpour's report and is improper because it exceeds the scope of rebuttal. I agree, in part, that such opinion is absent from Dr. Mohitpour's report. As noted above, Dr. Botros's suggestion that PacifiCorp's cyclone-type scrubber was not the appropriate type of scrubber deviates from Dr. Mohitpour's report, which indirectly suggests that such a scrubber, if properly maintained, was suitable. Accordingly, I find it appropriate to exclude this opinion to the extent it concludes PacifiCorp's cyclone-type scrubber was not appropriate for PacifiCorp's plant. However, PacifiCorp cannot claim to be surprised by Dr. Botros's suggestion that PacifiCorp needed a coalescing filter. As GTN states in its reply, "[t]his has been an issue since early in the case." GTN's Reply, #476, at 5. Indeed, in his report, Dr. Mohitpour unequivocally states that PacifiCorp needed a coalescing filter: "Satisfactory operation (including abnormal situations) of a combined cycle Power Generation requires proper coalescing filtration . . . . Hermiston Generating Station lacked such facilities and close to the intake to the Generating units . . . ." Mohitpour Report at 21; *see also id.* at 4, 11. Thus, Dr. Botros is not prohibited from testifying that the Hermiston power plant needed a coalescing filter.

10.    **"The design of fuel gas system at Hermiston Power Generation should have included a gas pre-heater."**

PacifiCorp contends that this opinion, contained on pages 4-5 and 44 of Dr. Botros's report, is improper because it exceeds the scope of rebuttal. I disagree. Mr. Choquette opines that GTN delivered gas containing impurities that interfered with its "commercial utilization." Choquette Report at 12. Dr. Botros's opinion that PacifiCorp needed a gas pre-heater is a response to Choquette's report; that is, Dr. Botros opines that GTN delivered gas that could be commercially utilized but PacifiCorp lacked the industry-standard equipment to use it.

Moreover, in Dr. Asante's report, he notes:

> In the gas pipeline industry there are typically two ways of
> handling liquids that accompany the gas:
>
> 1)    **Remedial Measures:** This mainly requires the use of
>       facilities such as Scrubbers, Filter/separators, Coalescing
>       Filters, Slug catchers, Drips, etc., to arrest the liquids.
>       None of these remedial measures, however, has 100%
>       recovery efficiency.
>
> 2)    **Preventive Measures:** This requires altering operating
>       variables such as pressure and temperature to avoid liquid
>       drop out.  Compression is used to increase the pressure
>       while heaters are used to increase the temperature.

Asante Report at 9.  Dr. Botros responds to Dr. Asante's observation by noting that the Hermiston

plant did not have these preventive measures in place—it lacked a heater.  Accordingly, I find

that this portion of Dr. Botros's report is within the scope of rebuttal and, therefore, is not subject

to exclusion.

///

///

///

///

///

///

///

///

///

///

## CONCLUSION

For the reasons discussed above, GTN's motion for leave to amend its rebuttal expert disclosures and to disclose a new rebuttal expert (#468) is granted in part and denied in part. GTN is granted leave to designate Dr. Botros as a substitute rebuttal expert. However, those portions of Dr. Botros's report that advance new opinions or theories are excluded and Dr. Botros is prohibited from testifying regarding those subjects at trial.

Dated this 26th day of November, 2013.

Honorable Paul Papak
United States Magistrate Judge